KEITH M. KIUCHI 2735
American Savings Bank Tower
1001 Bishop Street, Suite 985
Honolulu, Hawaii 96813

Telephone: (808) 533-2230
Facsimile: (808) 533-4391
E-Mail: kkiuchi106@cs.com

*Attorney for Plaintiff*
*Gary Victor Dubin*

GARY VICTOR DUBIN
Harbor Court Office Tower
55 Merchant Street, Suite 3100
Honolulu, Hawaii 96813

Telephone: (808) 537-2300
Facsimile: (808) 523-7733
E-Mail: gdubin@dubinlaw.net

*Attorney for Client Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| GARY VICTOR DUBIN, doing business as the Dubin Law Offices; individually and on behalf of all Hawaii attorneys similarly situated, | Case No. _____ |
| | (Partial Class Action) |
| Attorney Plaintiff, | VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND FOR ACTUAL AND PUNITIVE CIVIL RIGHTS DAMAGES, DECLARING THE HAWAII ATTORNEY DISCIPLINARY SYSTEM AS |
| and | |
| CHRISTIE ADAMS; TORU AKEHI; GWEN ALEJO-HERRING; GLORIA ALMENDARES; JERIS YUKIO | (CAPTION CONTINUED ON NEXT PAGE) |

AMAZAKI; DEBRA ANAGARAN; )
DIRK APAO; MARGARET APAO; )
JERRY BADUA; JULIA BADUA; )
LIAO LUCY BAMBOO; MIA BAN; )
ROMAN BAPTISTE; CHARLES )
BASS; LAURIE BASS; AGRIPINO )
PASCUA BONILLA; RUTH ROJAS )
BONILLA; SHERILYN MAY ROJAS )
BONILLA; KANOA ROSS BRISTOL; )
DONNA BROOKS; DAVID R. )
BROWN; REYNALDO CABUDOL; )
CHRISTY CARRICO; PHINEAS )
CASADY; JOYCE CHANDLER; )
WILLIAM CHANDLER; JENNIFER )
CHAPMAN; LUIS C. CHAVEZ; )
STEPHEN CHEIKES;  MERVIN )
HALFRED NAEA CHING; LUCIA )
CHING; SUTAH CHIRAYUNON; )
SEUNG CHOI; BRETT )
CHRISTIANSEN; AH MEI CHUN; )
HUGH JOHN COFLIN; JANET )
COFLIN; RUSSEL COLE; PAUL )
COLLINS; WATOSHNA LYNN )
COMPTON; GEORGE COSTA; )
GREGORY CLYDE SOUZA )
CRAVALHO; TONI NOELANI )
CRAVALHO; ROGER CUNDALL; )
ERIC LEE DAVIES; WILLIAM )
DAVIS; VANDETTA DAVIS; )
YUKIKO HAYASHI DAY; PAIGE DE )
PONTE; FATIMA DUNCAN; )
CAROLINA CABUDOL EALA; )
EDWIN PAET EALA; DAVID )
WENDELL ELLIS; LORI LYNN )
ELLIS; JANICE ELLISON; SCOTT )
ELLISON; NELIE BANIAGA )
ESCALANTE; NORBERTO RAMELB )
ESCALANTE; ELENA FEDOROVA; )
AKIKO FERGERSTROM; JUSTIN )
FERGERSTROM; JOHN J. )

PROMULGATED AND AS
ENFORCED BY THE HAWAII
SUPREME COURT TO BE AN
UNLAWFUL DELEGATION OR
JUDICIAL USURPATION OF
HAWAII STATE LEGISLATIVE
POWER IN DIRECT VIOLATION OF
THE HAWAII SEPARATION OF
POWERS CONSTITUTIONAL
MANDATE AND IN DIRECT
VIOLATION OF THE FREE
SPEECH, EQUAL PROTECTION,
AND DUE PROCESS FAIR
HEARING REQUIREMENTS OF
THE FIRST AND FOURTEENTH
AMENDMENTS TO THE UNITED
STATES CONSTITUTION;
VERIFICATIONS; DEMAND FOR
TRIAL BY JURY; SUMMONS

(CAPTION CONTINUED ON NEXT PAGE)

2

FREEPARTNER III; LISA MARIE )
FREEPARTNER; MICHAEL J. )
FUCHS; IRENE SAJOR GANO; )
ROYD ALLEN GANO; EDNA )
GANTT; PAUL GANTT; LEAH )
GILLESPIE; ROBERT GILLESPIE; )
ELIZABETH GILLETTE; DAVID )
GOODWIN; MALIA GRACE; )
ANTONIO GRAFILO; NELIA )
GRAFILO; HOWARD GREENBERG; )
KENNETH HAGMANN; MICHAEL )
JON HAMMER; DARRYL HASHIDA; )
SEAN HAYWORTH; NICOLE )
FLORES HOSAKA; TOD HOSAKA; )
CHRISTIAN JENSEN; DAVID )
KAPLAN; DONALD KARLEEN; )
BEATA KARPUSIEWICZ; )
JAROSLAW KARPUSIEWICZ; )
YVONNE M. KEAHI; KEITH KIMI; )
OTELIAH KIND; KORY KLEIN; )
MARY KNUDSEN; RALPH )
KNUDSEN; ELEANA U. KOAKOU; )
LENORE LANNON; ROBERT )
LANNON; STEPHEN LAUDIG; )
MALLORY ASPILI LONGBOY; )
SHARI ARAKAWA LONGBOY; )
FRANK JAMES LYON; ERIC )
MADER; AMY KATHLEEN MAHER; )
MICHAEL CHARLES MAHER; )
GWEN MARCANTONIO; MARK )
MARCANTONIO; ARMAND )
MARIBOHO; DARLA MARIBOHO; )
JENNIFER MARTIN; MARYELLEN )
MARKLEY; LAURA MARQUES; )
CHANELLE LEOLA MATTOS; )
JOSEPH KEAOULA MATTOS; )
WILLIAM MCTHEWSON; EMILOU )
N.A. MIKAMI; RICKEY R. MIKAMI; )
TROY MIZUKAMI; JONNAVEN JO )
MONALIM; MISTY MARIE )

(CAPTION CONTINUED ON NEXT PAGE)

MONALIM; ROBERT-GAVIN            )
MOORE; TERESA MOORE;            )
THOMAS MORTON; TERRY LYNNE )
OHARA MOSELEY; YVONNE            )
NIELSEN; AILYN OUNYOUNG;         )
SAMRIT OUNYOUNG; DAVID L.       )
OWLES; LORI Y. OWLES; RAQUEL    )
PACHECO; JOHN PERREIRA; ROSE   )
PERREIRA; MICHAEL PIERCE;        )
MARIO PORTILLO; EBONI            )
PRENTICE; ROSARIO RAMOS;         )
LURLINE RAPOZA; MERRILLYN        )
M.J.L. RAPOZA; JOHN RIDDEL, JR.; )
JEANETTE ROSEHILL; MARCUS        )
ROSEHILL; RAY J. RUDDY;          )
MICHELE COLLEEN RUNDGREN;       )
TODD RUNDGREN; JO RUSSO;         )
KELLY KALANIKAPULAHA'OLE        )
SAMPAIO;  RICHARD MILIKONA       )
SAMPAIO, JR.; JOHN SAVAGE;       )
RONALD SCHRANZ; JOHN             )
SHIGEMURA; JASON SIEGFRIED;      )
MELEANA SMITH; JODY              )
SOLBACH; ELIZABETH SPECTOR;     )
DANIEL JOSEPH SPENCE; ELAINE    )
DAMLOA SPENCE; EILEEN            )
EVELYN STEPHENSON; CONNIE        )
SWIERSKI; DAVID SWIERSKI;        )
BONNIE SWINK; JACK SWINK;        )
EVELYN TAKENAKA; NADINE          )
TAMAYOSE; REID TAMAYOSE;         )
KARRI TESHIMA; CLOVER THEDE; )
DYLAN THEDE; LANA M.             )
TOLEAFOA; SAUMANI LOPI           )
TOLEAFOA; BRUCE ROBERT           )
TRAVIS; ELISE TRAVIS; DARREN     )
TSUCHIYA; LANCE TSUCHIYA;        )
MALIA OLIVAS TSUCHIYA;           )
ANTHONY TUCKER; GLADYS           )
TUPULUA; HEDY UDARBE;            )

(CAPTION CONTINUED ON NEXT PAGE)

4

RUSTICO UDARBE; VALERIE                   )
UYEDA; EDWARD VALLEJO; JON                )
VAN CLEAVE, M.D.; PATRICK                 )
VERHAGEN; STEPHEN WARD;                   )
DONOVAN WEBB; VALERIE                     )
WOODS; LERMA YAMASHITA;                   )
JACK YOUNG; and NANCY PATSY               )
YOUNG; individually and on behalf of      )
all clients of Hawaii attorneys similarly )
situated,                                 )
                                          )
               Client Plaintiffs,   )
                                          )
    vs.                                  )
                                          )
THE SUPREME COURT OF THE                  )
STATE OF HAWAII, in its legislative       )
rule-making capacity and in its judicial  )
capacity; THE HONORABLE MARK              )
E. RECKTENWALD, in his official           )
capacity while serving as Chief Justice   )
of the Supreme Court of the State of      )
Hawaii; THE HONORABLE PAULA               )
A. NAKAYAMA, in her official              )
capacity while serving as Associate       )
Justice of the Supreme Court of the       )
State of Hawaii; THE HONORABLE            )
SABRINA S. MCKENNA, in her                )
official capacity while serving as        )
Associate Justice of the Supreme Court    )
of the State of Hawaii; THE               )
HONORABLE MICHAEL D.                      )
WILSON, in his official capacity while    )
serving as Associate Justice of the       )
Supreme Court of the State of Hawaii;     )
and THE HONORABLE KATHERINE               )
S. LEONARD, in her official capacity      )
while serving as appointed substitute     )
Associate Justice of the Supreme Court    )    (CAPTION CONTINUED ON NEXT PAGE)
of the State of Hawaii,                   )

5

State Defendants, )

and )

THE OFFICE OF DISCIPLINARY )
COUNSEL OF THE HAWAII )
SUPREME COURT, in its individual )
capacity as a non-agency Special )
Master; THE DISCIPLINARY BOARD )
OF THE HAWAII SUPREME COURT, )
in its individual capacity as a non- )
agency Special Master; THE )
LAWYERS' FUND FOR CLIENT )
PROTECTION OF THE HAWAII )
SUPREME COURT, in its individual )
capacity as a non-agency Special )
Master; BRADLEY R. TAMM in his )
individual capacity while serving under )
color of law as both the Chief )
Disciplinary Counsel of the Office of )
Disciplinary Counsel of the Hawaii )
Supreme Court and the Fund )
Administrator of the Lawyers' Fund for )
Client Protection of the Hawaii Supreme )
Court; CLIFFORD L. NAKEA in his )
individual capacity while serving under )
color of law as Chairperson of the )
Disciplinary Board of the Hawaii )
Supreme Court; ROY F. HUGHES in )
his individual capacity while serving )
under color of law as a Hearing Officer )
of the Disciplinary Board of the Hawaii )
Supreme Court; CHARLENE M. )
NORRIS in her individual capacity )
while serving under color of law as )
Senior Disciplinary Counsel of the )
Office of Disciplinary Counsel of the )
Hawaii Supreme Court; and ANDREA )
R. SINK, in her individual capacity )

(CAPTION CONTINUED ON NEXT PAGE)

| | |
|---|---|
| while serving under color of law as an | ) |
| Investigator of the Office of | ) |
| Disciplinary Counsel of the Hawaii | ) |
| Supreme Court, | ) |
| | ) |
| Civil Rights Defendants | ) |
| _____ | ) |

**VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND FOR ACTUAL AND PUNITIVE CIVIL RIGHTS DAMAGES, DECLARING THE HAWAII ATTORNEY DISCIPLINARY SYSTEM AS PROMULGATED AND AS ENFORCED BY THE HAWAII SUPREME COURT TO BE AN UNLAWFUL DELEGATION OR JUDICIAL USURPATION OF HAWAII STATE LEGISLATIVE POWER IN DIRECT VIOLATION OF THE HAWAII SEPARATION OF POWERS CONSTITUTIONAL MANDATE AND IN DIRECT VIOLATION OF THE FREE SPEECH, EQUAL PROTECTION, AND DUE PROCESS FAIR HEARING REQUIREMENTS OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

## TABLE OF CONTENTS

*Introduction*…………………………………………………………..…………..10

**A. Jurisdiction and Venue**……………………………………...................11

    *Federal* Jurisdiction…………………………………………………...11
    *District Venue*…………………………………………………………11

**B. Identification of the Parties**…………………………………………12

    *Attorney Plaintiff*……………………………………..…………….....12
    *Client Plaintiffs*………………………………………………………..13
    *State Defendants*………………………………………………………14
    *Civil Rights Defendants*………………………………………………16

**C. Unequal Disciplinary Structures**……………………..…….....19

*Disciplinary Agencies Created by Hawaii State Legislature*………...19
*Disciplinary Nonagencies Created by Hawaii Supreme Court*……...23

**D. Dubin's Pre-Disbarment Law Practice**……………………….31

*Dubin Started First Hawaii Successful Foreclosure Defense*……….31
*Dubin's Unmatched Appellate Case Record*…………………….…...32
*Dubin's National Radio Talk Show*……………………………….38
*Dubin's Overwhelmingly Earned Public Support*……………….…...43

**E. Foreclosure Defense Attorneys Targeted**…………………….71

*The Challenges of Mortgage Securitization*…………………………71
*The ODC's Irresponsible Targeting of Dubin*………………….…...75

**F. All Allegations Against Dubin Proven False**………………..…...82

*First: The ODC Two-Prior-Discipline Claim Proven False*………...82
*Second: The DCCA False Certification Claim Proven False*……. …86
*Third: The Kern False Accounting Claim Proven False*……………96
*Fourth: The Kern Noncooperation Claim Proven False*……………99
*Fifth: The Andia Misappropriation Claim Proven False*………….....109
*Sixth: The Andia Nondisclosure Claim Proven False*……………132
*Seventh: The Andia Overcharging Claim Proven False*………….......133
*Eighth: The Andia Excessive Billing Rate Claim Proven False*…...136

**G. Dubin's Clients Damaged Post-Disbarment**………………….137

**H. Claims for Relief**……………………………………..…….…750

*Count One: Individual/Class Action for Declaratory Judgment
by Attorney Dubin Against all State Defendants for Their
Unconstitutional Exercise of Legislative Authority*……………..150

*Count Two: Individual/Class Action for Declaratory Judgment
by Client Plaintiffs Against all State Defendants for Their
Unconstitutional Exercise of Legislative Authority*……………..153

*Count Three: Individual/Class Action for Declaratory Judgment by Attorney Dubin Against all State Defendants for Their Unconstitutional Violation of Equal Protection*……………………..156

*Count Four: Individual/Class Action for Declaratory Judgment by Client Plaintiffs Against all State Defendants for Their Unconstitutional Violation of Equal Protection*………………… 160

*Count Five: Individual/Class Action for Declaratory Judgment by Attorney Dubin Against all State Defendants for Their Unconstitutional Violation of Due Process*………………………163

*Count Six: Individual/Class Action for Declaratory Judgment by Client Plaintiffs Against all State Defendants for Their Unconstitutional Violation of Due Process*………………………166

*Count Seven: Individual/Class Action for Actual and Punitive Damages by Attorney Dubin Against all Civil Rights Defendants for Their Unconstitutional Violation of Due Process*…………….169

*Count Eight: Individual/Class Action for Actual and Punitive Damages by Client Plaintiffs Against all Civil Rights Defendants for Their Unconstitutional Violation of Due Process*…………….171

*Count Nine: Individual Action for Actual and Punitive Damages by Attorney Dubin Against all Civil Rights Defendants for Their Unconstitutional Violation of Freedom of Speech*…………174

**I. Prayer for Relief**………………………………………………..176

***Verification by Gary Victor Dubin***…………………………………179

***Verification by John D. Waihee III***……………………………...180

***Demand for Trial by Jury***………………………………………...  --

***Summons***……………………………………………………….. --

*Introduction*

COME NOW each and all the above-identified Plaintiffs, Attorney GARY VICTOR DUBIN ("Dubin") and nearly 200 of his Clients as Plaintiffs ("Clients"), and hereby allege and aver the following claims as stated herein against each and all of the above-identified Defendants listed below:

a.   THE SUPREME COURT OF THE STATE OF HAWAII ("Hawaii Supreme Court"), THE HONORABLE MARK E. RECKTENWALD ("Recktenwald"), THE HONORABLE PAULA A. NAKAYAMA ("Nakayama"), THE HONORABLE SABRINA S. MCKENNA ("McKenna"); THE HONORABLE MICHAEL D. WILSON ("Wilson"), and THE HONORABLE KATHRINE S. LEONARD ("Leonard") (collectively "State Defendants"), each and all sued in their official capacities, and

b.   THE OFFICE OF DISCIPLINARY COUNSEL ("ODC"), THE DISCIPLINARY BOARD OF THE HAWAII SUPREME COURT ("Board"), THE LAWYERS FUND FOR CLIENT PROTECTION ("Fund"), BRADLEY R. TAMM ("Tamm"), THE HONORABLE CLIFFORD L. NAKEA (RET.) ("Nakea"), ROY F. HUGHES ("Hughes"), CHARLENE M. NORRIS ("Norris"), and ANDREA R. SINK ("Sink") (collectively "Civil Rights Defendants"), each and all sued in their individual capacities.

## A. JURISDICTION AND VENUE

### *Federal Jurisdiction*

1. This lawsuit is brought directly pursuant to the free speech, life, liberty, and property protections against discrimination and abuse by State action prohibited by the Constitution of the United States of America, enforceable under the Supremacy Clause set forth in Article VI, and this District Court's statutory, supplemental, and ancillary jurisdiction.

2. This lawsuit seeks redress specifically for violations of the civil right to free speech and to a fair trial as protected by the Federal Freedom of Speech, Equal Protection and Due Process Guaranties of the First and Fourteenth Amendments, and as implemented by civil rights legislation enacted by the United States Congress and as interpreted by the decisions of the United States Supreme Court.

3. This lawsuit also seeks to enforce the Obligation of Contracts pursuant to the Contract Clause of Article I, Section 10 of the Constitution of the United States of America, and actual and punitive damages.

### *District Venue*

4. Venue in this District is proper as prescribed by 28 U.S.C. Section 1391, as all of the acts and violations and harm complained of herein occurred, and are continuing to occur, and are threatened to continue to occur, in and throughout the

State of Hawaii against Dubin and his Clients and against all Members of the Hawaii State Bar and their clients unless redressed.

## B. IDENTIFICATION OF THE PARTIES

### *Attorney Plaintiff*

5. Dubin, age 82, a resident of the City and County of Honolulu at all times referenced herein, graduated *summa cum laude* with an A.B. degree in 1960 from the University of Southern California, earning his J.D. degree *cum laude* from New York University School of Law as a Root-Tilden Scholar in 1963.

6. Dubin fulfilled all the educational and character requirements of the State of Hawaii and studied for and passed the Hawaii State Bar Examination and became a Member of the Hawaii State Bar in 1982, and remains to this day a Member in Good Standing of the California State Bar since 1964, and remains to this day a Member in Good Standing of the Bar of the Ninth Circuit Court of Appeals since 1964, and remains to this day a Member in Good Standing of the Bar of the United States Supreme Court since 1976, and has never been found to have violated any ethical duty to a client or to anyone else in any of those jurisdictions, except for the recent Hawaii disciplinary events described and challenged hereinbelow.

7. Dubin's heretofore unblemished ethical record has extended to his early law teaching career at Stanford, Berkeley, Denver, Harvard, USC, UCLA, Texas, and at the RAND Corporation, and found to be of good character being admitted *pro*

*hac vice* in state and federal courts in Arizona, Indiana, Nevada, New Jersey, New York, Oregon, Tennessee, and Washington State, again without ever being disciplined for any ethical violation involving a client or anyone else in any of those other venues at any of those times either.

8. Dubin's diverse legal career has also included employment with the law firm of Covington and Burling in Washington, D.C., his assisting U. S. Supreme Court Associate Justice William O. Douglas, his heading a nationwide Criminal Justice Courts Task Force appointed to that position by President Lyndon B. Johnson developing National Standards and Goals,  his arguing before the International Court of Arbitration in the Hague, and as a national radio talk show host for eight years featuring foreclosure defense issues -- again without ever having been disciplined in any of those other venues for any ethical violation involving a client or anyone else..

### *Client Plaintiffs*

9. Not only has Dubin as alleged  below been unfairly harmed by the acts and conduct complained of herein, but his clients have also been similarly grievously harmed as also explained below, having their cases and their legal rights and their lives disrupted and their investment in Dubin's legal services threatened and/or lost by the unconstitutional and abusive manner in which he has been treated.

10. And as a result, hundreds of Dubin's clients, above-named, having standing as victims also to complain, have therefore volunteered to join him in this

lawsuit collectively and individually as Client Plaintiffs, being separately denied unfairly and prejudicially his continuing and/or his future legal services in state courts in Hawaii and his legal advice, as well as subjecting Dubin to pending reciprocal discipline in other jurisdictions.

11. The present captioned list of Dubin's Clients hereinabove represents approximately one-half of his clients having already directly experienced said disruption and loss, and it is expected that more will seek leave to join this lawsuit on behalf of Dubin and on behalf of themselves once the harmful acts and conduct challenged below become also known to and experienced by them as well.

### *State Defendants*

12. The Hawaii Supreme Court is the highest court in the State of Hawaii. Recktenwald, Nakayama, McKenna, and Wilson have been Members of the Hawaii Supreme Court at all material times hereto, and Leonard, appointed by reason of a 2020 vacancy on said Court, has served with them at all times material hereto as described below, and continues to serve with them, specially to decide Dubin's disciplinary case and after disbarment proceedings as described below.

13. The State of Hawaii is the 50th State to join the Union and therefore the least experienced with the licensing and regulation of occupations and professions, including that of attorneys.

14. The Hawaii State Constitution within its Article VI which establishes the Hawaii Judiciary makes no direct mention of the Hawaii Supreme Court having occupational licensing powers, nor disciplinary licensing jurisdiction, nor revocation authority over the legal profession outside of its courtrooms or any other professions or occupations in the State of Hawaii, leaving processional and occupational licensing exclusively to the Hawaii State Executive to regulate through the creation of administrative agencies pursuant to Article V, Section 6 of the State Hawaii Constitution, upon their origination and enactment into law by the State Legislature.

15. The existence of the ODC, the existence of the Board, and the existence of the Fund are not prescribed nor mentioned within the Hawaii State Constitution nor listed in any enactment of the Hawaii State Legislature in Hawaii State Statutes, and when their standing and capacity has been challenged, they have been self-servingly described instead by the Hawaii Supreme Court in various of its attorney disciplinary related Orders as its own "creatures" akin to "special masters," that Court denying that they have any capacity whatsoever even as state "agencies."

16. The role of the ODC is advertised to the general public as the disciplinary investigative arm of the Hawaii Supreme Court, the role of the Board is advertised to the general public as the disciplinary recommending arm of the Hawaii Supreme Court, claiming its "mission is to maintain the integrity of the legal profession and protect the public from professional misconduct by attorneys," and the Fund is

advertised to the general public as the compensatory restitution arm of the Hawaii Supreme Court when client monies are found to have been misappropriated by Hawaii attorneys and lost, which "creatures" are funded by Hawaii State Annual Bar dues in an amount set by the Hawaii Supreme Court without appropriation or funding by the Hawaii State Legislature.

17. The staff of the ODC, including Tamm, Norris, and Sink, and the Members of the Board, including Nakea, and its Board Hearing Officers, including Hughes, and the staff and Trustees of the Fund, including Tamm, are all exclusively subject to appointment, retention, and removal by the Hawaii Supreme Court, with all three sharing in material part the same staff, the same secretary, the same offices, with their employees bearing duplicitous and officially commingled job titles.

### *Civil Rights Defendants*

18. Three of the "Civil Rights Defendants," the ODC, the Board, and the Fund, have no recognized legal capacity, with all of their members, including their staff, liable for damages caused knowingly individually and as a group for federal civil rights violations waged as described below under color of state law, and are not funded by the State but by the compulsory dues collected annually from Hawaii attorneys.

19. Tamm, sued in his individual capacity, is a Hawaii attorney who was appointed to head the ODC staff during Dubin's disciplinary proceedings described

below, while also heading the Fund at the same time, and who was disqualified on ethical grounds by Order of the Hawaii Supreme Court at the start of its consideration of Dubin's disbarment, who nevertheless continued to participate in *ex parte* direct and/or indirect communications and hidden discussions with Nakea and others, and in unethical, false briefing(s) with and while serving the Hawaii Supreme Court in both capacities as described below.

20. Nakea, sued in his individual capacity, is a retired Hawaii Fifth Circuit Court Judge and presently an inactive Hawaii attorney, volunteering to be an unpaid Chairperson of the Board, presiding over Dubin's disciplinary proceedings described below, who knew that a vocal member of the Board, an unpaid volunteer practicing attorney, had a conflict of interest, yet nevertheless actively hid that information from the other Members of the Board and from Dubin while that Member participated in the Board's disciplinary deliberations with that disqualified Member's active participation.

21. Hughes, sued in his individual capacity, is a practicing Hawaii attorney volunteering to be an unpaid Hearing Officer, appointed nonrandomly by the Board Chairperson, Nakea, from a list derived from ODC's solicitations and recommendations, to preside over all of Dubin's disciplinary hearings identified and described below, who nevertheless had a conflict of interest opposed to Dubin requiring disclosure and his recusal, being and still being an opposing party of Dubin

in appellate and trial proceedings. However, Hughes failed to decline the appointment or to disclose that conflict of interest to the Board Chairperson upon his appointment as Dubin's Hearing Officer, whose conflict of interest was objected to by Dubin to Hughes and to the Board, yet ignored by Hughes, Nakea, and the Board.

22. Norris, sued in her individual capacity, is a practicing Hawaii attorney who was appointed to be an ODC Special Assistant Disciplinary Counsel (and then promoted after the unethical conduct described below to be a Senior Disciplinary Counsel), initially hired for the express purpose of representing the Board in prosecuting the Board's disciplinary recommendation of disbarring Dubin before the Hawaii Supreme Court, and who also drafted the Board's disbarment charges filed against Dubin with the Hawaii Supreme Court, although she had a conflict of interest having earlier represented Dubin, as a result of which the Hawaii Supreme Court ordered her and the entire ODC staff, including Tamm, disqualified on ethical grounds from any participation in Dubin's disbarment proceedings before it and any such discipline matters involving Dubin, yet nevertheless said Court left standing her drafted charges against Dubin before it.

23. Sink, sued in her individual capacity, is a self-described "paralegal" who was hired as an investigator by the ODC and who was nonrandomly assigned to all of Dubin's disciplinary cases described below while she personally had a conflict of interest involving her divorced husband, yet despite Dubin's objection submitted to

her and to Nakea in writing requesting that Dubin's matters therefore be transferred to another ODC investigator of which there were several at that early time without any known conflicts of interest, Dubin's objection was simply ignored, neither investigated nor acted upon, and instead Sink remained exclusively assigned to Dubin, even taking away for herself to investigate a few matters otherwise initially assigned to other investigators after Dubin complained about her conflict of interest.

24. In committing each or all of the acts and omissions described below, Tamm, Nakea, Hughes, Norris, and Sink each singularly harmed Dubin and his Clients under color of state law in violation of Hawaii's applicable Rules of Professional Conduct and Hawaii's Revised Code of Judicial Conduct and Hawaii's Supreme Court Rules, and Hawaii's Rules of the Disciplinary Board of the Hawaii Supreme Court, as identified below, committing said unethical and other wrongful acts proscribed within one or more or all of those Rules promulgated by the Hawaii Supreme Court.

## D. UNEQUAL DISCIPLINARY STRUCTURES

### *Disciplinary Agencies Created by Hawaii State Legislature*

25. Every State today regulates, by licensing requirements, various occupational and professional practitioners in its jurisdiction, as do many of its cities and counties, pursuant to their undeniable police power to protect the general welfare, on behalf of its citizens and its residents.

26. The Hawaii State Legislature in Title 25 of its Revised Statutes entitled "Professions and Occupations," for example, pursuant to its "Uniform Professional and Vocational Licensing Act" provides for the granting and the revocation of licenses in specific detail for professions and occupations in the State of Hawaii, ranging from barbers to physicians or others, entrusting delegated subsidiary rule-making authority to specialized licensing boards and commissions under various administrative controls.

27. Included therein, specifically named for example, are acupuncture practitioners, athletic trainers, alarm businesses, motor vehicle businesses, barbering, beauty culture, boxing contests, mixed martial arts contests, cable television systems, telecommunications, cemeteries and funeral homes, chiropractic, collection agencies, contractors, debt adjusting, unaccredited degree granting institutions, dental hygienists, dentistry, dietitians, dental service organizations, electricians, plumbers, electrologists, elevator mechanics, escrow depositories, hearing aid dealers and fitters, health care professionals, marriage and family therapists, genetic counselors, massage, medicine and surgery, mental health counselors, mortgage brokers and solicitors, real estate and collection agencies, mortgage servicers, naturopathic medical practitioners, notaries public, nurses, nurse aids, nursing homes, opticians, pest control operators, pharmacists and pharmacies, physical therapists, port pilots, private investigators and guards, podiatrists,

engineers, architects, surveyors, landscape architects, psychologists, public accountants, radiologists, real estate appraisers, real estate brokers and salespersons, social workers, speech pathologists and audiologists, travel agencies, activity providers, undertakers, embalmers, funeral directors, and veterinarians.

28. This exclusively delegated licensing authority is derived from Article V, Section 6, of the Hawaii State Constitution mandating that "all executive and administrative offices, departments and instrumentalities of the state government and their respective powers and duties shall be allocated by law among and within not more than twenty principal departments in such a manner as to group the same according to common purposes and related functions."

29. The Hawaii State Legislature, pursuant to its exclusive constitutional licensing authority, in Section 9 of Chapter 26 of the Hawaii Revised Statutes created the Department of Commerce and Consumer Affairs ("DCCA"), establishing a structure "to supervise the conduct of . . . professions," governing professional and occupational licensing including revocation, "to protect the interests of consumers," *inter alia*, consisting of investigative and enforcement officers, hearing officers, voluntary specialized advisory committees, and disciplinary boards.

30. The Hawaii State Legislature, pursuant to its exclusive constitutional licensing authority, in Chapter 91 of the Hawaii Revised Statutes enacted an Administrative Procedures Act establishing Rules governing the conduct, *inter alia*,

of professional disciplinary proceedings embodying due process and other constitutional safeguards protecting the rights of professionals facing DCCA sanctions including license revocation.

31. Those Administrative Rules provide numerous due process protections, specifically for those facing professional and occupational license revocation, including the following thirteen safeguards:

a. the DCCA requires that every complaint be sworn to, subject to criminal penalty;

b. the DCCA's delegated licensing revocation standards for hearing notice purposes are required to be clear and unambiguous;

c. the DCCA must represent the general public, not the complainants who must certify all of their allegations under oath;

d. each grievance received if facially accepted must be separately investigated and separately tried;

e. licensing sanctions if sought by the DCCA must be identified in each discipline petition for hearing notice purposes;

f. the DCCA investigators and hearing officers must be full time DCCA employees, and professionally trained;

g. all DCCA investigators, hearing officers, and boards must be free of any conflicts of interest with those investigated and with those tried;

h. any *ex parte* contacts between and among DCCA investigators, hearing officers, boards, and reviewing DCCA officials are prohibited in theory and practice;

i. licensees must be allowed at hearings to present evidence, call witnesses, and cross-exam witnesses;

j. clear, convincing, trustworthy, transparent, and published findings are required to be appointed by the DCCA;

k. specialized, specially appointed advisory and mediational peer groups for each case are required by the DCCA;

l. DCCA disciplinary proceedings must be kept strictly confidential unless and until a license is revoked;

m. nondiscretionary, separate and independent appellate review of DCCA actions is preserved in both Hawaii Circuit Courts and in the Hawaii Intermediate Court of Appeals for each case, a dual level merits review.

### Attorney Disciplinary Nonagencies Created by Hawaii Supreme Court

32. Pursuant to the express mandatory provisions of the Hawaii State Constitution, Article III, Section 1, all State legislative power "shall" be exclusively vested in the Hawaii State Legislature.

33. The Hawaii State Legislature in turn, in the exercise of its exclusive rule making authority over the licensing and disciplining including license revocation of occupations and professions in the State of Hawaii, *supra*, by state statute has

delegated that responsibility exclusively to the DCCA, which administrative regulatory statutes however are silent with respect to the regulation of the legal profession in the State of Hawaii, while covering the licensing and disciplining of physicians, for instance, but not Members of the mandatory Hawaii State Bar.

34. Article VI, Section 7 of the Hawaii State Constitution does expressly grant the Hawaii Supreme Court the power to promulgate rules and regulations for all courts "relating to process, practice, procedure and appeals," but that authority is expressly restricted in the same sentence of the Hawaii State Constitution to "in all civil and criminal cases" and thus only in Hawaii courts.

35. And while of course no one questions the authority of the Hawaii Supreme Court or any state supreme court to regulate practice and procedures within state courts, or for that matter any state agency having that right regarding its practice and procedures, that authority does not include authority over the entire legal profession unless provided for in state constitutions or delegated by legislative enactments, as most Members of the Hawaii Bar perform legal services in the State totally outside of court as counselors and draftspersons and not as court litigators.

36. The Hawaii State Legislature both before and after Statehood pursuant to, for example, Section 602-11 of the Hawaii Revised Statutes, expressly cautiously recognizes that that limited rule making authority of the Hawaii Supreme Court was restricted to regulating the functioning *within state courts*, limited to procedural

administration, not substantive rights, such as the right to counsel of one's choice: "Such rules shall not abridge, enlarge, or modify the substantive rights of any litigant, nor the jurisdiction of any of the courts, nor affect any statute of limitations."

37. The Hawaii Supreme Court following Statehood nevertheless began to promulgate rules on its own without legislative authority and approval, regulating the entire Hawaii legal profession, including licensing and disciplining of attorneys for conduct in and outside of court, with apparently no Member of the State Legislature aware of such overreaching or its Members feeling relatively powerless to object despite the Hawaii Supreme Court's usurpation of its State Constitutional authority.

38. The Hawaii Supreme Court, in announcing such broad substantive rule making powers, usurped legislative authority and overrode the provisions of the Hawaii State Constitution by claiming self-servingly for the first time that it has "the ultimate authority . . . to oversee and control the privilege of the practice of law in this state," quoting from its self-announced Rule 1.1 of the Rules of the Hawaii Supreme Court, entitled "Authority of Hawaii Supreme Court," often referred to as the "inherent power" doctrine, some sort of self-proclaimed autocratic divine right.

39. Yet American history and practice shows that state supreme courts have never had such exclusive "inherent" or "ultimate" authority over the legal profession in the United States, which has instead, even to this day, been disputed by, if not

shared with, state legislatures, state bar associations, the American Bar Association, law schools, and even the general public itself claiming the right to hire whoever it wants to, to advocate its rights in court.

40. In colonial times there was no formal licensing or disciplining of attorneys, looked upon more like tradesmen, merchants and businessmen, with no formal legal training, controlled merely by reputation and performance in a free marketplace, and the constitutional rule making provisions similar to that found in the Hawaii State Constitution, *supra*, were interpreted according to historians as limited to rules regulating the "practice" of courts as regards forms, the operation and effect of processes, and the mode and time of proceedings.

41. By the middle of the 19th century there were over 100 law schools in the United States who began to acquire a prominent role in attorney licensing, which led to the establishment of educational licensing standards eventually controlling admission to the legal profession throughout the United States.

42. Local bar associations before 1870 were mostly social groups, when in 1870 the Association of the Bar of the City of New York also emerged to advocate for attorney regulation, and over 1,100 bar associations were created by 1930, called upon to organize, discipline, and professionalize lawyers, controlling licensing by overseeing requirements regarding academic curriculum, library facilities and

availability of full time faculty, while at the same time protecting lawyers from being falsely criticized.

43. In all of American history there has never been any ultimate or inherent authority of state supreme courts to control and to regulate the legal profession, but only relatively recently has there been a competitive effort by bar associations, law schools, state legislatures, state supreme courts, and the general public to exclusively or to jointly do so.

44. The licensing and disciplinary models in use today vary from state to state, from the enactment and control by state legislatures such as in California, to the other, Hawaii extreme, the complete judicial regulation of the legal profession by the Supreme Court in the State of Hawaii pursuant to its self-described, mistaken "inherent authority," *See*, *In re Trask*, 46 Haw. 404, 415, 380 P.2d 751, 758 (1963) ("the primary power in that respect rests with the court and not the legislature").

45. In doing so, the Hawaii Supreme Court has established, through its own rule making, a licensing and disciplinary scheme for attorneys that on the surface closely mirrors that of the DCCA, *supra*, promulgating professional rules and creating a prosecutorial ODC, a peer review oversight Board, and as a final step a process of judicial review exclusively however by itself, giving the appearance of fairness, impartiality, and adherence to mandatory due process protections.

46. While ultimately it is less important who controls an attorney regulatory scheme than how fair and impartial it is, not only is Hawaii's two separate yet supposed equal systems for licensing and disciplining attorneys, versus licensing and disciplining other professionals such as physicians, neither explained nor attempted anywhere to be justified, but *in practice* treats attorneys prejudicially differently in violation of an attorney's fundamental constitutional rights, when compared, for example, to the thirteen separate disciplinary standards, *supra*, controlling DCCA revocation proceedings below:

a. the ODC does not require complaints against attorneys to be signed under oath and even accepts anonymous complaints;

b. the ODC's licensing revocation standards are vague and ambiguous and admittedly even often contradictory;

c. the ODC's partisan mindset is that it represents complainants as its clients, and not the general public;

d. the ODC lumps several complaints from different complainants together for investigation and for trial at one and the same time merely for its own convenience.;

e. the ODC prejudicially hides many of its intended, harsher, recommended sanctions by not specifically including them in its petitions for discipline;

f. the ODC's employees have high turnover rates and are additionally untrained, as are its *ad hoc* hearing officers, which prejudices targeted attorneys;

g. the ODC and the Board allow investigators and hearing officers to have conflicts of interest despite Hawaii Supreme Court and Board Rules to the contrary;

h. the ODC, the Board, and the Hawaii Supreme Court allow *ex parte* communications to take place between and among them despite contrary Rules;

i. the ODC and the Board deny targeted attorneys their right to call witnesses and their cross-examination rights;

j. the ODC, the Board, and the Hawaii Supreme Court ignore requirements for trustworthy, unadopted findings;

k. the ODC and the Board do not provide specialized peer group mediation and oversight or advisory boards;

l. the ODC, the Board, and the Hawaii Supreme Court treat petition confidentiality as discretionary;

m. there is no nondiscretionary appellate review of original disbarment orders entered by the Hawaii Supreme Court, denying targeted attorneys review rights provided to every other profession and every occupation in the State of Hawaii whose license is terminated, or who receives any discipline whatsoever.

47. The separate, unequal nature of the two disciplinary structures becomes evident when comparing the differences in chart form as follows, which differences open the door to widespread abuses by the ODC and the Board, all of which occurred

in Dubin's disciplinary case, illustrating the scope and the seriousness of the constitutional challenges set forth in this lawsuit.

| | Practice and Procedure Governing Handling of Disciplinary Complaints | DCCA Policies Governing Non-Attorney Disciplinary Complaints | ODC/Board Policies Governing Attorney Disciplinary Complaints |
|---|---|---|---|
| a | Complainant Oath | **YES**. Certification under oath is mandatory or a complaint is not accepted. | **NO**. Every complaint is docketed and no oath as to truthfulness is required. |
| b | Clear Standards | **YES**. The legislature enacts clear standards and the DCCA supplements them. | **NO**. There are no clear standards. HRPC are often contradictory and unclear. |
| c | Public Seen as Client | **YES**. The DCCA stresses that its client is the public and not the complainant. | **NO**. ODC investigators take complainant's side of case rehearsing them. |
| d | Separate Hearings | **YES**. DCCA tries each complaint on its own merits without mixing of evidence. | **NO**. Unrelated cases are tried together, cross-contaminating the evidence. |
| e | Sanctions in the Petition | **YES**. DCCA sets forth the exact, maximum discipline sought in each case. | **NO**. Only minimum sanctions are disclosed in petitions for discipline. |
| f | Full Time Training | **YES**. DCCA employs full time professional staff, periodically trained. | **NO**. High turnover of ODC staff and untrained hearing officers ad hoc volunteers. |
| g | No Conflicts of Interest | **YES**. DCCA has strict anti-conflict of interest rules which are strictly enforced. | **NO**. Despite anti-conflict of interest rules, they are not adhered to by ODC, Board. |
| h | No Ex Parte Contacts | **YES**. Ex parte contacts prohibited among staff, Board, hearing officer, etc. | **NO**. In practice ex parte contacts are encouraged among staff, Board, Court. |
| i | Evidentiary Rights | **YES**. Full evidentiary rights are respected, to call and to cross-examine all witnesses. | **NO**. Hearing officers in practice allowed to restrict evidence in sole discretion. |
| j | Complete Findings | **YES**. DCCA requires complete findings of fact and conclusions of law. | **NO**. Hearing officers, Board may adopt verbatim ODC partisan findings. |
| k | Peer Review | **YES**. DCCA empanels specialists to serve as peer review Board for each case.. | **NO**. No attempt is made to involve peer attorneys practicing in same field. |
| l | Records Confidential | **YES**. All proceeding are confidential if and until any discipline is imposed. | **NO**. Petition shortly becomes public unless Board Chairperson extends. |

| m | **Appellate Review** | **YES**. Any discipline can be appealed to the Circuit Court, and then to the ICA. | **NO**. A nondiscretionary appeal is not permitted after Supreme Court discipline. |
|---|---|---|---|

## E. DUBIN'S PRE-DISBARMENT LAW PRACTICE

### *Dubin Started Hawaii's First Successful Foreclosure Defense*

48. Dubin moved his national law practice in 1982 to Hawaii, becoming a Member of the Hawaii State Bar, and began what no other attorney in Hawaii was successful in doing, starting primarily a successful foreclosure defense practice.

49. Previously, foreclosure judges in Hawaii had merely asked homeowners and commercial owners in foreclosure if they were behind in making monthly payments, permitting few if any meaningful foreclosure defenses.

50. In the years that followed, Dubin created the first successful foreclosure defense practice in Hawaii and in the process became very controversial. Hawaii is a small State and the Hawaii legal community even smaller; there are, for instance, more judges in the State of California than there are litigators in the entire State of Hawaii, less than a few hundred appearing regularly in our civil courts.

51. Moreover, Dubin started his law practice in Hawaii as an outsider, not having attended prestigious local schools nor having family members who were or who had been Hawaii attorneys or Hawaii judges, otherwise often important credentials in small legal communities, with Hawaii being no exception to the rule.

52. There have been at least three major reasons why Dubin became controversial: his appellate practice, his radio show, and his increasing public support, each of which for different reasons some thought threatening.

### *Dubin's Unmatched Appellate Case Record*

53. *First,* initially Hawaii trial judges, both state and federal, were largely unable to free themselves from feeling bound to prior local appellate Neanderthal precedent inherited from the Mainland, no matter how outdated, that unfairly prejudiced homeowners in foreclosure cases, which finally led Dubin to seek the help of both state and federal appellate courts, including the United States Supreme Court, and in the past twenty years, in addition to prevailing in scores of nonjudicial foreclosure cases, and in both trials and hearings for his clients, Dubin began to achieve a remarkable, unprecedented nearly one hundred appellate victories for homeowners, some legal issues taking him more than ten years and numerous failed appellate attempts before finally changing early case precedents, with many other of his appeals still awaiting decision, most of which consumer appeals involved foreclosure defenses, set forth below for example in reverse chronological order, by case name, case citation, and year decided:

a. 2021 -- *Cambridge Management, Inc,. v. Nicole Jadan*, Hawaii Supreme Court, SCWC-17-0000176 (February 16, 2021) (decided in his client's favor after Dubin's disbarment); *Wilmington Savings Fund Society vs. Ryan*, Hawaii Supreme

Court,  --- P.3d ----, 2021 WL 128554 (January 14, 2021) (decided in his client's favor after Dubin's Disbarment).

b. 2020 -- *PennyMac Corp. v. Godinez*, 148 Hawai'i 323, 474 P.3d 264 (2020); *U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust v. Verhagen*, 148 Hawai'i 322, 473 P.3d 783, 2020 WL 5948127 (App. 2020); *U.S. Bank National Association as Trustee for CSMC Mortgage Loan Trust 2006-7 v. Compton*, 148 Hawai'i 275, 472 P.3d 42, 2020 WL 5587685 (App. 2020); *Sakal v. Association of Apartment Owners of Hawaiian Monarch*, 148 Hawai'i 1, 466 P.3d 399 (2020); *HawaiiUSA Federal Credit Union v. Monalim*, 147 Hawai'i 33, 464 P.3d 821 (2020); *U.S. Bank National Association, as Trustee for Harborview Mortgage Loan Trust 2005-16 v. Thede*, 146 Hawai'i 235, 460 P.3d 340, 2020 WL 1695145 (App. 2020); *U.S. Bank National Association as Trustee for SARM 05-19XS v. Thede*, 146 Hawai'i 235, 460 P.3d 340, 2020 WL 1686161 (App. 2020); *Hawaii National Bank v. Chirayunon*, 146 Hawai'i 118, 456 P.3d 191, 2020 WL 433368 (App. 2020); *Rapoza v. Hawaiian Homes Commission State of Hawaii*; 3CC-18-1-0000296 (Third Circuit 2020).

c. 2019 -- *Matter of Trust Agreement Dated June 6, 1974, as Amended*, 145 Hawai'i 300, 452 P.3d 297 (2019); *Wells Fargo Bank, N.A. v. Pierce*, 144 Hawai'i 436, 443 P.3d 128, 2019 WL 1254039 (App. 2019); *Wilmington Savings Fund Societies, FSB v. Akehi*, 144 Hawai'i 430, 433 P.3d 122, 2019 WL 2559486 (App.

2019); *PL III, LLC v. Puu Lani Ranch Corp*, 144 Hawai'i 385, 442 P.3d 448, 2109 WL 2281269 (App. 2019); *U.S. Bank National Association v. Jung Hoon Kim*, 144 Hawai'i 383, 442 P.3d 446, 2019 WL 2205680 (App. 2019); *Bank of Hawai'i v. Marques*, 144 Hawai'i 379, 442 P.3d 442, 2019 WL 2082546 (App. 2019); *Association of Apartment Owners of Terrazza/Cortebella/Las Brisas/Tiburon v. Lopez*, 144 Haw. 5, 433 P.3d 662, 2019 Haw. App. LEXIS 34, 2019 WL 336919 (2019); *Wells Fargo, N.A. v. Cole*, 144 Haw. 6, 433 P.3d 444, 2019 Haw. App. LEXIS 35, 2019 WL 351213 (2019); *In re Davis*, 144 Haw. 65, 435 P.3d 1079, 2019 Haw. App. LEXIS 84, 2019 WL 967783 (2019); *Bayview Loan Servicing, LLC v. Woods*, 2019 Haw. App. LEXIS 122, 2019 WL 1254039 (2019); *In re Trustees under the Will of Estate of Campbell*, 2019 Haw. App. LEXIS 132, 2019 WL 1292282 (2019).

d. 2018 -- *Federal National Mortgage Association v. Amaral*, 142 Hawai'i 356, 418 P.3d 1212, 2018 WL 2425855 (2019); *Wells Fargo Bank M.A. v. Behrendt*, 142 Haw. 37, 414 P.3d 89 (2018); *Bank of New York Mellon v. St John*, CAAP-17-0000436 (App. 2018); *U.S. Bank Trust v. Schranz*, CAAP-17-0000519 (App. 2018); *HSBC Bank USA v. Bartolome*, 2018 Haw. App. LEXIS 285 (2018); *U.S. Bank v. Kotak*, 2018 Haw. App. 264 (2018); *Wilmington Savings Fund Society v. Riopta*, 2018 Haw. App. LEXIS 270, 2018 WL 2928182 (2018); *U.S. Bank v. Swink*, 2018 Haw. App. LEXIS 236, 2018 WL 2714851 (2018); *JPMorgan Chase Bank v.*

*Rundgren*, 2018 Haw. App. LEXIS 228 (2018); *MTGLQ Investors v. Brennan*, 2018

Haw. App. LEXIS 226, 2018 WL 2439384 (2018); *Fannie Mae v. Amaral*, 2018

Haw. App. LEXIS 224 (2018); *Blue Mountain Homes v. Page*, 142 Haw. 354, 2018

Haw. App. LEXIS 210 (2018); *HSBC Bank USA v. Moore*, 2018 Haw. App. LEXIS

156, 142 Haw. 210, 416 P.3d 931 (2018); *U.S. Bank v. Fergerstrom*, 2018 Haw.

App. LEXIS 180, 2018 WL 2110079 (2018); *Bayview Loan Servicing v. Pierce*,

2018 Haw. App. LEXIS 162 (2018); *Bank of Hawaii v. Kimi*, CAAP-17-0000712

(2018); *Sakal v. Association of Apartment Owners of Hawaiian Monarch*, 143 Haw.

219, 426 P.3d 443, 2018 Haw. App. LEXIS 356, 2018 WL 3583580 (2018);

*PennyMac Corp. v. Travis*, 143 Haw. 329, 430 P.3d 890, 2018 Haw. App. LEXIS

466, 2018 WL 6074792 (2018); *Association of Apartment Owners of Century Center

v. Young Jin An*, 143 Haw. 523, 432 P.3d 2, 2018 LEXIS Haw. App. 501, 2018 WL

6716879 (2018); *Ramirez v. Aurora Loan Servicing*, 143 Haw. 524, 432 P.3d 3, 2018

LEXIS Haw. App. LEXIS 507, 2018 WL 6804180 (2018); *Bank of New York Mellon

v. West*, 143 Haw. 525, 432 P.3d 4, 2018 Haw. App. LEXIS 509, 2018 WL 6818681

(2018).

  e. 2017 -- *Bank of America, N.A. v. Miyake*, 139 Hawai'i 426, 391 P.3d 1248,

2016 WL 3548347 (2017); *U.S. Bank v. Mattos*, 140 Haw. 26, 398 P.3d 615 (2017);

*HSBC Bank USA v. Yamashita*, 2017 Haw. App. LEXIS 482 (2017); *Deutsche Bank

National Trust Company v. Garcia*, 2017 Haw. App. LEXIS 322, 2017 WL 2829398

(2017); *Bank of America v. Yeh*, CAAP-16-0000128 (2017); *U.S. Bank v. Wright*, 2017 Haw. App. LEXIS 270, 2017 WL 2735634 (2017).

f. 2016 -- *Association of Apartment Owners of Century Center v. Young Ja An*, 139 Haw. 278, 389 P.3d 115 (2016); *Mount v. Apao*, 139 Haw. 167, 384 P.3d 1268 (4 Consolidated Separate Appeals 2016); *Federal Home Loan Mortgage Corporation v. Moore*, 2016 Haw. App. LEXIS 514 (2016); *First Horizon Home Loans v. Galiza*, 138 Haw. 142, 377 P.3d 1060 (App. 2016); *Bank of Hawaii v. Mostoufi*, 138 Haw. 141, 377 P.3d 1059 (App. 2016); *Association of Apartment Owners of Century Center v. Nomura*, 138 Haw. 141, 377 P.3d 1059 (App. 2016); *Association of Apartment Owners of Century Center v. Thai Hawaiian Massage, Inc,.*, 138 Haw. 140, 377 P.3d 1058 (App. 2016); *Bank of New York Mellon v. Lizarraga*, 138 Haw. 51, 375 P.3d 1289 (App. 2016); *Association of Apartment Owners of Century Center Inc,. v. Nomura*, 138 Haw. 51, 375 P.3d 1289 (App. 2016); *JPMorgan Chase Bank v. Benner*, 137 Haw. 326, 372 P.3d 358 (App. 2016); *Association of Apartment Owners of Century Center Inc,. v. Young Jin An*, 137 Haw. 204, 366 P.3d 1083 (App. 2016); *U.S. Bank v. Smith*, 2015 Haw. App. LEXIS 617 (2016).

g. 2015 -- *Takushi v BAC Home Loans Servicing, LP*, 2015 U.S. LEXIS 634, 135 S. Ct. 1152 (U.S. Supreme Court); *Santiago v. Tanaka*, 137 Haw. 137, 366 P.3d 612 (2015); *Mount v. Apao*, 136 Haw. 365, 361 P.3d 1268 (App. 2015); *Hawaii*

36

*National Bank v. Chirayunon*, 136 Haw. 372, 362 P.3d 805 (App. 2015).

h. 2014 -- *Lee v. Mortgage Electronic Registration Systems, Inc,. (In re Mortgage Electronic Registration Systems (MERS))*, 555 Fed. Appx. 661, 2014 U.S. App. LEXIS 2019, 2014 WL 351358 (2014); *Krog v. Koahou*, 133 Haw. 186, 324 P.3d 996 (2014); *Pappas v. Duran*, 134 Haw. 179, 339 P.3d 533 (App. 2014); *Tanaka v. Santiago*, 133 Haw. 510, 331 P.3d 488 (App. 2014); *American Savings Bank v. Riddel*, 134 Haw. 114; 334 P.3d 777 (App. 2014); *Federal National Mortgage Association v. Brown*, 133 Haw. 452, 330 P.3d 390 (App. 2014).

i. 2013 -- *Scroggin v. Mandarin Oriental Management (USA)*, 129 Haw. 106, 294 P.3d 1092 (2013); *Karpeles Manuscript Library v. Duarte*, 129 Haw. 90, 294 P.3d 1076 (App. 2013).

j. 2012 -- *Isobe v. Sakatani*, 2012 Haw. App. LEXIS 587, 2012 WL 1951332 (2012); *Wells Fargo Bank v. Markley*, 126 Haw. 265, 269 P.3d 800 (App. 2012).

k. 2011 -- *Low v. Minichino*, 126 Haw. 99, 267 P.3d 683 (App. 2011); *U.S. Bank v. Salvacion*, 2011 Haw. App. LEXIS 387 (2011).

l. 2009 -- *State v. Bereday*, 2009 Haw. App. LEXIS 246 (2009); *Doe v. Doe*, 120 Haw. 149, 202 P.3d 610 (App. 2009).

m. 2008 -- *Bank of Hawaii v. Shinn*, 120 Haw. 1, 200 P.3d 370 (2008); *Moyle v. Y & Y Hyup Shin Corporation*, 118 Haw. 385, 191 P. 3d 1062, *amended* 2008 Haw. LEXIS 205 (2008); *Western Financial Bank v. Raras*, 2008 Haw. App. LEXIS

313 (2008).

n. 2006 -- *808 Development, LLC v. Murakami*, 111 Haw. 349 (2006); *Mohr v. Ing*, 2006 Haw. App. LEXIS 180 (2006).

o. 2005 -- *KNG Corporation v. Kim*, 107 Haw. 73, 110 P. 397 (2005).

p. 2003 -- *Dunster v. Dunster*, 2003 Haw. App. LEXIS 46 (2003).

q. 2002 -- *Mellon Mortgage Company v. Bumanglag*, 2002 Haw. App. LEXIS 21 (2002); *Associates Financial Services Company of Hawaii v. Richardson*, 99 Haw. 446, 56 P.3d 748 (App. 2002); *Norwest Mortgage v. De Rego*, 2002 Haw. App. LEXIS 9 (2002).

r. 2001 -- *GE Capital Hawai'i v. Yonenaka*, 96 Haw. 32, 25 P.3d 807 (App. 2001).

s. 2000 -- *Hawaii Community Federal Credit Union v. Keka*, 94 Haw. 213, 11 P.3d 1 (2000); *GE Capital Hawai'i v. Barlan*, 2000 Haw. App. LEXIS 113 (2000).

t. 1999 -- *GE Capital Hawai'i v. Miguel*, 92 Haw. 236, 990 P.2d 134 (App. 1999).

### *Dubin's National Radio Talk Show*

54. *Second*, Dubin after appearing weekly for years on another one-half hour local talk show, thereafter started his own, self-financed, one-hour weekly radio talk show on Hawaii's local A.M. all Island news station KHVH, the first broadcast of its kind, which became syndicated throughout the United States on iHeart Radio,

eventually building a local as well as a national audience, including some judges and some state legislators, overall several hundred thousand listeners weekly, where Dubin, with co-host former Hawaii Governor John D. Waihee III, have discussed various foreclosure defense issues, recent judicial decisions, and needed improvements in the legal system, some of which weekly topics with guests addressed highly controversial subjects, but always in a thoroughly professional manner, a few of which shows during his full, eight years of broadcasts prior to his disbarment included, for instance, the following illustrative featured topics, all eight years of which combined over 400 hours of past weekly broadcasts can be heard and their absolute professionalism verified, archived at www.foreclosurehour.com:

a. 2020 -- E.g., "*The Abolition of Unjust Enrichment in the Awarding of Foreclosure Deficiency Judgments, the Emerging Majority Rule*" (May); "*The Hidden Secrets Behind Legal Reasoning That Every Homeowner Needs To Know To Survive Foreclosure*" (March); "*The United States Supreme Court and the Current Foreclosure Crisis: The Causes and Effects of a Ten-Year Record of Institutional Neglect*" (February); "*Do Some Judges Discriminate Against Homeowners In Foreclosure And If So What Can Be Done About It?*" (January).

b. 2019 -- E.g., " *'Larry the Banker' Is Back: Exclusive Tell-All Interview With Retired Big Five Bank Executive*" (December); "*What Every Homeowners Needs To Know About When And How A Lender's Attempted 'Acceleration' and*

*Subsequent Unilateral 'Deceleration' Of Mortgage Balances Affects The Running Of The Statute Of Limitations And Hence Foreclosure Defense*" (October); "*What Every Homeowner Needs To Know About The Myths And Realities Of Custodians Of Records In Defending Against Foreclosure*" (July); "*What Every Homeowner Needs To Know About The Myths And Realities Of Foreclosure Auctions As A Defense To Forfeiture in Foreclosure*" (July); "*The 68 Mostly Under Used Affirmative Defenses That Can Save Your Home From Foreclosure And You And Your Family From Eviction*" (June); "*Is a Homeowner's Appeal Moot Upon the Sale of Foreclosed Property?*" (May); "*The 20 Most Overlooked Foreclosure Defenses*" (March).

c. 2018 -- E.g., "*Myths and Realities That Every Homeowner Needs To Know About Truth-In-Lending Act (TILA) Rescissions As A Defense To Foreclosure*" (December); "*How To Draft Discovery Requests That Will Defeat Foreclosure*" (September); "*Ten Strategies for Defeating Foreclosure by Objecting to the Admissibility of Business Records as an Exception to the Hearsay Rule*" (August); "*How To Disprove Standing of Pretender Lenders in Foreclosure Proceedings by Offensively Weaponizing Your Discovery Even if Appearing Pro Se*" (July); "*Understanding Hawaii's 25 New Foreclosure Standing Requirements*" (July); "*Does a Different Statute of Limitations Apply to the Enforcement of Mortgages than to the Enforcement of Notes?*" (May); "*Congratulations, You Defeated Plaintiff's*

*Motion for Summary Judgment, But Do You Know The Ten Things You Need To Do Next?"* (April); *"Ten Urgently Needed Structural Reforms of the American Foreclosure System Completely Out of Service"* (February).

d. 2017 -- E.g., *"What Every Homeowner Needs To Know To Emotionally Survive Foreclosure"* (November); *"What Every Homeowner Threatened With Foreclosure Needs To Know About the Advantages and Disadvantages of Bankruptcy"* (August); *"10 Ways Courts Could Easily Reduce Otherwise Increasing Residential Foreclosure Case Backlogs by More Than 95% While Protecting Homeowners at the Same Time -- Are Any Judges Listening?"* (July); *"10 Easy Ways To Lose a Judicial Foreclosure Case: The Most Common Mistakes Made Defending Against Foreclosure"* (June); *"The Rule Ritual, Neil Gorsuch, and the Case of the Frozen Truck Driver -- Its Significance for the Future of Foreclosure Defense"* (March); *"How Fannie Mae and Freddie Mac Were Used To Steal Public Pension Funds"* (February); *"Ten Things That Every Foreclosure Judge Needs To Know"* (January).

e. 2016 -- E.g., *"Special Checklist of Twenty Proven Ways of Bulldozing Through a Foreclosing Mortgagee's Dismissal and Summary Judgment Firewalls"* (November); *"Securities Fraud; In Search of the Holy Grail of Foreclosure Defense"* (July); *"The Notice of Default And Right To Cure -- How To Use This Most Overlooked Foreclosure Defense To Defeat Summary Judgment And Win At Trial"*

(July); "*What Every Homeowner Needs To Know About Loan Modifications*" (June); "*How to Use a Forensic Audit in Your Defense*" (February); "*How To Use The Rules of Evidence As Your Defense*" (February).

f. 2015 -- E.g., "*What Every Homeowner Needs To Know About Foreclosure Defense Attorneys: Why They Remain An Endangered Species And What If Anything Can Be Done About It*" (December); "*What Every Homeowner Needs To Know About Surviving In Foreclosure Court*" (November); "*What Every Homeowner Needs To Know About Force-Placed Insurance*" (October); "*Ten Hidden Secrets of Securitized Trusts They Desperately Do Not Want You or Your Judge To Know*" (August); "*25 Ways in Which Foreclosure Attorneys Are Knowingly Committing Fraud On Our State and Federal Courts*" (June); "*Exposing The Top Ten Worst Foreclosure Frauds Of This Century*" (May); "*A 28-Count Indictment Against the Majority of America's Foreclosure Judges*" (March); "*What Every Homeowner Needs To Know About Robo Notaries*" (March); "*Exclusive Tell-All Interview with Bank of America Robo Whistle Blower*" (March); "*20 Winning Ways To Defeat Promissory Notes In Foreclosure Proceedings*" (February).

g. 2014 -- E.g., "*Exclusive Tell-All Interview With Retired Big Five Bank Executive*" (December); "*What Every Homeowner Needs To Know About Deficiency Judgments*" (November); "*Ways of Defeating Foreclosure Summary Judgments*" (November); "*What Every Homeowner Needs To Know About Appellate Judges*"

(October); "*What Every Homeowner Needs To Know About Foreclosure Judges*" (September); "*What the Government does not want you to know about its 17 billion dollar settlement with the Bank of America*" (August); "*Exposing the Mainland Mortgage Mafia*" (August); "*Deadbeats Are Not The Problem: The Legal System Is*" (July); "*Piercing the Securitized Veil*" (May); "*1,000 and One Ways To Defeat Foreclosures by Securitized Trusts*" (March); "*The Advantages of Public vs. Private Banks*" (February); "*Special Robo-Signer Exclusive Exposé*" (January).

h. 2013 -- E.g., "*Most Significant 2013 Foreclosure News Events and Awards*" (December); "*No Foreclosure Is Hopeless: Your Note Is Paid Off*" (November); "*Securitization Issues, Foreclosure and Bankruptcy*" (October); "*Understanding the History and Functions of MERS*" (September).

### *Dubin's Overwhelmingly Earned Public Support*

55. *Third*, as a result of his increasing trial and appellate victories pertaining to cases on all Islands and his national *pro hac vice* practice in other jurisdictions (including Canada) now embarrassingly *pro hac vice* appearances all shut down as a result of his recent disbarment, Dubin became one of the leading foreclosure defense attorneys in North America and the Hawaii Judiciary rightfully became considered to be one of the most knowledgeable and respected in the entire United States, which generated a flood of unsolicited testimonials probably never before received by any attorney in this State or elsewhere in such volume and with such

praise, only some of which, due to space limitations, can be quoted below to counter the ODC smear, all differing widely from the angry obituaries that might be expected for a disbarred attorney, while dwarfing by comparison the miniscule and disproven, falsely contrived allegations which dishonestly caused Dubin's disbarment:

a. *"When I was diagnosed with advanced stage cancer, I wasn't able to work to pay my mortgage. I tried to do the right thing and sell my house, but just before closing, my big mainland mortgage company added on more than $140,000 in unfair fees and penalties, making the house impossible to sell. My buyers were angry, I was sick and almost out of money, and the mortgage company was foreclosing, which would mean losing the life savings I had invested in my house. I honestly did not know what to do. Gary Dubin and his team took my case, fearlessly fought one of the largest mortgage companies in the country and won. This stopped the foreclosure proceedings and saved the beautiful old house I love so much and had spent years restoring. It was the most Incredible thing I have ever seen. Gary Dubin and his team are my heroes."*

b. *"Mr. Gary Dubin is the best lawyer specialist in foreclosure in the State of Hawaii. Do not lose your money and your precious time. The only lawyer who can save your house is Mr. Gary Dubin in Honolulu, Hawaii. He has the knowledge, experience, 24-hour/7-days/week availability for his clients."*

c. *"The tenacity of Dubin Law Offices is second to none. I highly recommend the team of Dubin Law Offices to represent your interests. They are highly professional and very proficient."*

d. *"Mr. Dubin and staff took on my foreclosure case in Honolulu and handled it with outstanding legal expertise and come through with a fantastic settlement in my favor."*

e. *"I live in Washington State and listen to your show. It's great and has helped me to understand what's really going on."*

f. *"Mahalo for so much you and your team does! I have forwarded your show and website to other fraud-closure fighters especially in CA and in other States."*

g. *"The corruption which our home lending institutions in this country have been able to arm themselves with is criminal! The system has been manipulated over the years by the lenders themselves and have in essence written their own laws for their own benefit and to the demise on the American dream. I have myself lived through a long, drawn out foreclosure process and have now a head of grey hair to prove I have "been there". This was some of the most humiliating and stressful times of my life where I lived in fear from day to day, answering my doorbell to large, scary looking men in black suites who would threaten me as to the consequences of my not adhering to their eviction notices, which were places publicity in the front of my home, where I had been living for some 20 years. The primitive tactics which*

*were used were terrifying to say the least, my wife would break down into tears as she would overhear the men at the door as they addressed me with the threats. The emotions carried down to my 6-year-old daughter. It was a horrible experience and wish it upon nobody. As the "Man of the House", I felt degraded and was made to feel undeserving to be living in my own home! Never a million years would I have ever dreamed of such a nightmare. I had no clue as to how this system worked when it worked when it worked against me. I had always paid my bills on time and had a perfect credit score for my entire career. I have a college education, 46 years old at the time, self-employed for 20 plus years and consider myself to be above average in many ways. The home lending institutions we are dealing with in our country are cutthroat and relentless. Before I knew it, the banks had processed a non-judicial foreclosure on my home, and I was told to get out of my home immediately or even more severe consequences would occur. Documents were then sent to my home by way of special delivery stating that I was no longer on title to my home. It showed that my lender had sold my home to another bank at a private auction, which later we found out was the same bank under a different name. The feeling reminded me of the humility and the pain I went through as a young boy in high school. I was robbed of my lunch money at recess, had my pants torn down to my knees and was severely beaten by three boys, all twice my size, then left on the ground which a broken nose and two broken ribs, unconscious and in a puddle of blood and too scared to name*

*the assailants. It was because I had hit this bottom that I called upon my business lawyer and friend, Sid. Sid recommended that I contact Lawyer Gary Victor Dubin. Ever since that day, things slowly turned around for me. I consider myself to be one of the lucky ones and Gary was able to find many discrepancies in the way my loan was originally presented to me. Breaches in commission payments to various brokers during my refinancing processes and "Truth in Lending" issues were also named in my suit against Countrywide Home Loans. Only because of my Lawyer and a fair Judge and due process as it should be, I still living in my home today with a new 30-year loan modified through our battled in court with a workable outcome and an interest rate of 3%. My advice to anybody in a situation would be to not waste any time as I had done but hire yourself a good lawyer immediately. I am in no way advertising for Gary Dubin but would have to say that he is positively the absolute best in all of Hawaii. If not for Gary, I do not know where I would be today. All I do know is that myself and my two girls are very thankful. We thank Gary for saving our home and my dignity."*

h.  *"Mr. Dubin is a wonderful caring attorney that was able to make the mortgage company admit they did wrongful acts during my lawsuit against them. Mr. Dubin is always been agreeable to answering all my questions and I would use him in the future. He has kept me informed in new laws and events that affect my case."*

i. *"Gary Dubin helped us with an action against Bank of America when everyone said it was either too late or impossible to win this case against the bank. For Gary, it was neither too late or impossible as he won in our favor and helped us keep our home. Our only regret was not using Gary Dubin from the beginning, without a doubt, he is brilliant and the only choice for someone who needs legal help!"*

j. *"Mr. Dubin has protected my family's $20,000,000 in real estate assets in Honolulu since the mid-1980s. He is an outstanding attorney and leading specialist in real estate litigation nationally. I recommend him highly. He and his law firm do an outstanding job no matter how large or how small the amount at issue."*

k. *"You have been a godsend game changer for us. We were in deep dark black hole, – which you have managed to pull us out off. I do not know if any other attorney could have accomplished for us what you have. As I have mentioned to you many times, our case was the first lawsuit that I have been involved with personally (I hope it is the last). Knowing what I know now – I wish that I had known about you from the start – when we first got involved with the lawsuit, we would not have had this legal mess. The prior attorneys that we hired did not do a very good job for us, but you have turned things about for us, when no one else gave us a change. You are like the quarterback that enters the game in the fourth quarter with our team behind 21 to nothing. It is now close to the 2-minute warning. We are behind 21 to*

*14 and on the opponents 10-yard line and driving for the tying touchdown. Thank God, that you entered our lives!"*

l. *"I am almost every day, listen to your wonderful radio. Love the program, the work of leading, music, interesting guest. All for class!"*

m. *"Dubin Law Offices has been there for us during a very difficult time and has been helping us negotiate multiple loan modifications. Without their support and guidance, we would have lost our house years ago. They have always been supportive of us and have had our best interest in mind. We're very grateful that there are people like Gary Dubin and his Associates."*

n. *"You can imagine my horror and disbelief bank in 2000 when I contacted my primary lender, Bank of America in an attempt to re-finance my property after having just reduced my debt ratio by 50% with a $444,000 loan re-payment from the sale of my Los Angeles, CA property, only to find that its subsidiary. BAC Home Loans had DOUBLED the mortgage payment on my Hawaiian home without even informing me and based its claims on a number of fraudulent points of business including: 1. A factious Escrow Account deficit; 2. Forced Placed Hurricane Insurance (on a property that already had Hurricane Ins.) via a B of A – owned insurance provided; and 3. Constant and relentless telephone harassment as many as 3-times a day, and as early as 4:00 A.M. regarding this account. Attorney Gary Victor Dubin and his staff at Dubin Law Offices, took up the gauntlet and*

*championed my cause with the end result being the defeat of Bank of America, BAC Home Loans, et al. in the Hilo Courts December 12th, 2015."*

o. *"You are a magician. How many times, just with me, have you pulled a rabbit out of the hat? Granted some of your other clients may not feel as grateful as I do, but they have not given you as many and as challenging a cascade of opportunities for you to show your ledge domains as I have! So much of this reminds me of why I did not remain a lawyer. Watching you, as I did another terrific lawyer in my late 20's, I felt I needed to find a career that I could excel at as much and love more than just a career, just as he did and as you do now. I succeeded, but just not for as long a run as you have had. When I see the one dimensionality of the NY lawyers I have used and their fear and timidness, besides frightening me, it makes me doubly grateful for your relentlessness and out of the box thinking, as well as the decades of experience you have had waging these kinds of wars. I also love that you love the little guy against the usually corrupt system. I am hoping that I help you have new and just law in Hawaii, in the dreaded foreclosure field and that you get the deserved credit. I know there's no guarantees in litigation, but I would have been hung and quartered by now with any other lawyer."*

p. *"Thank you for all you're doing to blaze a new trail of evolution and resolution!"*

q. *"Again, I thank you tremendously for everything you and your offices provided us in trying to save our home over the last 7 years. It is an absolute blessing where we are going on our new adventure."*

r. *"We are so grateful to you and your firm for all the help you've given us the HOPE and safety that you have bestowed to us in a very trying difficult time, it's unmeasurable. We think of the hundreds of people you have saved from a life of ruin and we smile. You must know you are loved, and your brain "admired". But most of all, we are grateful for your protection and humor during this long period. Thanks again for all you've done and for all you continue to do for our family."*

s. *"I have watched you perform on both sides of litigation; you are a special litigator with a "never say die attitude". Sometimes, I wonder if our judicial system is not tilted towards the politically connected, big money and large law firms. You help to level the playing field."*

t. *"Gary was personable, patient, knowledgeable, and helpful to me as his client. My foreclosure was a complete mess, the mortgage was 8 years delinquent and the commissioner (unbeknownst to me) had accepted an offer that the court confirmed, when I found Gary. So, I brought him a mess. I did not know what to do. I did not think it could be saved, but through Gary's creativeness and strategy (That I still do not fully understand) I was able to resolve my foreclosure status and maintain control of the property. Thank you for working miracles for me and my*

family! I felt as though my case was especially challenging but Gary saved it. I searched long and hard for the right attorney to help me, without success. I was embarrassed about my situation but am grateful that I asked around and found some friends that recommended Gary to me. I heartily recommend him to any homeowner, wishing to exercise their rights and pursue all legal remedies to keep their homes. Gary is the best! He's a Warrior with a soft spot for homeowners."

u. "I have been following your show for about the last six months. I really appreciate the information you are discussion in regard to foreclosure."

v. "Thanks for your great work on your radio show! It's great listening to your show to see how Wall St. and Washington have corrupted our judicial system."

w. "I have been in the Real Estate Development & Brokerage business in Hawaii since 1971. Approximately 20 years ago, I had a client of mine in trouble with a bank that was not living up to the agreements in made with my clients. I had heard the name Gary Dubin around for defending people like mine in disputes with their banks, so I asked my attorney about this and he replied "Gary Dubin, you mean the patron Saint of Debtors in Possession. Since that time, I have used Gary and referred him to countless clients, friends and colleagues who have needed help from time to time and Mr. Dubin always comes through and meets his objectives. I have only the highest regards for Gary and highly recommend him both as an attorney and a friend."

x. *"I am writing to congratulate you on your excellent radio program and the way you presented the facts and insights. I am amazed at the level of your foreclosure insight, professionalism, and the way you tackle the diverse array of issues, especially those dealing with the theft of homes by the financial mafia – "Too Big to Prosecute."*

y. *"I am a client of the Dubin Law Offices, which I value considerably. Mr. Dubin spend quality time with me in identifying the problems I faced and the solutions to which I could choose in which to strategically first the abuse and fraud that was imposed on me through a wall street mortgage of which I had no agreement or knowledge of its working and severe shortcoming in the years, past even until now. Mr. Dubin had a great passion to save people from this kind of fraud and he got my confidence. He studies the problem, knows the courts and all the trappings of the Mortgage Industry. I highly recommend his firm. And feel safe in choosing them. Do not do this on your own. You need a qualified firm to represent you."*

z. *"I live in South Kona, Hawaii and absolutely LOVE your show and applaud what you are doing on the air to educate the world about the banks' criminal behavior!!!! It's about time!"*

aa. *"In January 2010, my wife and I met with Gary Dubin to discuss our case. My wife and I had already contacted two other attorneys to help us. The first one did not even bother to get back to us and the second took our money and disappeared*

*later to have his license to practice suspended. We heard about Gary from a friend and decided to try again. Gary Dubin met with us and right away put our minds at rest. Gary is a true professional with a heart for his clients. Gary has helped to keep us in our home now for 7 years while still fighting out case. Thank you, Gary, and all of your staff and Associates."*

bb. *"My first appearance in Civil Court Foreclosure was of my Condo. The dreadful divorce preceded, involving five divorce lawyers to defend me from wife who left for Japan and never returned for 17 years to Hawaii. There were only credit card bills to pay. Ex-wife tried to liquidate the business I had and any hope of saving my business property. I went to Foreclosure Court Pro-se, the judge passed final judgment on the Foreclosure Case that morning. I sought legal defense and retained Dubin Law Offices. Gary Dubin consulted me; his legal team represented me at another hearing in court for the business I have. Given time to present a case against the loan from an illegal trust who made the loan. Without Dubin Law Offices, I had less that a 17% chance to keep my business property. My case is now before the appeal court and have a good chance to win the appeal. I highly recommend Dubin Law Offices for foreclosure defense. They never give up on your case."*

cc. *"THANK YOU!! Hardly seems powerful enough to express my IMMENSE GRATITUDE for ALL you have accomplished. I am so grateful for your*

representation which is so experienced and knowledgeable in the law. It takes brilliance to wade through and correctly argue for the rule of the law."

dd. *"Gary, I just wanted to thank you on behalf of the Imi Pono Foundation and all of the men and women that you've helped representing us, you don't realize how many people you have helped. I hope we can continue to help further. We are trying to expand our operations to help more homeless."*

ee. *"I can't thank you enough for the burden you have taken from all our hearts. I am so very grateful that you called me. Forgive me for equating lawyers with great white sharks. Bottom line! You have our eternal gratitude."*

ff. *"Love your efforts and info. Thank you for what you do."*

gg. *"Mr. Dubin and his staff at Dubin Law Office are true American Patriots. Far too many homeowners have been laid to waste by unscrupulous institutions. Unsuspecting homeowners find themselves unwitting victims of well-oiled and finely tuned attacks leaving them financially and emotionally exhausted. Dubin Law can make sense of your situation and put it into a format the court will understand. There are so many abuses, each more heinous than the last, that the homeowner inevitably wastes their precious two minutes of court time going off on a tangent. The homeowner thinks the court speaks English, and it sounds like English, but in fact it is a language all to itself. Emotional appeals to fairness and to justice means nothing. The well-funded institutions, literally stealing homes,*

know the language of court.  Further, these institutions organize and educate their legal representatives to further fine tune their ability to crush their opponents.  Unfortunately, their opponent is you, and your home is their prize. Mr. Dubin goes beyond simply representing a single homeowner in court.  He reaches out to educate homeowners and their attorneys. Legal concepts are making it through to some of the judges too.  Listen to his efforts on the Foreclosure Hour broadcasts. Mr. Dubin stands for truth, liberty, and the pursuit of happiness for homeowners.  The legal system is a tool.  Banks, loan servicers, and debt collectors have been using our court systems to fraudulently steal homes for too long.  Join the fight and you too can be a true American patriot."

hh. *"You are an amazing advocate for homeowners and bucking a judicial system. Thank you from the depths of my soul for what you are doing."*

ii. *"I just want to make sure you understand how your work on our behalf has made a profound difference on many people's life. Thank for going this distance, for thinking hard about it, applying your acumen, taking your precious time to present a worthy case, for flying to the court, working on crazy deadlines, dealing with bizarre verdicts – such a stressful life."*

jj. *"Congratulations! You are awesome! Keep up the fight! This does help. Listening to your show right now on the mainland on iHeart Radio. Mahalo!"*

kk. *"Never before have I witnessed an attorney with so much heart and feeling for a client trying to save their home. In a seemingly hopeless situation, you give hope with solid law and the determination to fight a corrupt antiquated system that offers the homeowner little relief or justice. You are relentless in your pursuit to help the little guy. The world would be a better place with more attorneys like you looking out for the homeowner's best interest and fighting big banks that perpetually perpetrate fraud on the courts and fraud on the public. Thank you for your great service. You are worth more than you charge."*

ll. *"Thank you for giving others and I hope to keep our homes!! My next run will be for Congress. Foreclosures will be a major issue I take on."*

mm. *"All my pro se attempts to get the Courts to follow the law have been ignored! Thanks again for all you do and have been doing. You are an honest attorney and a real modern-day hero in my opinion!"*

nn. *"I cannot express the hole that my family was in and through Gary Dubin and his law firm, we came out of that dark hole!! His expertise is worth every penny spent! My family home was a victim of fraudulent foreclosure and I found Dubin at the right time! Our case took some time, but patience is a virtue and we won!! I love Mr. Dubin and his staff. My family will be forever grateful for Dubin Law Offices."*

oo. *"Dubin Law firm has been a God send to me and my wife. We had been scammed by two other Attorneys in a battle to try to save our home from our corrupt*

*mortgage company who wrote us an illegal home loan. Gary and his team not only restored our faith in Attorneys they gave us peace of mind in this long fight and are still standing strong by our sides. We thank God for Gary and his team. They are truly professionals."*

pp. *"Mahalo to you and John for another great show today! I have learned so much from your presentations and guests and remain Incredibly grateful for your continued "state of the art" representation. Thanks again for all the great work!"*

qq. *"Thank you for your help and hard work, God Bless your team. With much Aloha!"*

rr. *"On behalf of Imi Pono Foundation and its Founder, Mr. Jody A. Solbach, we would like to express our gratitude for your unwavering assistance in helping us in retaining these properties. Your assistance has led to altering the lives of several hundred men and women on their road to recovery; many of those would be homeless without our facilities. Thank you and much appreciation from Imi Pono Foundation and its members."*

ss. *"You and your staff have worked hard over time and we appreciate everything you have done and still continue to push for a positive ending. We have read all of the similar cases that you have provided and now have a clearer understanding of what other homeowners like us have felt hopeless and worried about losing their homes. It goes to show that caring attorneys like you exist for*

people like us. We thank you for the bottom of our hearts for all your efforts and hard work. We look forward for the results of the coming court hearing later this month."

tt. *"I am learning so much from your radio show. Once again, I can't thank you enough for all your work and educating the public."*

uu. *"I really appreciate your time AND the education, you're absolutely amazing. Your team is lucky to have a vested mentor in you."*

vv. *"I fought my own appeal at the Intermediate Court, I did my own litigation, 300+ pages later, picking up everything I could find including OCC restrictions on US Bank. The appellate court ruled in my favor, just so you know that this is the conclusion and I am relieved to know that there is still justice out there and I know you are the supporter of that so I just want you to know that your initial meeting with me and you are taking the time to actually pointing out the few key information about note assignment triggered my curiosity about those legal aspects, so I did win."*

ww. *"It is with deepest appreciation that we acknowledge how very thankful we are for you! Your brain, your Witt, your life experience (street smarts!)!!! Without you, Fred, your firm, our lives would be an entirely different story. We have one fight life, but at last, there will be others on this wheel called life! We pray for you and your happiness and continued success. This Christmas, we always think of*

those who have touched our lives and you are one of those special people! Thank you, thank you, thank you Gary."

xx. *"Thank you for sharing your time every week to educate your audience. Your legal analysis is inspirational."*

yy. *"You are a blessing! I was at a point of desperation and severe depression due to the absence of hope! I believe God answered my prayers in getting in me in touch with you!"*

zz. *"Thanks for your constant support. You and your firm are doing miracles for our homeless community dealing with drug and alcohol problems. God bless."*

aaa. *"I love you Gary. You deserve a special place in heaven for helping homeowners."*

bbb. *"Just a simple thank you for all your hard work. We deeply appreciate the times you would meet with us even if its last minute. You and your team are just outstanding, and we are grateful for everything you have done for us. Mahalo for your patience, understanding, and especially for giving us the opportunity to own our home again."*

ccc. *"You are a godsend Gary. Bless you. We sleep well knowing you are at the helm."*

ddd. *"I am glad I have you in my corner. Homeowners need a champion like you to fight for them, against this corrupt system. Great Job Gary!"*

eee. *"Thank you, attorney. God is so good to us. God bless you more and more Godly wisdom in our favor, glory to God. I thank God also for the Judge; he is a wonderful judge. I am in tears with joy, attorney. I love you in the love for the Lord God bless you."*

fff. *"Unbelievable appellate resume, you've prevailed using such a variety of arguments, brilliant. I love what you mentioned today on your radio show, FOLLOW THE MONEY."*

ggg. *"Info To Fight Foreclosure congratulates and commends Gary Dubin for his diligent, and mostly successful, defense of homeowners and the American Justice System. We post this review of his SIXTH anniversary and highly recommend you spend a few hours listening to one of the most successful foreclosure defense attorneys in the nation!"*

hhh. *"I have great news to share with you in regard to our current foreclosure status as it relates to this show the foreclosure hour. I am an avid listener to your show the foreclosure hour. I do my best to listen attentively and also to study any avenue to benefit the favor of my mother and our house as we defend against what we believe to be a fraudulent foreclosure. Recently we have received record from the court, granting an order (in our favor) for reconsideration. We were in summary judgment; summary judgement was granted (in opposition to us) and all seemed lost. Through extensive work and study, we filed many different documents addressing*

*various discrepancies that the court was willing to hear. Most all of these things were either directly or indirectly attained by means of your show the foreclosure hour. I will be filing an order denying summary judgment next with great confidence that it will be decreed. I do not consider this case to be over, but I do feel that the tables have been turned. There has been a lot of prayer through this time of distress, but I do not know if we could have done any of this without the support of your show! I am beyond grateful. Mahalo Nui."*

iii. *"I would just like to commend you Mr. Gary Dubin and Mr. John Waihee for such a great show. While I plan on never having to contest foreclosure, I love the content of this show and find it all so fascinating. As 41-year-old, Generation X'er, someone who grew up in the late eighties and nineties, I appreciate the topics of discussion but what makes this show great is getting a glimpse of the wealth of knowledge you both have and hearing about your past experiences. I love that you are in tune with what goes on nationally and locally and include topics that effect this industry. I have often stayed in my car after arriving at my destination on to just listen to your awesome show. I also love that I can listen to past shows on your website. I do wish the show were longer or even televised but I understand the content may not be popular enough with the general public. I just wanted to thank you for such a great show that for me is such a breath of fresh air."*

jjj. *"What a wonderful Thanksgiving gift all because of you. You are truly a ray of light from God for saving our home. There is a real story here and now we can implement the lawsuit against PennyMac and Chase for perpetrating this fraud upon us. I hope you have a wonderful Thanksgiving and know that you are loved by so many people thankful for your presence on earth."*

kkk. *"Thank you, Sir. I appreciate all you are doing on this case as so many others that you represent do as well.  Our State Judiciary is a much better place with practicing Law and holding the "Big Boy's" accountable.  You are hereby forbidden to ever retire GVD."*

lll. *"Just to let you know that I consider you the best attorney I have ever had."*

mmm. *"For ten years, Gary Dubin in Hawaii has been practicing law defending homeowners from foreclosure. He has preached his own version of how to combat foreclosure fraud. And he has practiced what he preached. I find his work enlightening and refreshing. His article and proposals are extremely well-written, objectively stated, reasonable and necessary. In my opinion Dubin's quest should be supported by homeowners and non-homeowners alike as it proposes to correct a deficit in our legal system, our economic system, and our Society. The inequality of wealth that was exacerbated by what amounts to outright theft by a handful of banks*

can be corrected and our economic system can be stabilized if we return to the rule of law."

nnn. *"Todd & I think of you so often and we constantly ponder on how in the world we can ever thank you enough! You changed our lives, and we will forever be grateful. We are on tour, working our buns off.... to restore our home to its original beauty. All thanks to you! I hope we can entertain you if you come to Kauai or our paths cross on the mainland. Sending much love and respect."*

ooo. *"You're really awesome and amazing person. My family really love you Sir and we thank God for giving you to us."*

ppp. *"Gary is the best of the best. Deeply knowledgeable about the whole process! You want a lawyer to really help and guide you, contact his office."*

qqq. *"Once again, I cannot thank you enough for all Dubin Law has done for Imi Pono Foundation and the hundreds of members that have been helped by you."*

rrr. *"I agree, God bless you and thank you. You are an attorney with the greatest ethics, morals and the most intelligent I have ever meet and I pray God bless you with good health and blessings in your life. I have the greatest respect and admiration for who you are. Thank you."*

sss. *"Thank you, Gary, for saving my business. It could have been a totally different result if it were not for you."*

ttt. *"I found you to be not only knowledgeable and personable, but an inspirational leader as well. In today's world, it is so refreshing to find such a capable attorney with such sound fundamental values. You make us feel proud to be lawyers."*

uuu. *"We just had our case dismissed in Judge Cardoza's courtroom. Thank you, Mr. Dubin, for your radio broadcast over the years that has allowed me to gain your knowledge that's helped us in our victory."*

vvv. *"I agree God bless you and thank you. You are an attorney with the greatest ethics, morals, and the most intelligent I have ever meet and I pray God bless you with good health and blessings in your life. I have the greatest respect and admiration for who you are. Thank you. At least the OCC wrote that they committed a violation by trying to do what they did in the nunc pro tunc to change or say they corrected what I owed just to continue to foreclose and by doing this, they violated the OCC between the same year they came back into court with the nunc pro tunc. Now we can show Judge Cahill they committed deceptive practices and show him this article you sent me."*

www. *"I am so grateful to you for saving this house for me and my 80 years old handicapped mother. I am forever thankful to you for helping me. I am without words. If I can ever help you or your family, I am a loyalist and will be there no matter what, that is how I was raised."*

xxx. *"Thank you so much for all your efforts. I love to listen to your show. I always learn something from each show, even the replays. Keep up all the great work."*

yyy. *"Your reputation definitely proceeds you! I'll never forget visiting your office and you told me to never give up!"*

zzz. *"I think you're a genius. I also appreciate the fact that you combine your mental ability with hard work and constant attention."*

aaaa. *"You are on my gratitude list of great American heroes. Thank you."*

bbbb. *"Thank you again for all your fine work on my behalf and on behalf of your other clients."*

cccc. *"We found that you were not only good—but incredibly good at your job. Complete knowledge of all elements of foreclosure law. Your knowledge and expertise have to be tops in your field and the specialty of foreclosure law. The local banks have a huge influence with local judges. Where do these judges get house loans and credit lines?"*

dddd. *"Every single time I touch the legal system something crazy happens. It is a cesspool of evil. I do not know how you managed to survive and thrive all those years. It is tragic that in the end, it screwed you too."*

eeee. *"You have been a trailblazer in the realm of bank foreclosure abuses."*

ffff. *"Sorry to hear about the swamp trying to silence you as big surprise as you have done an outstanding job. The system as we know it, as far as I am concerned, is so corrupts, it is beyond belief."*

gggg. *"This is incredibly unfair in what they are attempting to do to you and all you clients and family."*

hhhh. *"We owe you so much gratitude and respect, Gary. We hope this injustice will be reversed."*

iiii. *"Thank you for the tireless work you are doing. I cannot begin to comprehend the passion you display for this work, and I am grateful."*

jjjj. *"Gary, you saved us at one of our lowest point. Knowing you were there watching our back for the past ten years have given us sanity, that light we needed."*

kkkk. *"You are a rare breed, a good man. I thank you for your dedication you have had to fighting for humanity, providing balance, hope for the little guy. And personally, I am honored to know you. You definitely provided peace when all was falling down around us. Knowing you had our back kept us from drowning."*

llll. *"Please know that I remain your biggest fan in Hawaii. Without your help, I would have lost my home because I could not work while fighting cancer. If there is every anything I can do to help, I am a writer author and editor, or can provide testimonials, or speaking in public – I am your girl. In my case, you stopped*

*predatory loans by Wells Fargo, and set a precedent that I am sure helped many others."*

mmmm. *"I am truly sorry for what happened to you. We live in a corrupt system. You have worked hard for all of your 300 clients. You are a caring individuals who wants to help others."*

nnnn. *"A family friend/insurance attorney specializing in fire insurance defense has won so many cases against insurance companies that they keep targeting him with fake legal actions, another "David" going up against Goliath. Your position is the same."*

oooo. *"I will defend your right to practice your chosen Profession until my last breath. I also can be counted on as a full participant in your defense in any way possible, including testifying in court on our behalf."*

pppp. *"Gary, thank you for all you have done for me and so many others. You are an amazing and selfless man that has helped so many."*

qqqq. *"You have done so much to help my family and myself and we have more to do. Let me know what I can do to help you."*

rrrr. *"I would be glad to help you in your efforts. Your firm helped me very much and I too feel the legal system in Hawaii need some "adjustments"."*

ssss. *"Thank you so much. You are the best!!! It would not have been possible if you have not given me the opportunity to fight this case. I am extremely grateful."*

tttt. *"We are so sorry and disappointed in our system. Both my husband and I would like to please be added to the client list supporting you."*

uuuu. *"Mahalo for all the work you have done here and let's hope truth will prevail."*

vvvv. *"Gary Dubin is my hero. He is the most brilliant attorney in the world to handle foreclosure cases. He is my attorney and will always be my attorney."*

wwww. *"We are here to support you and would love to join in on the fight for you. You have been a great help to us, and we are here to help in any means possible."*

xxxx. *"You and your staff have been helping us and guiding us through the foreclosure defense process since October 2011, and we need you professional help and support to see us through to the end, and relying on your expert legal help. We, as your clients feel a desperate need for you and your firm to be there for us in order for justice to prevail in our case."*

yyyy. *"Bless your heroic heart. You are a powerful advocate for good, and a rare foreclosure attorney at that. Thank you for continuing to fight and for being our hero."*

zzzz. *"I stand by you Gary 100 percent with total trust in you, as a true supporter of your amazing and hard work you do for all your clients."*

aaaaa. *"You have helped so many local families to be able to stay in their homes. You have been my attorney for over 6 years, and you have answered every email I sent, you never pressured me for more money, and you have acted in a professional manner the whole time. You are one of the few attorneys in the nation, that understands what these corrupt and crooked banks are doing to families. They make up paperwork, (They have admitted that and paid fines for it), they get paid by mortgage insurance, and then they still come after the homeowners. They file false and misleading documents to the court, without any ramifications. Their greed is so nefarious that they even sell these loan packages to more than one buyer. Your disbarment would be a giant loss to the Hawaii legal system and create undue hardships on all your current clients who have cases pending. Your record is remarkable and should be rewarded not punished. I truly appreciated all that you have done for me."*

bbbbb. *"I have suffered damages. Being cut off from my attorney of choice leaves me vulnerable to pretender lender abuses."*

ccccc. *"I just want to offer my condolences and support for your case. I can only assume the mortgage lender (foreclosure companies) are funding this travesty of justice. No one else in this State has helped more people in this situation. After 45 years, I am becoming Increasingly disillusioned with Hawaii."*

dddd. *"I would like to take this time to thank Gary Dubin & his firm for helping us with our foreclosure case. Gary has always been available via email, phone or in person appointments. It is very stressful at times going through a foreclosure case but, with a clear and consistent approach to our defense Gary was able to overturn a summary judgment against us and we are still in our home. Our fight continues & we feel that Gary & his firm is a valuable necessity in our fight to save our home & to help others that are facing foreclosure. There is not another lawyer in Hawaii with his expertise dealing with foreclosure cases."*

## F. FORECLOSURE DEFENSE ATTORNEYS TARGETED

### *The Challenges of Mortgage Securitization*

56. Traditionally, homeowners would buy or refinance their home, signing a promissory note and a mortgage. The mortgage would then be recorded and the promissory note placed in the lender's vault until paid, and if the homeowners had any difficulties in paying, both the homeowners and their lender, usually a neighborhood bank, savings and loan, or credit union, would meet and try to work out an accommodation, usually called a "work out," with both having a mutual interest in protecting the bank's collateral and the homeowners' equity jointly.

57. However, 25 years ago some banks decided to experiment with securitization, where mortgages were transformed into securities, sliced and diced,

and traded among numerous investment banks serving variously as trustees and as loan servicers, encouraged by favorable IRS "REMIC" pass through tax treatment.

58. Following the attack on the World Trade Center Towers on 911, the U.S. Treasury Department, responding to the ensuing financial crisis, seized on the opportunity to jump start the national economy by unlocking homeowner's equity otherwise just literally sitting there unused, and gave its full support to securitization, and so began a new era in mortgage lender.

59. However, various state laws governing promissory notes and mortgages were designed for the traditional lending model only and were ill equipped, as were this Nation's judges, to deal with securitization, which created an entirely new industry, mortgage securitization, neither disclosed to borrowers nor understood by federal or state judges in their application of centuries old English property law.

60. The securitized secondary mortgage market, as it is sometimes called, grew so rapidly as an underground casino where more than 100 million mortgages in one form or another were being constantly traded and sold to investors without any regulatory supervision and were being solicited with little if any attention to whether a homeowner could afford the loan or not, and rewarded initiators who upon immediately trading the mortgages became free of any financial obligations with in effect no further liability, that otherwise was the situation with traditional mortgage loans.

61. The result was predictable. A flood of foreclosures followed in state courts, leading to the Mortgage Crisis of 2008. Most homeowners were not aware of the fact that most securitized trusts had lost through carelessness or had for convenience placed on microfiche and destroyed their promissory notes as well as mortgage assignments, which led to the creation of armies of robo-signers signing and notarizing false recreations for filing under oath in court and with state recording offices in order to meet traditional court evidentiary requirements.

62. Securitization had become a multi-trillion-dollar business, with the federal government on the hook for having guaranteed most of the mortgage loans, and as a result the federal government and the securitized trusts and loan servicers worked together to hide the true facts of securitization from both the American people and our state and federal courts, while preoccupied bailing out the investment banks.

63. "Big Law," leading Wall Street connected law firms, were immediately hired to cover up what in many instances had been underlying predatory lending, consisting. for example. of false appraisals, false loan applications, and false or no-doc financial statements, as well as lost loan documentation, all otherwise required by the common law and the UCC before lenders could foreclose under state law. Being honest with our courts was apparently never considered to be a viable option so long as needed documents could be falsified and predatory lending covered up.

64. Foreclosure judges, on the other hand, were ill-prepared for such non-traditional foreclosures and nether was the traditional law on the books, and Big Law, Fannie Mae, Freddie Mac, and HUD teamed up to retain uninquiring local law firms who have unfairly pejoratively been called "foreclosure mills" to record and to file their false documents in state courts, blameworthy only for blindly taking orders from frankly Mainland crooks, who if anyone should be the ones disbarred.

65. While a few attorneys in each State, contacted by homeowners facing foreclosure since 911, have tried to help homeowners, not only have they found themselves at a comparative financial disadvantage against the so-called foreclosure mills being supported by Big Law and Fannie Mae, Freddie Mac, and HUD with the U.S. Treasury Department approvingly in the background, but almost all of them with a few exceptions never understanding securitization in order to be able to help, nor were their foreclosure judges comprehending either what was really going on.

66. As a result, the war against foreclosure defense attorneys, led by many prominent state attorney regulatory agencies, began, and a foreclosure defense practice in the United States became an inherently dangerous enterprise in that clients facing foreclosure are often understandably emotional wrecks; moreover, they rarely fully understand the legal system, and if they lose some are instinctively prone to turn against their attorneys, viewing their own counsel as just a part of what

they perceive to be a rigged system, or otherwise some are just dishonest and believe that by complaining they can at least get their money back.

### The ODC's Irresponsible Targeting of Dubin

67. The ODC followed the national trend and in recent years has prosecuted approximately half a dozen foreclosure attorneys in Hawaii, leading to suspensions and mostly disbarments, prior to going after Dubin, foreclosure defense attorneys being looked upon as crooks, supposedly taking money from vulnerable foreclosure defendants when behind on their mortgages and having supposedly no defenses.

68. While in many instances those charges against some may have been true, it was certainly not the case with regard to Dubin, whose record, *supra*, speaks for itself, but Dubin became the most obvious, prize candidate to go after, for those at the ODC coveting promotions, or for other less apparent reasons explained below.

69. The nationwide state attorney disciplinary agencies, like the ODC, have been in fact acting almost in unison to target foreclosure defense attorneys, sending memos to each other back and forth encouraging a regulatory disbarment sweep against foreclosure defense attorneys, to the point where the ODC even posted an advertisement on Craigs' List years ago asking any client dissatisfied with Dubin's performance to please contact them immediately.

70. Worse still, Dubin became raw meat for the ODC, who subjected him to procedures that likely would have even made the Judges of the English Star Chamber

blush, affording him through the entire process of his disbarment procedures none of the thirteen DCCA protections given members of other professionals, such as physicians and members of other occupations in the State of Hawaii, a virtual orgy of deprivations, also in violation of written yet unenforced Hawaii Supreme Court and Board Rules themselves, the actual specific facts and circumstances of which are detailed in Section F, *infra*, and set forth summarized below, *albeit* only generally:

a. complainants against Dubin were not required to sign under oath, one of which involving his mortgage company, explained below, was for an alleged incident that had supposedly occurred more than half a decade earlier, which moreover was filed against Dubin anonymously;

b. Dubin was charged with supposedly violating published ethical rules that were and still are not only vague, but often contradictory;

c. the ODC brags that, contrary to Board Rules, it nevertheless dockets every complaint received on the assumption that it is *prima facie* fully justified and investigates afterwards, putting Dubin and other targeted attorneys to the costly burden of preparing a defense and submitting voluminous requested boiler plate documentation even if not related to what is being complained of, as the ODC carries out a fishing expedition looking for ethical violations, determined to find them;

d. the ODC lumped several alleged complaints against Dubin by four different sources in one petition for discipline and tried all four together although unrelated.

e. the ODC put in its petition and amended petition against Dubin the requested sanction of only attending ethics classes if found guilty, not revealing it was seeking disbarment until later at a pretrial conference, adroitly only after the time to seek an extension of the period during which the petition would remain confidential had expired;

f. the ODC staff is untrained and the turnover extraordinary, making it difficult for Dubin to have discussed the case with senior staff; for instance, during Dubin's several years of proceedings the ODC had at least four Chief Disciplinary Counsel removed and a like number of Assistant Disciplinary Counsel resign, all at the rate of about one year each, which even curtailed scheduled pretrial conferences, and the two senior staff members signing his petition for discipline were, for instance, soon gone after the signing;

g. conflicts of interest were prevalent everywhere and although Dubin objected, his objections were either denied or ignored; for instance chronologically:

i. Sink, the investigator exclusively specially assigned to Dubin's cases, was a former wife and paralegal of a notorious ambulance chaser who brought two prior malpractice cases against Dubin, both dismissed with prejudice, Dubin being awarded summary judgment and his fees and costs in the second one, and who put a

TV ad on cable TV accusing several attorneys, including Dubin, of legal malpractice while Sink was working there in a one-employee office, presumably placing the ad.

ii. Hughes, the ODC hearing officer, at the same time was opposing counsel of Dubin in an ongoing combined civil and appellate case, where Hughes had lost the appeal for the opposing parties in that case which Dubin had won, and upon remand settlement negotiations were still admittedly underway between Dubin and Hughes while Hughes nevertheless was also Dubin's hearing officer and at the same time openly negotiating settlement terms in that other case with Dubin;

iii. Nakea, while serving as Board Chairperson, admitted later that a Board Member, an attorney with the loudest of loud mouths on the Board, had come to Nakea before the Board hearing scheduled to determine what discipline if any to recommend to the Hawaii Supreme Court, and that Board Member who was opposing attorney in two of Dubin's cases was told by Nakea not to disclose it or to recuse himself at the Board Meeting, and therefore that Board Member did neither;

iv. Norris, who the ODC hired specially as Senior Disciplinary Counsel to advocate its petition for discipline against Dubin before the Hawaii Supreme Court, had been hired by Dubin as his attorney in defeating a prior targeting of him by the ODC, and although she denied having received a retainer from Dubin, when Dubin presented to the Hawaii Supreme Court in response a copy of his prior $15,000 check

made payable to her as a retainer fee, the Court disqualified her over her objection and disqualified the entire ODC staff also for that very reason.

h. All during Dubin's ODC proceedings before the Hawaii Supreme Court, the latest, new Chief Disciplinary Counsel, Tamm, had been providing *ex parte* communications to the Members of the Hawaii Supreme Court behind Dubin's and his co-counsel's backs pertaining to alleged additional complaints from clients to the ODC and to the Fund against Dubin which was not true as there were in number no such volume of complaints, presumably provided *ex parte* directly or indirectly through Nakea, prejudicing Dubin's disciplinary case, and when Dubin post-disbarment found out about it and that it was actually the Court's stated written policy set forth in prior disciplinary appeals to accept such hidden prejudicial *ex parte* communications, when Dubin confronted the Court with that objection it did not deny it, only writing that received *ex parte* communications played no part in the disposition of Dubin's case, although bare receipt of such *ex parte* communications is ethically prohibited by the Hawaii Rules of Professional Conduct and by the Hawaii Revised Code of Judicial Conduct;

i. at the hearing with Hughes presiding, Dubin was denied his right by Hughes to cross-examine Ms. Andia, although she was clearly a joint complainant, yet her testimony was nevertheless allowed in, indirectly, through the unable to be cross-examined testimony of her husband with her not there, and despite Dubin's belief

that she had authored the other, anonymous complaint, *supra*; whereas Hughes refused to allow any of Dubin's clients to be called to testify in support of his ethics;

j. Hughes adopted the findings and recommendation of the ODC without changing a single word, syllable or punctuation mark, then the Hawaii Supreme Court in turn ignored those findings and came up with its own findings for the first time in its disbarment order without providing Dubin in advance with the ability to respond;

k. no member of the ODC knew anything about foreclosure defense, including Tamm, and Hughes and the Board Members who as attorneys all represented landlords and anti-consumer clients, with two of the Board Members serving as opposing counsel against Dubin in four cases where Dubin was in those ongoing cases representing homeowners against their clients, in no way his peers able to appreciate or understand the pitfalls of representing homeowners facing foreclosure;

l. Dubin was tricked into believing that the sanction he faced was limited to being ordered to take ethics classes, for that was the only sanction specifically listed in his petition and amended petition for discipline, the effect of which was his not seeking to extend the short time afforded where the petition would be confidential, and as a result Hughes' disbarment recommendation appeared in various local media and Internet reports that severely injured Dubin's law practice and cash flow and ability to retain and to keep associates and staff, and consequently to defend himself

throughout most of the disbarment proceedings, causing clients and staff to leave him and potential replacements as well as new clients to keep far away;

m. Dubin was denied the ability to seek nondiscretionary appellate review of the Hawaii Supreme Court's order of disbarment, which was the first original proceeding adversely affecting his right to practice law, whereas the termination by the DCCA of a license, for instance of a physician, may be appealed to the Circuit Court and thereafter to the Hawaii Intermediate Court of Appeals.

71. The flagrantly vicious animosity with which the ODC targeted Dubin is best illustrated by the statement of one of its attorneys made under oath in formal papers to the Hawaii Supreme Court supporting disbarment, that supposedly Dubin's radio show, *supra*, co-hosted by former Hawaii Governor John D. Waihee III, was "a menace to the general public," quoting one show's alleged excerpt that did not even exist. Thereafter, that junior staff member was promoted.

72. Despite the ODC's targeting of Dubin and despite all of its due process violations in an attempt to create a false factual record of misconduct by Dubin, the ODC failed to support its petition for discipline with any clear and convincing evidence, not even by a preponderance of the evidence.

73. Yet the ODC nonetheless succeeded in convincing a rubber-stamp, voluntary Board and a busy Hawaii Supreme Court, saddled by increasing caseloads, one Justice short, and by COVID-19 complications caused the Judiciary, to order

disbarment, adopting eight of the ODC's adopted findings arising from three of the four separate cases tried together: "We find and conclude, by clear and convincing evidence, that Petitioner Gary V. Dubin committed the following misconduct."

74. All eight of the Court's adopted disbarment findings arising from three of the four cases are factually untrue and were completely discredited below.

75. There was an additional, fourth case against Dubin of professional misconduct presented by the ODC, lumped together with the other three for one consolidate hearing, and the ODC's one-sided proposed findings of ethical violations in that other case, also adopted *verbatim* by Hearing Officer Hughes, was based on Dubin's supposed having filed an appellate brief with improper case citations (!), so embarrassing and ridiculous that it was however completely ignored by the Hawaii Supreme Court, as however all of the charges should have been.

## G. ALL ALLEGATIONS AGAINST DUBIN PROVEN FALSE

### First: The ODC Two-Prior-Disciplines Claim Proven False

76. The first finding against Dubin by the Hawaii Supreme Court was that *"In aggravation, Respondent Dubin has two prior disciplines,"* Disbarment Order, page 4.

77. Contrary to this adopted conclusion, taken from the ODC's self-serving narrative, Dubin had never been disciplined for any ethical violation against a client in his entire 58-year career as an attorney.

82

78. That is a fact, and there is nothing whatsoever contradictory in the underlying record. It was therefore fundamental prejudicial error for the Hawaii Supreme Court to adopt in aggravation the ODC's accusation of prior discipline.

79. There are two possible explanations for this egregious factual mistake.

80. First, the ODC reached back to mistakenly try to use Dubin's quarter-century-old, 1995 federal IRS failure-to-file income tax misdemeanors to claim prior misconduct, having been bench tried and convicted of IRS misdemeanor charges in Honolulu by Visiting California U.S. District Judge Manuel Real, recently deceased, a controversial federal judge widely criticized for erratic and abusive behavior, even though the ODC itself when it was a responsible investigative body, following a three-year full investigation, ruled that Dubin under the circumstances did not commit any professional misconduct, pursuant to its concluding report:

> Based upon the information and documents obtained by our investigation, the Reviewing Member of the Disciplinary Board has determined that a finding of professional misconduct on your part, regarding your 1995 misdemeanor conviction for Willful Failure to File Income Tax Returns in violation of 26 United States Code section 7203, is not warranted due to the unique circumstances pertaining to your matter.

81. Thereafter, the California Bar Court, of whose Bar Dubin has been a Member since 1964, conducted a similar investigation, the Bar Court Settlement Judge agreeing with the ODC's decision, *supra*, nevertheless within his limited

authority was only able to give Dubin the minimum public reproval, which when drafted and published however read more like an approval than a reproval:

> In January 1994 Dubin was convicted of violation of 26 USC section 7203 failure to file federal income tax returns, from 1986 through 1988. He has since filed the returns but owed no taxes for those years because of business losses. At about the same time he failed to file those returns, he was audited. He received a letter from an employee of the Internal Revenue Service stating that he was not required to file income tax returns for the years covered by the audit.

> There were no factors in aggravation. In mitigation, at about the time of the misconduct, Dubin was under great stress because his son had been terminally ill and passed away in 1992. The misconduct was due, in part to the letter he received from the IRS stating that he was not required to file the tax returns. Also, the misconduct did not involve clients.

82. And thereafter, the ODC confirmed to Dubin in writing that it would not be seeking reciprocal discipline, and did not, since the ODC had earlier found no professional wrongdoing by Dubin on the same exact underlying facts.

83. Dubin then appealed to the IRS Seattle District Office with the assistance of the entire Hawaii Congressional Delegation, and the IRS apologized to Dubin that it was wrong and admitted that it actually owed Dubin almost $100,000 for the tax years in question, and Dubin was further exonerated by a seven-year investigation by the American Bar Association published as a front-page story in its *Journal*.

84. Yet at the hearing before Hearing Officer Hughes, the ODC prosecutor denied the exculpatory evidence that the ODC itself had cleared Dubin of any

wrongdoing regarding his much earlier misdemeanor convictions, at first the ODC prosecutor even emphatically denying before the Hearing Officer Hughes the fact that any such documentary evidence refuting the ODC's aggravating circumstances claim existed in the ODC files, with the Hearing Officer refusing to compel the ODC to produce the documents, instead placing that burden on Dubin, until Dubin found and later produced copies at the hearing, exculpatory evidence being intentionally concealed by the ODC prosecutor (who happened to head the ODC at the time no less) in the ODC's own office files in the cabinets adjoining the hearing room.

85. Second, the ODC further reached back to present the Hearing Officer Hughes with evidence of a 16-year-old ODC informal admonishment in 2004 in a case brought by someone not even Dubin's client, for supposedly being late in providing an irrelevant requested document, so charged according to the ODC prosecutor self-servingly, which notice of admonishment was ironically belatedly machine post-marked days after the September 11, 2001 bombing of the New York World Trade Towers when the whole Country including the U.S. Post Office was closed and not sorting and delivering mail, and the notice was eventually received too late for Dubin to seek reconsideration although he tried, only to be told there was no procedure for reconsideration thereafter.

86. That informal admonishment was however subsequently ordered expunged when that prosecutor, a Special Assistant Disciplinary Counsel bringing

that noncooperation charge (playing prosecutor, judge, and jury as the ODC prosecutors like to do, self-servingly charging failure to cooperate with them), later was fired for bias for his own wrongdoing pertaining to that very investigation, with all related records pertaining thereto ordered destroyed by the State Attorney General in First Circuit Court Civil No. 06-1-1485 GWBC, nevertheless dishonestly resurfacing at Dubin's disbarment hearing before Hearing Officer Hughes, submitted by the ODC in support of disbarment nonetheless.

87. And although Dubin had never been found to have committed any misconduct toward a client or anyone else as an aggravating factor, the Order of Disbarment nevertheless erroneously adopted the ODC/Hearing Officer/Board's erroneous adopted findings, ignoring Dubin's unblemished disciplinary record.

### *Second: The DCCA False Certification Claim Proven False*

88. The second finding against Dubin by the Hawaii Supreme Court was that *"Respondent knowingly misrepresented the truth on a government form; he certified the information thereon as true.* Smith  Case, Disbarment Order, pages 1-2.

89. Since "knowingly" is the ABA standard that the Hawaii Supreme Court approvingly cites in its Disbarment Order, page 4, as controlling its disbarment decisions, it is difficult to understand how the Court came to the above conclusion in the Smith Case, since at the hearing the ODC presented no witnesses at all on that issue, no witnesses whatsoever as to Dubin's intentions or state of mind.

90. To understand how all this came about, one needs to consult the record chronologically in order to understand the factual context, completely absent from the Disbarment Order.

91. Five years ago, on March 7, 2016, the ODC received an anonymous half-page, typed, unsworn letter signed "/s/ Joe Smith," describing himself "as a member of the public," with an obvious personal animus, claiming, *inter alia*, as follows:

> As the enclosed summary disposition order shows, the Hawaii Intermediate Court of Appeals affirmed the revocation of the mortgage solicitor's license of Hawaii attorney Gary Victor Dubin (attorney number 3181) based on the fact that Gary Victor Dubin lied in a response to a question on his application form that asked whether he had been convicted of a crime during the prior 20 years. **** Rule 8.4(c) of the Hawaii Rules of Professional Conduct states: "It is professional misconduct for a lawyer to: . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

92. When notified of the Smith letter by the ODC, Dubin replied, explaining that he was not aware of the mistake at the time, and that that DCCA decision and the subsequent decision of the ICA were not based on any finding of wrongful knowledge or intent or lying, but were treated as *malum prohibitum* violations without any proof or finding of wrongful intent required, which is exactly how Dubin answered the ODC's Amended Petition.

93. Frustrated by residential lending abuses while practicing foreclosure defense, in 2006 Dubin, as a sole nonparticipating investor only, had formed Dubin

Financial, LLC, a Hawaii licensed mortgage brokerage, hiring an experienced licensed local mortgage broker to manage the company for him.

94. Unfortunately, mortgage brokers at that time were largely unregulated, and when Dubin discovered that the licensed mortgage broker he had hired was cheating borrowers and stealing from Dubin, which was the mortgage broker culture of the times, Dubin fired him and as a matter of public record voluntarily closed Dubin Financial in early 2009.

95. However, a mortgage brokerage cannot operate without a designated mortgage solicitor in charge, so Dubin had to hurriedly apply to become a mortgage solicitor himself, so designated, in order to briefly maintain Dubin Financial's license, solely for the purpose of completing a few loans already in the pipeline so as not to prejudice the existing few remaining loan applicants.

96. No new business was undertaken, and Dubin Financial, LLC was closed, and the mortgage brokerage license voluntarily terminated in early 2009.

97. Two years later *after the closing* the DCCA brought administrative charges against Dubin alleging his 2008 solicitor's license contained a "misrepresentation" it deemed to be *malum prohibitum* grounds for retroactively revoking a mortgage brokerage license and issuing a fine, *albeit* illogically in part as the license had already been voluntarily released by Dubin two years earlier.

98. The basis for the belated DCCA revocation was that Dubin's application failed to disclose that he had been previously convicted in 1995, thirteen years earlier, of federal failure-to-file income tax misdemeanors  by Judge Real, *supra*, because one of the several form questions asking whether an applicant had been convicted of a crime was checked "NO" instead of "YES," hence not disclosing that Dubin 13 years earlier, in 1995 had been bench tried and convicted of IRS misdemeanor charges, *supra*.

99. Dubin explained under oath that he did not knowingly nor intentionally check the wrong box on the form, but that as he recalled, it was a long time ago, the form was filled out mistakenly by a law clerk either before or after he had signed it and in any event he had not been found by the DCCA to have knowingly done anything wrong as otherwise gleefully and erroneously charged by the ODC.

100. Nevertheless, the ODC, cavalierly denying Dubin's request to meet first, informed Dubin that they would meet with him to discuss the issues after the Petition for Discipline was first filed, and the ODC then proceeded to include the Smith complaint within its 2017 Petition for Discipline and Amended Petition for Discipline solely on the basis of the DCCA's use of the word "misrepresentation" nine years earlier, ignoring the DCCA's stated position nonetheless that Dubin's intent was not at issue, and ignoring the ICA's subsequent identical appellate *malum prohibitum* decision that it had not found Dubin to have personally intentionally

misrepresented anything on his mortgage solicitor's form, merely ignoring proof of intent (*mens rea*) as a part of any such administrative investigation, charging:

> By failing to disclose information on his licensing application [in 2008] Respondent violated the following provision of the Hawaii Rules of Professional Conduct: 8.4(c) (pre 2014 version) (A lawyer shall not engage in dishonesty, fraud, deceit or misrepresentation; 8.4(a) (pre 2014 version) (A lawyer shall not violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.)

101. Dubin appropriately filed a Verified Answer to the ODC's charges, *inter alia*):

> Respondent hereby responds that he denies that there were any findings whatsoever that Respondent made any misrepresentations; instead it was considered a *malum prohibitum* regulatory violation, and indeed both the DCCA prosecutor and the hearing examiner as recorded refused to find any intention by the Respondent or any personal wrongdoing by the Respondent to misrepresent anything, which if anything should be *res judicata* and/or collateral estoppel and/or issue preclusion as to such a charge here based entirely upon such rejected finding or misrepresentation.

102. However, the ODC petitioned for discipline against Dubin on the sole basis that he supposedly had been found by the DCCA to have intentionally lied on his solicitor's application and lost his appeal in the ICA.

103. There nevertheless was no finding whatsoever by the DCCA nor the ICA of knowledgeable or intentional misrepresentation, nor even negligence.

104. To the contrary, despite the misleading nomenclature of "misrepresentation," the DCCA considered itself bound by the decision of the Hawaii Supreme Court in *Kim v. Contractor's License Board*, 88 Haw. 264, 965 P.2d 806 (1998), holding that such omission of any finding of proof of knowledge or intent was irrelevant since it was a *malum prohibitum* violation, not requiring proof of any intent:

> There was no evidence that Respondent Dubin took part in the preparation of the mortgage broker's application of Respondent Dubin Financial or in the submission of that application. In addition, the was no evidence that either Lindberg or Vu consulted Respondent Dubin regarding the contents of the application or that Respondent Dubin had any knowledge of the contents of that application. * * * * Proof of an untruthful statement within the meaning of this statute does not require proof of intent to lie or intent to not tell the truth.

105. Indeed, that was the stated legal position of the DCCA prosecutor throughout, who on March 29, 2011 in his final argument before the DCCA Hearing Officer freely conceded the point:

> The Hawaii Supreme Court came to that conclusion [in *Kim*] based on its review of Chapter 444 and the fact that there was a complete absence of any explicit requirement of intentional state of mind on the part of the applicant in holding that they were - basically they were not going to read a requirement of intentional state of mind in a statute that just talks about material misrepresentation. . .. I believe, similarly, in this case there is no requirement of intent in that provision. * * * *
>
> I don't think the evidence supports a finding that he [Respondent] intentionally tried to pull one over on the department by answering that question no . . . . I mean I don't see the evidence that he was

doing this intentionally. First, because he's a smart guy and he wouldn't think that the department was - that they would not catch that, so I don't -- and, frankly, it was a matter of public record that he was convicted and I think anyone in the legal community probably knew that at the time that he applied for the license, and in any case it is a matter of public record and also a matter of some publicity; so I don't think Mr. Dubin would have done that with the hope the department wouldn't know.

106. The "publicity" that the DCCA prosecutor was referring to was the fact that Dubin himself at the very same time the application was being signed by him had been publicizing his discredited misdemeanor convictions by publishing full page color ads in local newspapers copying the exculpatory ABA *Journal Report* entitled "Real Trouble" dated September 1, 2006 available on the Internet, together with the IRS letter he had received stating he had no filing requirement for the tax years in question, further evidence that Dubin was not trying to hide anything, and indeed to the contrary he was trying to publicize his false misdemeanor convictions at the very same time, recanted by the prosecuting party witness, the IRS.

107. Dubin, the evidence at the DCCA hearing, *supra*, further similarly showed, had earlier applied for a Honolulu liquor license for a convenience store of his and the prior convictions question had been checked "yes," and the liquor license was immediately granted nevertheless, further evidence that Dubin was not trying to hide anything or felt he had to hid anything, always freely acknowledging those discredited convictions to the entire world every chance he had to this day, trying to erase what for some it seems is nevertheless indelibly etched in their brain, which is

how public smears remain prejudicial even when, as here, the complaining witness, the IRS, admits that it was wrong.

108. The DCCA Hearing Officer agreed with the DCCA prosecuting attorney, finding a *malum prohibitum* violation and nothing more, disregarding the absence any finding of knowledge or intent.

109. Dubin appealed, arguing a *mens rea* defense. The ICA however affirmed, holding knowledge or intent was not a part of the violation charged, based on the prior *Kim* decision it felt bound to, therefore rejecting any *mens rea* defense.

110. No *certiorari* petition was filed in the Hawaii Supreme Court, Dubin considering the matter closed and having a primary obligation to work instead on clients' cases, never believing that the matter would be revived a full decade later *via* an anonymous complaint to the ODC, or be taken seriously given no finding of knowledge or intent or wrongdoing.

111. Of course, had Dubin known that it would later be used to disbar him, he would have certainly sought further review, for the *Kim* decision is largely nonsensical, and just another reason why there should be a statute of limitations in Hawaii for disciplinary complaints as there is in other States.

112. What finally should have resulted was ODC's Smith Case being dismissed with prejudice when Dubin's former paralegal, appearing at the hearing by telephone from Florida, submitted a Declaration and testified that he was the one

that filled out the form including the one that had checked the wrong box, not the

Dubin:

> [M]y responsibility was to fill out these forms, not just this mortgage form, but all other forms for the law firm. Mr. Dubin is always busy, so this was my full responsibility. I filled out the mortgage application accordingly, to my best knowledge, which was that the conviction was overturned; hence the exoneration of Mr. Dubin for such conviction. And again, the Hawaii Bar, there was no disciplinary actions taken against Mr. Dubin, nor did he lose his licenses in any shape or form. Thus, I filled out the application as such.

113. No contrary evidence of wrongful knowledge or intent was provided by

the ODC who had no witnesses at the ODC hearing, *none*, which nevertheless

relying upon its own prosecutorial rhetoric, submitted erroneous proposed findings

of fact and conclusions of law to the ODC Hearing Officer Hughes, himself

conflicted, *supra*, the prosecutor accusing Dubin of personally lying on the form,

ignoring the DCCA's unique statutory non-*mens-rea* definition of truthful ("The

[DCCA] Hearing Officer specifically found that Respondent's answer to Question

No. 8 was 'untruthful within the terms of HRS § 436B-19(2)'"- ODC FOF #16). The

only one lying in his proposed findings of fact was the ODC prosecutor.

114. Meanwhile, during the entire four years of this aggressive prosecution,

the membership of the ODC kept changing, and those who brought the charges and

those who prosecuted the charges abruptly disappeared, including in a row at least

four Chief Disciplinary Counsel and at least three Assistant Disciplinary Counsel.

115. The ODC Hearing Officer Hughes, after an overall lengthy seven days of hearings nevertheless robotically adopted 100% *verbatim* the partisan findings of fact and recommendations of the ODC prosecutor, including as to the anonymous Smith complaint, without changing a single syllable or punctuation mark, by submitting a one-paragraph statement, embarrassingly incomprehensible, although rejecting intent as relevant to disbarment yet basing disbarment upon the "cumulative" effect of the four complaints, which the Board also circuitously subsequently adopted *verbatim*:

> I shall be submitting, as my report, the findings and recommendations of the Office of Disciplinary Counsel. As respects the proposed findings and recommendations of Dubin, while researched and consistent with his position throughout the proceeding, that the charges are "malum prohibitum" (that is, unlawful by rule or statute, but not evidencing wrongful intent), the conduct at issue and the cumulative complaints warrant the result [disbarment] requested by the Office of Disciplinary Counsel. [word in brackets added from his accompanying recommendation to the Board].

116. The Hawaii Supreme Court's finding of "knowingly" as the ABA basis for disbarment on this record is therefore totally indefensible, and certainly not alternatively justifiable either by the inexplicable "cumulative" reasoning of Hearing Officer Hughes, nor by any requisite "cumulative" clear and convincing evidence, as again, trying all of the cases together, cross-contaminating the alleged evidence, am anathema in the first place to due process, would be grounds for automatic

reversal and not grounds for changing the otherwise clear decision and judgment in any separate case.

### Third: The Kern False Accounting Claim Proven False

117. The third finding against Dubin by the Hawaii Supreme Court was that *"Respondent withdrew $3,500.00 of the clients' funds at a time when, based upon Respondent's own accounting, Respondent had not yet earned those funds."* Harkey Case, Disbarment Order, page 3.

118. When Dubin was forced to withdraw from representing Mr. Harkey, explained below, Mr. Harkey owed Dubin $69,475.44 in fees and costs.

119. It was only on November 28, 2017, just a few minutes before the conclusion of the combined omnibus hearings, that the ODC prosecutor waited for the very first time to raise the $3,500.00 issue, without providing Dubin time to investigate and knowledgeably respond:

> Q.   According to my calculations, as of the date you withdrew the $20,000 on March 7th, 2016, you withdrew $3,350 from Mr. Harkey's $20,000 in unearned fees.
>
> A. I don't know if your calculations are correct. I also do not know whether or not the accountant made a mistake in the dates, so -- ... There could have been a mistake. After all, we're 70,000 in arrears. I'm not even charged for this in the amended petition.

120. Dubin further replied that the invoicing is done by his in-house accountant, and there was no evidence submitted that any such mistake was knowingly made by her or by Dubin or otherwise intentionally done.

121. Furthermore, Dubin replied that the ODC prosecutor did not include costs and general excise tax in his calculations, and lots of documented work on the case done by other members of Dubin's law firm he noticed was inadvertently omitted from the calculations, and replied that the invoicing dates could have been mistaken by four days, and that he would have to check his office records, but the ODC prosecutor continued to repetitiously badgering him at the hearing with his usual habit of banging his fist on the table, not explaining why he brought that issue up at the very end of the hearings without giving Dubin time to investigate.

122. Errors by accident committed by others, moreover, in the absence of evidence of willfulness, do not *vicariously* equate to a clear and convincing, knowing ethical violation, and certainly not one justifying disbarment, and such questions should not have been reserved for the last few minutes of the hearings to prejudice Dubin. Nor should a contrary prosecutorial record be made by ambush.

123. Dubin, upon checking his records after the hearing, discovered that there was an almost two-month gap shown on that specific client invoice prior to March 7, 2016, starting at the end of January 2016, caused by lost manual time slips resulting in lost billings during that period, explaining the difference between the periodic oral reports given to the client, the procedure employed at the client's request, triggering earned withdrawals at the time, all ironically in the client's favor,

what was being challenged by ambush at the very conclusion of the hearings with only minutes to go.

124. One need look no further to confirm Mr. Kern's bias than to observe his attempt to speculate at the hearing how Dubin's final accounting produced was supposedly in miniscule error, by his challenging a few time entries which represented an infinitesimally extremely tiny fraction of the overall balance of uncontroverted fees and costs owed to Dubin by Mr. Harkey, one series of entries based on more than 24 hours charged in one day, that and a few others being clear accounting errors made by Dubin's office accountant, easily explained and corrected, who tabulates the hours and prepares the invoices as Dubin testified, not Dubin.

125. Another infinitesimal example was Mr. Kern's challenge based on a claimed entry of an allegedly incorrect date for Dubin's trip to Las Vegas to meet with Mr. Harkey, when in fact accompanying airline and hotel receipts in the record showed that Dubin's trip dates were cost invoiced correctly.

126. Mr. Kern simply did not know how to read date stamps on text messages, as he looked wildly for anything to complain about.

127. The Hawaii Supreme Court did not otherwise seem impressed by Mr. Kern's self-serving accounting claim, not ordering any funds to be returned.

128. Hearing Officer Hughes showed no interest in calling the accountant as a witness, the one who prepared the invoice, only interested in his concluding the omnibus hearings so that he could attend a luncheon previously scheduled, or so he said on the record, and thereafter began to write his one-paragraph report.

### Fourth: The Kern Noncooperation Claim Proven False

129. The fourth finding against Dubin by the Hawaii Supreme Court was that *"Respondent did not inform the client when he fully disbursed the client's $45,000.00 from the firm's client trust account, and he did not respond to clear inquiries from ODC regarding the matter."* Harkey Case, Disbarment Order, page 3.

130. First, the ODC's only witness, the record shows, was Mr. Kern, who had no personal knowledge of what had transpired between Mr. Harkey and Dubin, who was retained by Mr. Harkey for the Nevada case only after Dubin withdrew.

131. Mr. Kern, after substituting for Dubin in the USDC Nevada case and being rebuked with court sanctions by that Court for misbehavior and having subsequently lost the case for Mr. Harkey, dismissed for litigation abuse by Mr. Kern, was not paid, and his motivation was only to secure funds for himself.

132. While Mr. Kern did very belatedly, after Dubin challenged his authority, finally produce Mr. Harkey's signature with that of Ms. Nora (whose involvement is discussed below), authorizing Mr. Kern to seek billing information, however there

was not only no proof that that was Mr. Harkey's signature, itself described at the hearings as a facsimile, but Dubin had plenty of reason to doubt it.

133. There was also no proof that Mr. Kern's hearsay testimony at the hearings reflected Mr. Harkey's views, not mentioned in his alleged authorization letter, notwithstanding that Mr. Harkey was in bankruptcy proceedings at the time, yet Mr. Kern was permitted to speak for Mr. Harkey at the hearing by Hearing Officer Hughes without any foundation for his testimony and without there being any opportunity for Dubin to cross-examine Mr. Harkey. nor any explanation why Mr. Harkey was not also on the telephone as was solely Mr. Kern.

134. Second, although the ODC prosecutor through his investigator did claim that Dubin had not timely responded to his inquires, that testimony was proven to be completely mistaken at the hearing and expressly recanted by the ODC investigator after being shown at the hearing a fax to him responding to his supposed unanswered request for further information (one can never satisfy the endless requests from the ODC whose investigators are allowed self-servingly to testify regarding alleged failures to cooperate with them), the ODC investigator embarrassingly withdraw the claim that Dubin did not cooperate with the ODC at the conclusion of his testimony.

135. Yet somehow that false claim made its way inexplicably back before the Hawaii Supreme Court in its list of justifications for disbarment nevertheless.

136. In order to understand the truth, it is necessary to understand the chronology of events, and why Mr. Kern was not singularly a trustworthy firsthand witness at the hearings in the absence of Mr. Harkey himself, and why Dubin had to withdraw from representing Mr. Harkey due to a Ms. Wendy Nora suddenly becoming the Plaintiff in the Nevada case replacing as Plaintiff Dubin's client Mr. Harkey, as the new Harkey Trust Trustee, which Dubin testified to at the hearings and fully voluminously documented, summarized as follows:

137. Mr. Harkey, after having previously been convicted of federal financial felonies in federal court on the U.S. Mainland and later a felon in possession of a firearm, serving between ten to fifteen years in federal prisons, came to Dubin in late 2015 thereafter with various cases seeking *pro hac vice* representation.

138. One of his *pro se* foreclosure-related cases had just been dismissed in Washington State based on lack of jurisdiction and another ongoing at the time in Nevada federal district court in Las Vegas, where he was the Plaintiff *pro se*, which after Dubin later withdrew and was replaced by Mr. Kern, Mr. Kern was sanctioned by the presiding Federal District Court Judge and that case involuntarily dismissed with prejudice as a result on July 6, 2017.

139. Mr. Harkey hired Dubin first to attempt to salvage through reconsideration his Washington State loss, which Dubin began to do, but ultimately

Mr. Harkey instructed Dubin to cease working on the Washington State case and to concentrate on the Las Vegas action.

140. Dubin applied successfully for *pro hac vice* status with another member of his law firm in federal district court in Las Vegas, Nevada, thoroughly researching the case and communicating with nearly a dozen opposing Nevada counsel over outstanding discovery and other pretrial matters, and traveling to Nevada to meet with Mr. Harkey and other local counsel, while drafting new pleadings and discovery requests. All of that work is detailed in the Record within Dubin's thousands of pages of submissions to the ODC during its Kern investigation.

141. Mr. Harkey's existing wrongful foreclosure amended pleadings had been earlier ghost written by a Midwestern attorney, Wendy Nora, who at the time was under disciplinary investigation in her home State of Wisconsin and therefore unable to secure *pro hac vice* status in Nevada, and indeed had been not so politely removed by the presiding Nevada District Judge from doing any work in the Nevada case even as a paralegal following heated objections by opposing counsel before Dubin was retained, her having been discovered working on the case as an alleged paralegal sidestepping that District Court's *pro hac vice* rules, and then warned off the case by that Court after visibly surfacing in Mr. Harkey's case, and then being subsequently suspended from the practice of law for two years in her home state.

142. During Dubin's representation of Mr. Harkey, Mr. Harkey signed two written retainer agreements. Mr. Harkey, otherwise preferring to conduct his financial affairs orally, was at his request provided only with oral client trust account updates, as he emphatically specifically wanted nothing financially to be in writing, maintaining a low financial profile after his incarceration and apparently fearful of the IRS, having no bank accounts, and all retainer funds of his being wired to Dubin from bank accounts that were not his.

143. Similarly, Mr. Harkey would principally conduct business on the telephone and by text messaging, occasionally sending emails at least at first to Dubin only through a friend in Washington State.

144. In one such text message from Mr. Harkey, sent to Dubin in his representation of him, when his retainer funds had become exhausted, Mr. Harkey wrote Dubin acknowledging that Dubin had kept him orally fully informed and up-to-date regarding his fees and costs as Mr. Harkey had requested, and stating that Mr. Harkey was in the process of wiring additional funds for his Nevada litigation ("I have already pledged to get another installment to you as soon as I can. A Commitment" -- dated April 21, 2016).

145. Dubin, however, became ethically required to withdraw from his representation when Ms. Nora convinced Mr. Harkey to transfer his real property, which was the subject of the Nevada action and Dubin's representation, to a newly

formed operating trust headed by her as Trustee so that she could again take control of the Nevada litigation, telling Dubin what to do, as a ploy for overcoming her being disqualified from *pro hac vice* representation in Nevada, and Dubin by email on April 25, 2016, let Ms. Nora know why he was not going to join her in the fraud on the Nevada federal court:

> As you know, no attorney can accept the relationship you propose. You are forcing my law firm to withdraw our petition for pro hac vice appearances. I had hoped in recently emailing you that you could work with us on the Nevada case, not that you would control our representation and not that we would be stand-ins for you. Your proposal is unethical and would be contrary to the rules governing pro hac vice representation in the State of Nevada.

146. Thereafter contemporaneously followed a series of similar email exchanges between and among Dubin (explaining further why he could not ethically continue representing Mr. Harkey in the case) and Mr. Harkey (asking Dubin naively to please stay on and work with Ms. Nora while she was behind the scenes) and Ms. Nora (threatening Dubin, while explaining the way she intended to control the case).

147. That correspondence, in the Record, is similarly voluminous. There was no way that Dubin was going to participate in a fraud on the Nevada District Court, no matter how much money Dubin was being offered.

148. The discussion between Mr. Harkey and Dubin, Mr. Harkey continuing to beg Dubin to stay on and work with Ms. Nora, culminated with several final text

messages from Dubin to Mr. Harkey, again explaining why he could not ethically further represent Mr. Harkey.

149. Whereupon, Dubin moved to withdraw as did his chosen local counsel, at the time a Nevada State Representative and Chairman of Bernie Sanders' 2016 Presidential Campaign in Nevada, himself about to run for U.S. Senate in Nevada, who Dubin had assured, now embarrassingly, that being local counsel would not in any way risk his receiving any bad publicity due to the Harkey litigation.

150. The motion to withdraw was granted by the Nevada District Court who was told by Dubin only of "irreconcilable differences" between client and counsel so as not to prejudice Mr. Harkey's case. Meanwhile, Dubin warned Mr. Harkey that Ms. Nora was not competent to handle his case.

151. Ms. Nora as Trustee replaced Dubin with her personally selected out of state counsel who in turn selected as his local counsel Mr. Kern, joining in on the fraud, who together completely wrecked Mr. Harkey's case as Dubin had predicted, failing to cooperate in discovery, finally to the point where Mr. Harkey and Mr. Kern were sanctioned by the Nevada District Judge who then dismissed the case with prejudice for noncompliance with federal rules, *supra*.

152. In desperation, Ms. Nora and Mr. Kern attempted to blame Dubin for their discovery failings, but the Nevada District Court was not fooled and did not agree, and when Ms. Nora surfaced on the record as the Trustee, as Dubin had

predicted, the Nevada District Judge wanted nothing more to do with the case and before dismissing, entered monetary sanctions against all of them.

153. Ms. Nora then placed Mr. Harkey's trust in bankruptcy ("The Harkey Operating Trust") while appealing the dismissal by the Nevada Court, which bankruptcy was incorrectly filed by Ms. Nora in the U.S. Bankruptcy Court in Minnesota, then transferred to the U.S. Bankruptcy Court in Nevada. She was not capable of doing anything correctly.

154. The bankruptcy case was opposed by the IRS as could be expected and eventually dismissed with no discharge.

155. Dubin was contacted by the Trust's bankruptcy attorney, Mr. Edstrom, who informed Dubin that Ms. Nora had the Trust file a claim against Dubin for the return of all of Mr. Harkey's paid retainer fees based on allegations from Mr. Kern, not from Mr. Harkey.

156. Whereupon, Dubin explained the situation to Mr. Edstrom and although Mr. Harkey's Trust (who was never Dubin's client) was now the Debtor according to Mr. Edstrom in federal bankruptcy court and Dubin had been contacted by an official bankruptcy attorney not a part of Mr. Nora's fraud and claiming to have Mr. Harkey's approval, Dubin provided a complete written accounting showing way in excess of what Dubin had been paid as Mr. Harkey had never added his promised funds, *supra*, and that was the end of the matter.

157. Dubin's accounting was never challenged in the Harkey Operating Trust Bankruptcy, with all appeals from the Nevada dismissal rejected, and Ms. Nora's suspension from the practice of law by her State's disciplinary agency became final by order of its State Supreme Court which increased the duration of her suspension.

158. The ODC meanwhile received a complaint from Ms. Nora's chosen, discredited local counsel, Mr. Kern, accusing Dubin of failing to provide Mr. Harkey with a written accounting, even though Mr. Harkey had instructed Dubin not to do so in writing.

159. When the Kern complaint was first called to Dubin's attention by the ODC, Ms. Preece, then Assistant Disciplinary Counsel, no longer there, as usual, had already made up her mind to add the Harkey matter to her planned Petition for Discipline, refusing in writing to meet with Dubin until the Kern matter was submitted to a Member of the Disciplinary Board, exactly contrary to Board Rules.

160. The ODC chose to take Mr. Kern's testimony by telephone at the hearing, whose testimony regarding Dubin's representation of Mr. Harkey was all hearsay, the ODC making no attempt to call Mr. Harkey as a witness even by telephone, ignoring the fact that Mr. Kern had brought the charges so he could self-servingly be paid his fees. Dubin repeatedly tried to contact Mr. Harkey, but received no reply.

161. Mr. Kern meanwhile was unable to testify with personal knowledge regarding any of his or the ODC's charges against Dubin, producing no evidence

whatsoever that Mr. Harkey had any claims or any objections or any beef of any sort with Dubin, or that Mr. Harkey had so instructed him to do so at the hearing:

162. E.g.: (a) Mr. Kern, with respect to the requirements of Hawaii Rules of Professional Conduct (HRPC) Rule 1.15(d), had no personal knowledge of what the agreement had been between Mr. Harkey and Dubin regarding accounting for hours and costs, (b) Mr. Kern, with respect to HRPC Rule 1.15(c), had no personal knowledge of Dubin's deposits made by Mr. Harkey into Dubin's client trust account, which happened to be two direct wire transfers into Dubin's client trust account, (c) Mr. Kern, with respect to the requirements of HRPC Rule 1.15(d), had no personal knowledge of notices given to Mr. Harkey by Dubin concerning the disbursement of funds from Dubin's client trust account, and (d) Mr. Kern, with respect to the requirements of HRPC Rule 1.4(a)(3) (misquoted by the ODC in its Amended Petition), had no personal knowledge of how Dubin had or had not kept Mr. Harkey informed.

163. Mr. Kern's unsupported hearsay testimony was moreover completely contradicted by Dubin and Dubin's voluminous supporting documentation to the contrary, including evidence of Mr. Kern's attempted and rejected fraud on the Nevada Court, but nevertheless the ODC's findings of fact adopted every factually contradicted statement made by Mr. Kern at the hearings, and despite the fact that

Dubin was bound by HRCP Rule 3.3 not to aid Mr. Kern in his and Ms. Nora's waging of their fraud on the Nevada Court.

### Fifth: The Andia Misappropriation Claim Proven False

164. The fifth finding against Dubin by the Hawaii Supreme Court was that *"Respondent by signing the names of his clients, without their permission, in the endorsement section of a $132,000.00 settlement check made out to them alone and depositing it in his client trust account thereby gained control over those funds."* Andia Case, Order, page 2.

165. The truth is that although at first Mr. Andia demanded the entire $132,000, claiming it was all his, not all of the $132,000 settlement funds were actually owned by the Andias.

166. Close to fifty percent of the settlement funds Mr. Andia later had to concede and he agreed, as did the Hearing Officer and the Board and the Hawaii Supreme Court eventually, belonged to Dubin. Yet Mr. Andia tried to walk away with the entire settlement check.

167. Thus, of the $132,000, $70,297.13 was immediately paid to the Andias by Dubin once the Bank of America settlement check written on a Rhode Island Bank cleared Dubin's First Hawaiian Bank Client Trust Account, including $8,000.00 otherwise by written retainer agreement replenishing the Andias' retainer

account, also immediately paid to the Andias when Dubin's services were terminated by the Andias.

168. The ownership of the remaining $61,702,87 was initially disputed, Mr. Andia claiming the entire $61,702.87 as his, pursuant to a claimed "flat fee" agreement. That argument was eventually rejected by Hearing Officer Hughes and the Hawaii Supreme Court.

169. The settlement check was supposed to have been made out to the Andias and the Dubin Law Offices, as the Bank of America had requested and been provided with Dubin's W-9 IRS clearance form, and Dubin as well as the Andias assumed legal obligations pursuant to the settlement agreement, but when the settlement check arrived it was mistakenly made payable to the Andias alone. That came as a complete surprise.

170. Dubin consulted with officers of First Hawaiian Bank (FHB) who had to approve any third-party check being deposited, and suggested if Dubin sign the Andias' names, with his initials, they would approve the deposit into the trust account. FHB initialed its approval on the settlement check for the deposit.

171. Dubin initialed the back of the check as the Bank had instructed, and Bank officers initialed the front, hardly an attempt to defraud anyone, the disputed funds remaining untouched in Dubin's Client Trust Account until cleared and the distribution of the settlement funds agreed to by the Andias.

172. Their $70,297.13 was immediately paid to the Andia once cleared and an additional $8,000.00 retainer paid to them immediately thereafter upon discharging Dubin.

173. It is erroneous to say that Dubin had control over the monies, as every attorney as well as monies held in client trust accounts is bound by Court Rules, and it is conceded that none of the remaining, disputed monies left the client trust account until Dubin met with Mr. Andia to discuss the distribution.

174. During that meeting, Mr. Andia disputed only $19,885.00 of the $61,702,87, and after being explained the basis for the Associates' charges, which he approved (and later admitted in writing that he had fully approved at that early meeting), and only then was the remaining $61,702.87 disbursed to the Dubin Law Offices.

175. Every Hawaii Rule of Professional Conduct was adhered to. All disputed funds were placed safely in Dubin's client trust account, and the funds only removed and were required to be removed when the clients approved the distribution. Indeed it would have been a violation of our Rules not to have removed those earned funds after Mr. Andia agreed.

176. More than a full month later, Mr. Andia changed his mind, whereupon Dubin immediately offered to put the $19,885.00 that Mr. Andia, reneging, claimed

was his, immediately back into his client trust account, but Mr. Andia refused the offer.

177. Dubin offered to enter into Bar fee mediation or Bar fee arbitration. Mr. Andia refused, instead threatening First Hawaiian Bank and Dubin with lawsuits.

178. Filing two separate lawsuit: First Hawaiian Bank sought assistance and exoneration in First Circuit Court, Judge Chang presiding. Dubin sought assistance and exoneration in First Circuit Court, Judge Crandall presiding. Both Judges ordered the Andias to show up in their courtrooms. The Andias refused to show up.

179. Even the Hearing Officer and the Board both ultimately agreed that the $61,702,87 was correctly disputed by Dubin and that the Andias were not entitled to the entire amount, justifying considering the funds to be disputed pursuant to the Hawaii Rules of Professional Conduct, *supra*.

180. These are the simple material facts of ownership and full compliance with the Hawaii Rules of Professional Conduct by Dubin, contradicting the above conclusory finding.

181. Neither Dubin nor any other attorney can please every client as our courts are the decision makers in such cases, which is especially true in the area of foreclosure defense trying to save homes, which traditionally understandably generates enormous personal stress for affected homeowners, who may suffer from

lender abuses or who instinctively may and often do blame their attorneys as well as their judge if they lose their foreclosure case.

182. This has created occasional grief not only for Dubin's law firm which pioneered foreclosure defense in Hawaii, but for Hawaii trial courts also, as evidenced by Foreclosure Judge Blondin in Honolulu at the end of her term as foreclosure judge having had to require an armed deputy sheriff in her courtroom, and Judge Cardoza on Maui before retiring occasionally requiring two armed deputy sheriffs in attendance in his courtroom, and Judge Castagnetti in Honolulu last year having to stop proceedings in her courtroom in one case to summon armed deputy sheriffs to eject a yelling homeowner from her courtroom.

183. The Hawaii Supreme Court also has not escaped on the Internet the wrath of some foreclosed homeowners either, calling its Justices part of "the mob".

184. No wonder then that foreclosure defense attorneys generate the most Bar regulatory complaints nationwide through no fault of their own.

185. Clients are often confused by the inner-workings of the legal system, or conclude that their judges are biased in favor of lenders, and some foreclosure defense clients are simply dishonest, believing that by complaining against their defense attorneys they will get their monies or their homes back.

186. The Andias, who won a huge settlement from the Bank of America, were clearly of the latter kind. Few if any clients of Dubin would be upset to receive a six-

figure settlement from the Bank of America just on their counterclaim alone, plus attractive loan modification offers from their first mortgage holder, after not paying their mortgage for more than a decade and not even paying their lawyers for nearly four years of court work, but having an irresponsible attorney disciplinary agency to complain to can make all the difference.

187. And when the ODC gets a complaint against a foreclosure defense attorney, it begins a feeding frenzy, with a Neanderthal mindset contrary to the reality.

188. Foreclosure defense also is not a lucrative calling. Dubin's law firm routinely charges an initial retainer for foreclosure defense clients, most of whom thereafter are frequently unable to pay as the cases can continue for years, turning cases into *pro bono* efforts, yet Dubin's law firm unlike many, never withdraws from a case for nonpayment, being paid only if there is a settlement, as in the Andias' case, unless of course the client is dishonest.

189. Mr. and Ms. Andia became Dubin's clients on or about February 17, 2012, signing a retainer agreement for $16,500. They had not paid their mortgage for several years and were in the process of being sued for foreclosure and eviction. Their first retainer check was dishonored by their local bank.

190. After Dubin's initial meeting with the Andias, Dubin participated only initially in their case, researching and preparing a litigation plan and for nearly four

years thereafter had absolutely no contact whatsoever with the Andias until the dispute described below arose, their case being exclusively conducted by Associates in Dubin's law firm, the Associates being responsible for keeping track of their hours and case costs, billing the clients, preparing court documents, attending hearings, and communicating with the clients and opposing counsel, whereas Dubin or a Senior Associate will handle the trial, if any, as lead counsel.

191. Although Dubin is a sole proprietor, he is not a sole practitioner, his law firm handling hundreds of case, for which many cases an Associate is assigned full responsibility. Dubin has full responsibility for his own cases only. That is how law firms work.

192. The Andias' representation consisted of defending against foreclosure and eventually the Associates in charge of their case at their request filed a Counterclaim, which additional work including suing the Bank of America however was not a part of their written retainer agreement nor covered by their initial retainer.

193. Throughout their representation, the Andias reportedly continued to state that they were unable to pay for their legal representation further. Dubin's law firm, however, continued to represent them at considerable additional expense not contemplated at the time of retention and not a part of their written legal services agreement, what amounted to a forced contingency arrangement.

194. Almost four years later, Dubin's law firm, while managing to keep the Andias in their home at great savings for them otherwise in rental payments estimated to be a savings of more than $120,000, and without their paying their mortgage or property taxes or hazard insurance estimated to be a savings of $240,000, and without their paying Dubin's law firm further for almost four years saving more than $60,000, the Bank of America offered to settle for a dismissal alone of the Andia Counterclaim against it, while the foreclosure case was to continue with however a likely very attractive loan modification settlement promised.

195. It took negotiations lasting almost a year, including a sustained mediation effort, before the settlement was finalized by Dubin's Associates, who neglected to inform Dubin about all of the extra work done on the Counterclaim, on the Mediation before retired Supreme Court Justice Duffy, or on the Settlement until agreed upon.

196. The settlement as negotiated required the Bank of America to pay $132,000, which included the Andias' attorneys' fees and costs in exchange for a dismissal of the Counterclaim, with the settlement check to be made payable to the Andias and to the Dubin's law firm, the Dubin Law Offices, jointly, which is standard settlement procedure in Hawaii lawsuit settlements, if not everywhere.

197. It was and is also standard procedure everywhere, expressly reserved in the Andias' written retainer agreement at Paragraph 16, that Dubin had an attorney's

lien covering settlement proceeds giving Dubin a lawful ownership interest in settlement proceeds in the case:

> Attorney's Lien. You hereby grant us a lien on your claims or causes of action which are the subject of our representation, and on any recovery or settlement thereof, for any sums owed us during or after our representation.

198. Accordingly, local counsel for the Bank of America, as documented by email, requested IRS W-9 forms signed by both the Andias and by Dubin before its settlement check would be released, which both the Andias and Dubin thus signed and returned to opposing counsel.

199. The settlement agreement itself placed specific contractual burdens on Dubin as consideration for his agreement to certain settlement terms, and the standard policy of having settlement funds made payable to opposing parties and their attorneys is also specifically so that opposing counsel does not subsequently seek fees and costs in court.

200. When the settlement check was received by Dubin's office, it was mistakenly made payable by the Bank of America to the Andias only.

201. Dubin  was informed by the Associate in his office at that time, Richard Forrester, who was in charge of the Andias' foreclosure litigation taking over from Associate Andrew Goff who had negotiated the settlement regarding the Counterclaim, that Mr. Andia for the first time was demanding all of the settlement monies supposedly having had a "flat fee" agreement with Dubin, no matter how

much legal work had to be done and no matter how much costs were incurred, according to Mr. Andia.

202. Dubin discussed the payee mistake with officers at First Hawaiian Bank where his Client Trust Account has been located since 1982, and it was agreed to avoid having to return the check and the accompanying delays, that Dubin would deposit the disputed funds in his attorney Client Trust Account where they could remain until the matter was mutually resolved.

203. The deposit was approved by the Bank and its officers initialed the settlement check allowing it to be deposited, otherwise it could not be deposited, requiring only that Dubin sign the Andias' names and initial also.

204. Dubin agreed, and as he had been similarly instructed to do by First Hawaiian Bank Private Banking Vice Presidents ever since 1982 when receiving two-party settlement checks, he deposited the settlement check writing the names of the Andias followed by his initials as required by First Hawaiian Bank, with First Hawaiian Bank afterwards approving the deposit by initialing the settlement check also.

205. Obviously, the disputed funds were to be kept in Dubin's Client Trust Account and not released until the dispute was resolved, which is what Dubin and First Hawaiian Bank intended and what Dubin did until the Andias approved of the distribution of the funds, *infra*, as they subsequently did.

206. Previously, for about four years, Dubin had had no contact with the Andias whatsoever, and the responsibility to keep them informed of the status of their foreclosure case and their fees and costs was entirely the responsibility of assigned Associates in Dubin's office; moreover the Andias had never complained to Dubin regarding even once about anything having to do with their foreclosure case or the Bank of America settlement until after the settlement check was arriving.

207. Upon Dubin depositing the settlement check in his attorney Client Trust Account, Mr. Forrester testified before Hearing Officer Hughes that he explained to Mr. Andia that his case was not accepted on a "flat fee" basis, providing him with a copy of his signed retainer agreement showing that the "flat fee" box was not checked, at which point Mr. Andia by email withdrew his flat fee allegation, yet raised it again at the hearing on the biased urging of Hearing Officer Hughes, the transcript shows Hughes practically putting the words on Mr. Andia's lips.

208. Dubin timely wrote and informed the Andias of the deposit into his attorney client trust account and their responsibility for fees and costs while awaiting the settlement funds to clear, also providing them with an invoice for the total charges from 2012 through 2015 in the amount of $78,202.87, and enclosed a check for the balance due the Andias, crediting the Andias with their initial retainer payment after their first check bounced in 2012.

209. Dubin however did not charge the Andias for the more than a dozen hours spent by Mr. Goff in mediation efforts for the Andias which ironically resulted in the settlement, as Mr. Goff had left the law firm to join the Attorney General's Office without billing for those hours.

210. Mr. Forrester advised Dubin that Mr. Andia was anxious to hide the funds from his former wife and the State of Hawaii, wanting to keep the funds from appearing in his name if possible, since he was behind in child support payments.

211. Of course, Dubin's law firm could not agree to facilitate a fraud upon the State and refused, which greatly upset Mr. Andia, and appears to have been the immediate, real reason for his anger, losing the ability of having the entire check somehow having a better chance for those funds to disappear without leaving a paper trail through Dubin's Client Trust Account.

212. Mr. Andia was invited by Dubin to meet to discuss the distribution of the settlement funds in his Client Trust Account, specifically the amount payable to the Andias, after Mr. Andia voiced objection, and at the meeting solely challenged the billing rates of Dubin' Associates, Messrs. Goff and Forrester, which amounted to a $19,885.00 dispute.

213. Mr. Andia met Dubin at Dubin's Office clean shaven and dressed in a business suit, explaining at the beginning of their meeting that he, Mr. Andia, was a successful businessman with his own photography company. At the later hearing

before Hearing Officer Hughes, however, well-rehearsed, he appeared unshaven with ragged clothing and with a carefully staged homeless look straight from a Hollywood casting agency.

214. Dubin explained to Mr. Andia the Associates' billing rates at the meeting based on their superior performance and successful result as the term "reasonable" is defined in the Hawaii Rules of Professional Conduct, and again showed Mr. Andia a copy of the retainer agreement he signed showing that the representation was not based on a "flat fee," but on the fees and costs incurred in his case during the past four years, although the Andias were not even charged for the extensive year-long mediation effort and settlement work.

215. Dubin explained to Mr. Andia specifically all of the successful work that his law firm had achieved for Mr. Andia and for his wife, keeping them in their home since 2012 and securing for them a six-figure victory just on the Counterclaim alone which was moreover outside of the scope of their retainer agreement, without being paid for that work, and that based on a contingency fee arrangement they would have owed Dubin that much or more.

216. Dubin further testifying without contradiction at the hearing explained to Mr. Andia that Messrs. Goff and Forrester apparently never provided the Andias with a prior fee and cost statement because as provided in the retainer agreement they never asked for one and that Mr. Andia kept telling the Associates that he had

no more money to pay the law firm for any further work. Nevertheless, his law firm continued to do the work for the Andias.

217. Mr. Andia at the conclusion of his meeting with Dubin at Dubin's Office agreed that his proposed share of the distribution was reasonable and withdrew his $19,885.00 objection based on Associate billing rates and cashed his $62,297.13 check payable from Dubin's Client Trust Account a few days later which he had held for weeks, as well as cashing an $8,000.00 refund check since refusing to replenish the retainer account for the work ahead, his also cashing that additional Dubin's Client Trust Account check a week or so after cashing the $62,297.13 check upon informing Dubin that he was changing attorneys in their foreclosure action still ongoing, although their Counterclaim was no longer in the case.

218. Upon Mr. Andia's agreement, Dubin -- then and only then -- having already paid the Andias their agreed share of the disputed funds, transferred the agreed upon additional $69,702.87 agreed owing and payable to the Dubin Law Offices from the Dubin Client Trust Account to Dubin's Operating Account.

219. Subsequently, in email correspondence with Dubin, Mr. Andia voluntarily admitted in writing that he had agreed to the distribution ("**At our meeting, you gave me your explanation and I said 'okay'**" (emphasis added).

220. Months later, in an email to Dubin, Mr. Andia tried to explain away his consent to the agreed upon distribution, without which Dubin would never have

removed from his client trust account those monies ($19,885.00) that Mr. Andia had already agreed were for Dubin's law firm, Mr. Andia for the first time claiming that he only agreed because he was afraid that otherwise Dubin would stop payment on the separate $8,000 check, rehearsed by the ODC to offer that explanation at the disbarment hearing:

> I had just received a check from you in the amount of $8,000 and understood that if I disagreed with you in our meeting that you would most likely put a "stop payment" on the check.

221. In truth, Dubin had earlier assured Mr. Andia in writing that "If however you wish to replace us as your counsel, the $8,000 will be immediately released to you".

222. Additionally, Mr. Andia's belated excuse for agreeing to the distribution was further belied by the fact that he and his wife had held onto the first, much larger, $62,297.13 check for over a full week before cashing it with no such apparent worries, upon which of course no "stop payment" had been placed.

223. Meanwhile, according to Mr. Andia, he decided to change his mind during a Christmas Party attended according to him by several unnamed attorneys, and thereafter started to accuse Dubin of "forgery" telling Dubin he wanted to harm him and knew how to do it, openly telling that to local counsel for the Bank of America, to executive officers of First Hawaiian Bank, and to other local attorneys,

including filing a police report against Dubin for forgery which was ignored by law enforcement as not containing any of the elements of forgery.

224. Coincidentally, maybe, the list of Mr. Andia's Christmas invitees emailed to Dubin shows that one his sailing buddies has been an opposing client of Dubin's law firm who lost a major case in the Hawaii Supreme Court in 2016, which probably did not make him very happy, 139 Haw. 167, 384 P.3d 1268 (2016).

225. And coincidentally, also maybe, when Dubin withdrew from the Andias' foreclosure case, ironically over Mr. Andia's inconsistent objection, nevertheless the withdraw approved by Judge Ayabe, James Hochberg, a Hawaii attorney who Dubin had successfully earlier sued for legal malpractice in First Circuit Court before then Circuit Judge Border, for a client for whom Dubin had also won the related ICA appeal, 212 Haw. App. LEXIS 587, 2012 WL 1951332 (2012), suddenly appeared for Mr. and Ms. Andia, entering a "special appearance" in their foreclosure case, presumably another attorney Christmas guest of Mr. Andia.

226. Dubin in good faith, responding ethically, immediately upon learning of Mr. Andia's about face, offered to return the $19,885 to his client trust account and to mediate or arbitrate the dispute under the auspices of the Hawaii State Bar Association, notwithstanding Mr. Andia's having acknowledged that he was given a full explanation of the billing charges and billing rates previously and had given to Dubin his approval of the distribution and having thereafter cashed both the

$62,297.13 check and the $8,000 check given him months earlier, upon whose agreement Dubin had relied. Mr. Andia, however, refused mediation or arbitration, warning in a series of responsive emails that his intention was to harm Dubin. Upon disbarment, Dubin was forced to pay the Andias the $19,885 over objection.

227. Mr. Andia had been a difficult client from the beginning, according to the firm's Associates working with him. Mr. Andia throughout the foreclosure litigation was, for example, extremely hostile toward the legal system and to the opposing parties and their counsel, constantly using foul language in telephone discussions and in his emails to Dubin's Associate attorneys, writing, for instance, that he was "sick of being bullshitted" by his lender and accused respected opposing Hawaii counsel Pat McHenry of being "a dirt bag and a liar".

228. When the police refused to prosecute Dubin for forgery, Mr. Andia accused First Hawaiian Bank also of financial wrongdoing, threatening to sue First Hawaiian Bank and Dubin, which he however never did, causing First Hawaiian Bank to file a lawsuit for its exoneration in the First Circuit Court and alternatively having Dubin put the disputed funds back into his client trust account (which Dubin initially agreed to do but Mr. Andia refused), and causing Dubin also to file his own separate lawsuit in First Circuit Court to have his deposit of the settlement funds placed into his Client Trust Account approved by that Court.

229. Dubin's lawsuit, assigned to Judge Crandall, was heard first. The Andias, aware of the first hearing scheduled before Judge Crandall, did not even show up. Judge Crandall, a very thorough judge, now retired, wanted nevertheless to hear from the Andias, giving them their day in court, and issued an order to show cause to each of them which was served personally on both of them to appear at the next hearing before her, stating their objections if any to Dubin's deposit of the settlement check into his attorney Client Trust Account and to pled their case if any against Dubin and First Hawaiian Bank.

230. But neither Mr. Andia nor Ms. Andia, each duly served by a process server, bothered to even show up at the next hearing to which they had been formally served with an OSC, subpoenaed by Judge Crandall to attend, and court approval for the release of Dubin's portion of the settlement funds went uncontested.

231. First Hawaiian Bank's lawsuit was next heard before Judge Chang. Again, the Andias, timely served by First Hawaiian Bank as plaintiff, did not show up at the first hearing before Judge Chang either, and First Hawaiian Bank following Judge Crandall's ruling in Dubin's case, requested to withdraw its lawsuit before Judge Chang that sought to have the otherwise disputed funds returned to Dubin's Client Trust Account if it had in any way wrongfully approved the deposit of the settlement check, upon which request Judge Chang dismissed the case.

232. Dubin and First Hawaiian Bank filed joint positions that neither did anything wrong.

233. The Andias' stale claim, rejected by the Honolulu Police Department and by First Hawaiian Bank and by Dubin, and their failing to even show up in two First Circuit Court courtrooms before two separate judges, one of whom had them served with an order to show cause and subpoenas compelling their attendance, the Andias next filed their forgery grievance with the ODC, whose personnel not only lack investigative training or judicial training nor any problem solving expertise, but whose unsupervised personal personnel gotcha incentives historically have not placed a premium on finding the truth, but upon advancing their careers.

234. The ODC prosecutor drafted a self-serving hodgepodge of irresponsible, blatantly false proposed findings of fact (FOF) for consideration by Hearing Officer Hughes at the hearings, most of which completely contradicted the dispositive documentation and supporting testimony referenced above.

235. E.g.: the "flat fee" box was not checked by the Andias on their retainer agreement (vs. FOF 66, 68); no attempt was made by Dubin to represent that the Andias had signed the back of the check, having to the contrary been initialed by Dubin and also initialed as approved by officers of First Hawaiian Bank (vs. FOF 91); none of those funds were withdrawn from Dubin's client trust account or used in any way by anyone until the withdrawal and the distribution of those funds were

approved by the Andias, as subsequently verified by Mr. Andia in his admission against interest in writing set forth on Page 122, at Paragraph 219 above (vs. FOF 105).

236. Moreover, no substantive work, contrary to the ODC findings, was undertaken by Dubin or any of his Associates until five months after retention when the complaint was served and the Associates continued to work on the case without more funds, because the Andias said they had no money, planning to pay when the case settled (vs. FOF102); an additional $8,000 was retained only if the Andias wanted Dubin's Associates to continue working on the foreclosure claims which would continue after the settlement only because the Andias agreed to settle on the Counterclaim only (vs. FOF 99, 120); Dubin never refused to put the Associates' disputed $19,885 back into his Client Trust Account; months later after approving the distribution of the settlement funds Mr. Andia simply reneged, whereupon in writing Dubin offered immediately to maintain the *status quo ante*, but that offer was refused, Mr. Andia preferring instead to file a police report for forgery, subsequently rejected, and to threaten First Hawaiian Bank who had approved the deposit, with suit, nor did Dubin ever threaten Mr. Andia with additional charges, only mentioning he was not even charged for all of the work (vs. FOF 111).

237. Even more revealing are the material facts that were completely ignored by the ODC prosecutor in his draft of the proposed findings:

238. E.g.: there is no mention of the undisputed fact of the two lawsuits, brought respectively by Dubin and by First Hawaiian Bank, in which when asked by both presiding Judges to explain their positions regarding the money deposited in Dubin's Client Trust Account and whether those monies should be returned to the Client Trust Account and given to the Andias, they refused to even show up in court in either case; there is no mention of the fact that the Dubin Law Offices had represented them in their foreclosure case for close to half a decade defending against foreclosure and prosecuting their counterclaim to the point where the Bank of America settled for $132,000, hardly the usual achievement in a foreclosure case, after their not having paid their mortgage or a penny for fees or costs since February 2012; there is no mention of the fact that after having approved the distribution of the settlement funds according to Mr. Andia, the Andias waited months before suddenly deciding to accuse Dubin of forgery; there is no mention of the fact that after the Andias suddenly cried forgery, Dubin offered to put the Associates' disputed $19,885 back into his Client Trust Account, offering the alternative of mediation or arbitration, which offers were refused, and no mention that First Hawaiian Bank approvingly initialed the deposit also.

239. Dubin's conduct was without any intention to act contrary to the wishes of the clients and was in conformity with the requirements of the Hawaii Rules of Professional Conduct.

240.  The ownership interests of both the clients and Dubin were fully protected after the Bank of America, mailing the settlement check to Dubin's Office, the Bank having made a mistake in not making it jointly payable as the Settlement Agreement by its terms provided for bargained for performances by both Dubin *and* his clients, and all of that after Mr. Andia at first insisted in bad faith that he had no obligation to pay Dubin anything.

241. The check was deposited in Dubin's Client Trust Account and kept there until its distribution was agreed upon with the Andias, pursuant to the directives contained in HRPC Rule 1.15(e):

> When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claims interests, the property shall be kept separate by the lawyer until the dispute is resolved.  Disputed client funds shall be kept in a client trust account until the dispute is resolved.

242. And Dubin being bound by the balance of that same Rule 1.15(e), after Mr. Andia approved the distribution, including the funds to be paid to Dubin, the Rule mandated that the funds be immediately removed by Dubin from the Client Trust Account:

> The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

Not to have done so at that time would have been a clear HRPC ethical violation.

243.  Additionally, the ODC prosecutor contended that Dubin's published billing rates were departed from in Andias' case. Yet nowhere in the HRPC is there

a single mention of the "billable hour" as controlling what clients are billed, not even found therein once, and the Andias' retainer agreement specified fees "were subject to periodic increases."

244. Moreover, it was not Dubin, but the Associates working on the case alone for almost four years who were responsible for communicating with the Andias and doing the billing, for in those years Dubin did not even have any contact with the Andias whatsoever, yet now Dubin was disbarred *vicariously*.

245. None of the Associates were charged with any ethical violations, nor should they *nor Dubin* have been.

246. HRPC Rule 1.5(a) sets forth eight factors for determining the reasonableness of fees, not once mentioning the billable hour, and notably some of the factors can be applied *only after and not before the legal services are first rendered*, depending, for instance, on "the time and labor required," on "the novelty and difficulty of the questions involved," and on "the results obtained."

247. That is just another pronounced contradiction within Hawaii's judge made rules, holding an attorney responsible for reasonable fees from the outset of a representation, yet stating that the outcome of the lawyering is to be considered a part of the reasonableness of the fees.

248. And who could argue with the results obtained for the Andias: $132,000 for the winning of the Counterclaim alone after four years of effort, whereas the

Andias wanted to run away with all $132,000.00 for themselves, a skillful lawyering victory for which the Andias had paid nothing for four years in attorneys' fees. claiming that they had a flat fee, an absurd unsubstantiated argument which even the Hawaii Supreme Court rejected, yet disbarred Dubin anyway.

249. The above unsupported, conclusory finding that Dubin violated a disciplinary rule in the handling of a settlement check is directly contradicted by the material record facts utterly ignored by the Hawaii Supreme Court.

### Sixth: The Andia Nondisclosure Claim Proven False

250. The sixth finding against Dubin by the Hawaii Supreme Court was that *"Respondent did not immediately inform the clients of the receipt of the check when he learned of it. The invoice he subsequently issued to the clients on November 7, 2015 was the first billing statement or accounting since the inception of his representation of them in February 2012 wherein he asserted $69,702.87 in fees and costs owing, based upon an hourly rate of $385.00 an hour for Associates on the case."* Andia Case, Order, page 2.

251. This next conclusory ethical criticism is similarly not true. Dubin had no contact with the Andias or their case for approximately four years prior to his office receiving the settlement check, that keeping him informed was the responsibility of their assigned Associates, and that the Andias were immediately paid all undisputed

amounts as soon as the settlement check cleared and shortly before that Rhode Island check cleared in his client trust account.

### Seventh: The Andia Overcharging Claim Proven False

252. The seventh finding against Dubin by the Hawaii Supreme Court was that *"That rate was unreasonable because it exceeded by $115.00 per hour the rate agreed upon in the retainer agreement for Associates and was also applied to one Associate for work done at a time when that Associate was not licensed to practice law in this jurisdiction".* Andia Case, Order, page 2.

253. The Hawaii Supreme Court failed to apply the "reasonableness" standard for judging the appropriateness of fees found in its own Rule 1.5(a) of the Hawaii Rules of Professional Conduct, since some of the factors adding to hourly rates can only be applied after and not before legal services are first rendered, depending, for instance, on "the time and labor required," on "the novelty and difficulty of the questions involved," and on "the results obtained."

254. In Andias' situation, Dubin had been paid nothing for the successful work of his law firm for four years on the Counterclaim, finally the settlement ultimately yielding $132,000.00 in settlement funds, which not only was a very successful outcome challenging loan modification abuses, but to this day an unprecedented recovery for any Hawaii homeowner in foreclosure.

255. Additionally, the Andias in those four years while Dubin's law firm pursued their Counterclaim (1) saved a total of more than $420,000.00, *supra*, not paying any legal fees or having to pay alternatively for renting elsewhere, nor being burdened with any mortgage payments or any real property tax or hazard insurance obligations instead being paid by their lender, plus (2) escaped hundreds of thousands of dollars more in any deficiency judgment, while being offered an attractive loan modification terminating the foreclosure.

256. All of this was reflected in the above questioned billing rates, for that is the language of the day, the "billable hour," notwithstanding that nowhere in Rule 1.5(a) is the "billable hour" mentioned or anywhere for that matter mentioned throughout the Hawaii Rules of Professional Conduct. Nowhere.

257. When Dubin began the practice of law in 1964 there was no such thing as the "billable hour" or "hourly billable rate." Instead, clients were billed after-the-fact as the Andias were at the first time that they could pay, based upon the agreed value of legal services, the risk of nonrecovery, and results obtained, precisely as set forth in Rule 1.5(a), the century old language of which still comprises the ABA standards of reasonableness to this day.

258. The history of the application of the ABA standard of "reasonableness" is thoroughly explained throughout the professional literature, for example, in a paper published in the 1977 *University of Pennsylvania Law Review*, one of many

justifying Dubin's billing conduct in the Andias' case. Indeed, perhaps the news travels more slowly to Hawaii, but a growing majority of Mainland law firms have begun to deemphasize "the billable hour" in favor of what is now called preferred "value billing" which is precisely what is suggested in the Hawaii Rules of Professional Conduct as "reasonable," for which Dubin has been disbarred, akin to Salem witch burnings.

259. No Court should impose a professional death penalty of disbarment on an attorney, especially at age 82, without even applying its own published "reasonableness" HRPC standards.

260. Finally, as for Mr. Forrester, not only was he a Member of the Nevada Bar before being employed by Dubin, but he became a Member of the Hawaii Bar a few months after he started working on the case at which time thereafter virtually all of his billings on the Andia case occurred.

261. Mr. Andia raised the same billing questions at his meeting with Dubin shortly after the settlement check was received, all of which questions were fully answered and the answers were explained to Mr. Andia, and he agreed with the billing which he later acknowledged *in written* he had been explained and he had approved (at the same time, moreover, that he was aggressively reneging on his acceptance of the distribution of the settlement funds), and it was only then upon his acceptance and at his direction that the disputed settlement funds otherwise sitting

untouched in Dubin's Client Trust Account were released as required by the Hawaii Supreme Court's own ethical rules, and there is nothing in the record nor any finding by anyone anywhere that Mr. Andia suffered from a mental or educational or language disability or other handicap requiring a guardian to make those decisions for him and for his non-testifying, otherwise subpoenaed wife.

### *Eighth: The Andia Excessive Billing Rate Claim Proven False*

262. The eighth finding against Dubin by the Hawaii Supreme Court was that *"We also find the clients were never contacted or consulted regarding an amendment of the agreed-upon rate. As a result, Respondent overcharged the clients a minimum of $19,885.00."* Andia Case, Order, page 2.

263. Dubin, again, had no contact with the Andias for the approximately four years leading up to the time his office received the Bank of America settlement check which fact is not contested, and it was not Dubin's responsibility, but the responsibility of the Associates assigned to the Andias' case to keep them informed.

264. And, if that was not done, and there is no contrary testimony other than that from Mr. Andia, the "agreed-upon rate," notwithstanding Mr. Andia's discredited insistence that there was to the contrary a "flat fee" agreement only, was followed in the retainer agreement by the language that the billing rates were subject to periodic change.

265. And, in any event the amount billed according to Hawaii's own prescribed standards of reasonableness after-the-fact, *supra*, could not have been determined until the results were known without possessing clairvoyance and without contradicting the laws of physics.

266. And, most importantly, Mr. Andia himself admittedly in writing later that he ultimately agreed upon the billings and the final distribution of the settlement funds while still remaining safely in Dubin's Client Trust Account, lest the obligation of contract is also to be shredded along with Dubin's ability to have a livelihood.

### G. DUBIN'S CLIENTS DAMAGED POST-DISBARMENT

267. The Star Chamber, cavalier disbarment of Dubin with no nondiscretionary appeal created a virtual irrevocably train wreck, as it were, not only for Dubin who immediately lost all of his remaining Associates and almost all of his remaining staff while operating on a fixed overhead, but has been a total disaster as well for his many clients trapped in approximately three hundred court cases in various active stages of litigation, many of whom have invested in his expertise or have become dependent on his *pro bono* assistance, and who were completely satisfied with his ethics and performance, and now find themselves without legal counsel and few if any competent replacement alternatives being provided by a legal

system that talks about "Access To Justice," yet shuts its doors capriciously to competent counsel.

268. Summarized by court, case name, and case number on the following pages, which speaks for itself, is a list of some of the ongoing court cases in Hawaii at the time of Dubin's disbarment that were disrupted to the detriment of Dubin's clients as well, victimized as members of the general public, materially harmed by his disbarment which was supposedly ironically intended to protect the general public from this highly successful attorney and who nevertheless were paradoxically intentionally excluded from participating in any of his disbarment proceedings:

269. First Circuit Court (Honolulu) -- *Bank of New York v. Burt Santos Acidera*, 1CCV-20-0000703; *Timothy Roy James Pagan v. Betty Masuno et al.,* 1CCV-20-0000579; *Ounyoung v. Ocwen*, 1CCV-20-0000349; *Jacques B. Garrett v. AOAO Terrazza/Cortebella*, 1CC191001594; *Wilmington Savings Fund Society v. Royd Allen Gano*, 1CC191001380; *HSBC Bank USA N.A. v. Elmer Kuhiolani Drew*, 1CC191001304; *Deutsche Bank Natl. Trust v. Edmund M. D. Calucag*, 1CC191001254; *Bank of New York Mellon v. Edwin Paet Eala,* 1CC191001251; *US Bank Natl. Association v. Kosta Slobodan Voinovich*, 1CC191000832; *Cit Bank N.A. v. Stanley Manoa Jr*, 1CC191000520; *US Bank Natl. Association v. Karl Kazuo Saiki,* 1CC191000474; *Wilmington Savings Fund Society v. Yvonne Nielsen*, 1CC181002090; *Deutsche Bank Natl. Trust v. RML Yee Spec Admin*,

1CC181002036; *CSMC Mortgage-Backed v. Richard M. Morgenstein Jr.*, 1CC181001969; *Isabelo Pacpaco Domingo v. Wilmington Savings Fund*, 1CC181001561; *Deutsche Bank National Trust v. Roger Lee Cundall*, 1CC181001360; *CitiMortgage Inc, v. Michael Mamoru Kinoshita.*, 1CC181001335; *Deutsche Bank Natl. Trust v. Mark Anthony Luna,* 1CC181001254; *US Bank Trust N.A. v. George Costa Jr.*, 1CC181001219; *Robert Louis Santiago Successor Trustee v. Ruth K. Tanaka*, 1CC181001221; *Title Guaranty Escrow Services v. Metlife Home Loans*, 1CC181000759; *Bank of New York Mellon v. Sterling N. Silva,* 1CC181000292; *Bank of New York Mellon as Successor Trustee v. Mia Ban*, 1CC181000084; *Bank of New York Mellon v. David Wallace Howell*, 1CC171002105; *US Bank Natl. Association v. Marie Cabuyadao Butler,* 1CC171002071; *US Bank Natl. Association as Trustee v. Alexander M, Ibarra*, 1CC171002020; *Bank of America v. Gwen Alejo-Herring Successor Trustee*, 1CC171001991; *Deutsche Bank Trust Co. v. John Perreira Jr,* 1CC171001938; *Deutsche Bank Natl. Trust v. Loreen Director Troxel*, 1CC171001941; *Bank of New York Mellon as Trustee v. Jody A. Solbach*, 1CC171001921; *US Bank Natl. Association Successor Trustee v. David D. Goodwin.,* 1CC171001561; *Santander Bank N.A. v. Haruyo Hayashikawa,* 1CC171001481; *Wilmington Savings Fund v. Ralph C Soto Jr.,* 1CC171001388; *Bank of America N.A. v. Constance May Magalong.,* 1CC171001379; *Wilmington Trust Natl. Association v. Jaroslaw*

*Karpusiewicz,* 1CC171001385; *Deutsche Bank Natl. Trust Company v. Rudy Villanueva,* 1CC171001170; *Deutsche Bank Natl. Trust Company v. Theresa Archer,* 1CC171001153; *U.S. Bank Natl. Association  v. Emiliana R. Escalante,* 1CC171000492; *Bucks Financial LLC v. Raymond Rapoza Jr.,* 1CC161002244; *US Bank National Association v. Saumani Toleafoa,* 1CC161002246; *Cit Bank National Association v. Antonio Aquino Grafilo,* 1CC161002197; *Lakeview Loan Servicing LLC v. Antonio A. Grafilo*, 1CC161002102; *Rory D. Otto v. Patrick Allen Watts,* 1CC161001820; *Deutsche Bank Natl. Trust v. Rose M, Woods,* 1CC161001404; *Bank of N.Y. Mellon  v. Dorothy F. Murata,* 1CC161001145; *Wilmington Trust N.A. v. Michael J Butenbah,* 1CC161001046; *Deutsche Bank Natl. Trust Company v. Valerie Uyeda,* 1CC161001025; *Wells Fargo Bank v. Jaroslaw Karpusiewicz,* 1CC161000875; *Direct Capital Corp. v. Budget Color,* 1CC161000767; *Wells Fargo Bank Natl. Association  v. Beau R. Champion,* 1CC161000402; *Arthur E.  Lee Jr. v. John Savage,* 1CC161000412: *US Bank National Association v. Myrna Tolbe Tumbaga.,* 1CC161000015; *Deutsche Bank Natl. Trust Co. v. Javier Nevares,* 1CC151002221; *Lasalle Bank Natl. Association v. Paul L Collins*, 1CC151002142; *Bank of New York Mellon v. Verna F. Carey,* 1CC151002143; *Cit Bank N.A. v. Rachel K Kawahakui,* 1CC151002104; *Bank N.Y. Mellon Trust Company v. Lenore Lyle Lannon,* 1CC151001868; *US Bank NA v. James Anthony Willig Jr.,* 1CC151001556; *Bank of New York Mellon v. Stephen Laudig,* 1CC151001533; *US*

*Bank Natl. Association v. Estate of Deogracias Andres,* 1CC151001366; *Bank of N.Y. Mellon v. Kenneth G. Hagmann,* 1CC151001330; *Deutsche Bank Natl. Trust Company v. Darlene M. Schneider,* 1CC151001170; *Wells Fargo Bank N.A. v. David Wendell Ellis,* 1CC151000953; *US Bank N.A. v. Melecia Magsanide Tabuyo Ulep,* 1CC151000833; *HSBC Bank USA N.A. v. Osvaldo Brighenti,* 1CC151000840; *US Bank Natl. Association v. Agripino P. Bonilla,* 1CC151000788; *US Bank Natl. Association v. Geri Hulon,* 1CC151000769; *HSBC Bank USA, N.A. v. Anthony Tucker, Sr.,* 1CC151000657; *Deutsche Bank Natl. Trust Company v. Margaret C, Rahr,* 1CC151000574; *Wells Fargo Bank N.A. v. Jonathan Behrendt,* 1CC151000407; *Wilmington Savings Fund Society v. Toru Akehi*, 1CC151000337; *HSBC Bank USA N.A. v. Robert Michael Imes,* 1CC151000107; *Wells Fargo Bank N.A. v. Sa Tupulua,* 1CC151000083; *Marjorie Kuniyoshi v. Wayland Lum Construction Inc.,* 1CC141002478; *Freedom Mortgage Corp. v. Mario Roberto Portillo,* 1CC141002381; *Wells Fargo Bank N.A. v. David A. S. Cordero,* 1CC141002257; *Villages of Kapolei Association v. Craig S. Landis,* 1CC141002061; *The Bank of N.Y. Mellon v. Brian Henry Ortiz,* 1CC141001928; *Bank of New York Mellon v. Raymond D Arancon,* 1CC141001597; *Deutsche Bank Natl. Trust Co. v. Joseph S. Sanchez,* 1CC141001527; *Deutsche Bank Natl. Trust Co. v. Mervin H. N. Ching,,* 1CC151001186; *Central Pacific Bank v. Lily Nomura,* 1CC141001176; *Deutsche Bank Natl. Trust Co. v. David Ray Fullmer,*

1CC141001126; *Christian Sakal v. AOAO of Hawaiian Monarch,* 1CC141001118;

*US Bank Natl. Association v. Bells Tsuneko Leigh*, 1CC141000722; *US Bank Natl.*

*Association v. Daniel Joseph Spence,* 1CC141000573; *US Bank N.A. v. Justin Ryan*

*Kapono Fergerstrom,* 1CC141000382; *US Bank Natl. Association  v. Thomas*

*Yadao,* 1CC141000221; *The Bank of NY Mellon  v. Won Cha Kim,* 1CC131003381;

*US Bank N.A. v. Robert Blaine Fernandez,* 1CC131003361; *Karen Cogdill v.*

*Angeline R Canlas*, 1CC131003144; *HSBC Bank USA Natl. Association v. Luz Cui*

*Bartolome,* 1CC131003050; *The Bank of New York Mellon v. Dorthea L. Yaros*,

1CC131002944; *CitiBank N.A. v. Craig R. Knedler,* 1CC131002820; *Bank of New*

*York Mellon v. Kekai DJ Quan Personal Representative*, 1CC131002571; *Deutsche*

*Bank Trust Co. Americas v. Michael A. Botelo*, 1CC131002378; *AOAO of Century*

*Center Inc. v. Young Jin An,* 1CC131002364; *Puu Lani Ranch Corp v. Daryle S.*

*Nekoba*, 1CC131002297; *Wells Fargo Bank Natl. Association v. Nicole K. Flores,*

1CC131002278; *First Tennessee Bank v. Darlene M. Schneider,* 1CC131001586;

*Bank of New York Mellon v. Roman Baptiste,* 1CC131001157; *Bank of N.Y. Mellon*

*v. Gene G. Pudiquet,* 1CC131001047; *Hawaii National Bank v. Sutah Chirayunon*,

1CC131000998; *HSBC Bank USA N.A. v. Marina Sergeyevna Newby,*

1CC131000776; *Federal Natl. Mortgage Association v. Raynette L Kau,*

1CC131000733; *Wells Fargo Bank N.A. v. Wayne Satoru Saito,* 1CC131000476;

*Citibank N.A. v. Stan Christopher Popovich,* 1CC131000161; *US Bank N.A. v.*

*Christie T. Adams,* 1CC131000082; *Bank of America N.A. v. Albert Andrew Alimoot,* 1CC131000074; *The Bank of New York Mellon v. Todd D. Dunphy,* 1CC131000015; *Deutsche Bank Nat'l Trust v. Allison S. Goto,* 1CC121003312; *Capital One Natl. Association v. Donald James Karleen,* 1CC121003266; *Deutsche Bank National Trust v. Todd Dunphy,* 1CC121003134; *Wells Fargo Bank N.A. v. John Frank Baker,* 1CC121003131; *Federal Home Loan Mortgage Corp. v. Larry A. Shaver,* 1CC121003125; *Wells Fargo Bank N.A. v. Elias V. Macapulay*, 1CC121003094; *Bank of America N.A. v. John Yeh,* 1CC121003074; *US Bank Natl. Association v. Dionisio P. Pasion,* 1CC121003044; *US Bank Trust N.A. as Trustee v. Ryoko Donaldson,* 1CC121002948; *Wilmington Trust N.A. v. Darryl M. Hashida,* 1CC121002843; *PHH Mortgage Corporation v. Patrick A. Kop,* 1CC121002709; *US Bank Natl. Association v. Sione Loketi Taufoou,* 1CC121002672; *Ocwen Loan Servicing v. Laramie Kelii De Soto,* 1CC121002478; *Deutsche Bank Natl. Trust Co. v. Raymond Lloyd,* 1CC121001855; *HSBC Bank USA Natl. Association v. Lerma Yamashita,* 1CC121001821; *Wilmington Savings Fund v. Craig Stuart Landis,* 1CC121001795; *Bank of New York Mellon v. Mallory A Longboy,* 1CC121001759; *US Bank Natl. Association v. Scott Lee P. Kekumano,* 1CC121001737; *HSBC Bank USA v. Michael M. Kinoshita,* 1CC121001685; *MTGLQ Investors LP v. Jaroslaw Karpusiewicz,* 1CC121001328; *Wilmington Savings Fund v. Jody Arthur Solbach*, 1CC121001224; *Bank of New York Mellon v. Joseph A. Spielman,* 1CC121001139;

*Ditech Financial LLC v. Raymond Ruddy III,* 1CC121000922; *Wilmington Trust N.A. v. Beverly C. Harton*, 1CC121000860; *Bank of America N.A. v. Brian Shigemi Miyake,* 1CC121000676; *The Bank of New York Mellon v. Todd Campbell,* 1CC121000401; *Jim Hogg v. Osvaldo Brighenti,* 1CC121000352; *US Bank Natl. Association v. Florentino C. Bantolina,* 1CC121000300; *US Bank Natl. Association v. Earl Kyoji Omizo,* 1CC121000219; *H&R Block Bank v. Ronald John Teasdale,* 1CC121000149; *Nationstar Mortgage v. Jody Arthur Solbach,* 1CC121000110; *US Bank Natl. Association v. Armand Wesley Mariboho,* 1CC111003048; *U.S. Bank Trust N.A. v. Lewis Homer Pettit II,* 1CC111002839; *Marion Chew Leary v. Sandra Hill,* 1CC111002737; *Steven D. Ward v. US Bank Natl. Association,* 1CC111002689; *Bank of America N.A. v. Jody A. Solbach,* 1CC111002681; *First Horizon Home Loans v. Mark David Melen,* 1CC111002601; *Ditech Financial LLC v. Wade Keone Abiva,* 1CC111002550; *Christiana Trust v. Telefoni Amuia Aumua Jr.,* 1CC111002411; *Wells Fargo Bank N. A. v. Theo Eldon Garcia,* 1CC111002297; *Bank of N.Y. Mellon v. Jhirmel E. Pagan,* 1CC111002039; *HSBC Bank USA Natl. Association v. Howard L. Hendricks,* 1CC111001782; *MTGLQ Investors LP LLC v. Randall R. Rhodes,* 1CC111001787; *Deborah Lyn K. Ramirez v. Aurora Loan Servicing,* .1CC111001767; *Wells Fargo Bank N.A. v. Michael A. Botelho,* 1CC111001734; *Bank of Hawaii v. Richard Anthony Marques,* 1CC111001345; *PHH Mortgage Corp. v. Darrell Gene Dycus,* 1CC111001228; *Young Hui Kim v.*

*Julia Kyung Soon Riihimaki,* 1CC111001139; *David S. Brown v. OneWest Bank FSB,* 1CC111000941; *Puu Lani Ranch Corp v. Daryle S. Nekoba*, 1CC131002297; *Wells Fargo Bank N.A. v. Maryellen M. Markley,* 1CC101000356; *US Bank National Association v. Cresencio Somera,* 1CC091001962; *Deutsche Bank Natl. Trust Co. v. Alvin S. Ishihara,* 1CC091001321; *Deutsche Bank Natl. Trust Co. v. Paul Adam McKiernan,* 1CC091000910; *Marcus Rosehill v. Jim Andrews,* 1CC061001982; *Jim Andrews v. Marcus Rosehill.* 1CC061001976.

270. Second Circuit Court (Maui) -- *NewRez LLC v. William McThewson II,* 2CC191000048; *County of Maui v. John L. Laudon,* 2CC181000135; *US Bank Trust etc. v. John James Barbier,* 2CC181000040; *HSBC Bank USA v. Mark Corba,* 2CC171000508; *Bank of New York v. Kim Myra Kurnow,* 2CC171000399; *Nationstar Mortgage LLC v. Randolph G. Currier,* 2CC171000296; *JPMorgan Chase Bank National Association v. Hugh John Coflin,* 2CC171000142; *US Bank N.A. v. William Lee Davis.* 2CC171000032; *US Bank Natl. Association v. Donovan Paul Webb,* 2CC171000024; *US Bank National Association v. Watoshna Lynn Compton,* 2CC171000025; *US Bank Natl. Association v. Howard E. Greenberg,* 2CC161000554; *The Bank of New York Mellon v. Christian Duncan,* 2CC161000532; *Romspen Investment Corp. v. L & E Ranch.* 2CC161000470; *NewRez LLC v. Ralph G, Knudsen,* 2CC161000384; *Federal Natl. Mortgage Association v. Randall Yee,* 2CC161000385; *HSBC Bank USA Natl. Association v.*

*Jailanie Barnachea,* 2CC161000379; *UMB Bank National Association v. Sharon E. Watson,* 2CC161000336; *Wells Fargo Bank v. Eboni A. Prentice,* 2CC161000169; *US Bank Trust N.A. v. Patrick Lowell Verhagen,* 2CC161000147; *US Bank National Association v. Bernadine Sila,* 2CC161000098; *US Bank National Association v. Steven D. Barnes,* 2CC151000252; *US Bank National Association v. Bonnie I. Swink, 2*CC141000702; *The Bank of New York v. Paul F. Wenner,* 2CC141000220; *Wilmington Savings Fund Society v. Rustico Udarbe,* 2CC131000924; *JPMorgan Chase Bank N.A. v. Elise Sari Travis,* 2CC121000527; *Stanwich Mortgage Loan Trust v. John L Laudon,* 2CC121000119; *DB Private Wealth Mortgage v. Brian J. Bouley,* 2CC111000525; *US Bank National Association v. Daneford Michael Wright,* 2CC091000961.

271. Third Circuit Court (Kona and Hilo) -- *Deutsche Bank Natl. Trust Co. v. Karri Lynn Teshima*, 3CC200000009; *Federal National Mortgage Association v. Jerry A Badua*, 3CC190000007; *US Bank National Association. v. Eric Richard Mader,* 3CC19100189K; *The Bank of New York Mellon. v. Nelia C. Grafilo,* 3CC18100234K, *Lurline and Merrillyn Rapoza v. Hawaiian Homes Commission,* 3CC181000296; *US Bank N.A.. v. Michael J. Hammer,* 3CC18100218K; *US Bank Natl. Association. v. Raymond P. Cerney,* 3CC18100158K; *Deutsche Bank Natl. Trust Co. v. Laurie Ann Bass,* 3CC181000189; *US Bank N.A.. v. Thomas A. Morton,* 3CC18100151K; *Deutsche Bank Natl. Trust Co.. v. Michael C. Maher,*

3CC18100004K; *US Bank National Association v. Timothy J. Butler*, 3CC17100395K; *CitiBank N.A. v. Franklin P. Embernate,* 3CC17100325K; *Deutsche Bank Natl. Trust Co.. v. Janice D. Ellison,* 3CC17100304K; *Federal National Mortgage Association v. Walter M. Paresa,* 3CC17100220K; *Wells Fargo Bank v. William K. Freitas,* 3CC17100205K; *MTGLQ Investors, LP v. Aloha Spencer*, 3CC17100135K; *US Bank Natl Association. v. P. Makarewicz-Kankaset,* 3CC16100344K; *US Bank N.A. v. Steven D. Ward*, 3CC16100248K; *GemCap Lending I LLC v. Trent A. Bateman,* 3CC15100428K; *Wells Fargo Bank N.A. v. Russel E. Cole,* 3CC15100293K; *US Bank National Association v. Jung Hoon Kim,* 3CC151000031; *Bank of America N.A. v. James F. Enocencio II. .*3CC131000683; *Mid Pac Portfolio LLC v. Michael Taniguchi,* 3CC131000386; *MTGLQ Investors LP v. Mary Ann T. Brennan,* 3CC13100002K; *Bank of New York Mellon v. James West,* 3CC121000373; *US Bank Natl. Association v. Bernice K. Will,* 3CC121000174; *PL III LLC v. Puu Lani Ranch Corp.,* 3CC11100433K; *Fed Natl. Mortgage Association v. Jerry A. Badua.* 3CC111000342; *The Estate of Bruce Makarewicz*, 3LP161000274.

272. Fifth Circuit Court (Lihue) -- *Robert Louis Santiago Successor Trustee v. Ruth Tanaka,* 5CC191000115; *US Bank National Association v. Christa E. Paul,* 5CC171000080; *Wilmington Savings. v. David Swierski,* 5CC151000092; *Wilmington Trust N.A. v. David Kaplan,* 5CC131000073; *US Bank National*

*Association v. Dylan Thede,* 5CC121000125; *US Bank National Association v. Dylan Thede.* 5CC121000114; *Wilmington Trust N.A. v Reid Tamayose,* 5CC121000044; *U.S. Bank Natl. Association v. Luciann Norton,* 5CC111000168; *Deutsche Bank v. Dale Scott Winters,* 5CC111000093; *Wilmington Trust N.A. v. Reid Tamayose,* 5CC121000044.

273. Hawaii Intermediate Court of Appeals -- *Deutsche Bank v. Bass*, CAAP-20-0000501; *U.S. Bank N.A. v. Saiki*, CAAP-20-0000450; *Smith v. Selene Finance*, CAAP-20-0000383; *Garrett v. AOAO Terrazza/Cortebella/Las Brisas*, CAAP-20-0000357; *Garrett v. AOAO Terrazza*, CAAP-20-0000287; *BOA v. Alejo-Herring*, CAAP-20-0000263; *U.S. Bank N.A. v. Paul*, CAAP-20-0000211; *Oleksa v. Chaikin,* CAAP-20-0000142; *Wilmington Savings Fund v. Swierski*, CAAP-20-0000031; *U.S. Bank v. Davis*, CAAP-20-0000027; *Wilmington Trust N.A. v. Tamayose,* CAAP-19-0000770; *Bank of New York Mellon v. Laudig*, CAAP-19-0000772; *U.S. Bank v. Olivas,* CAAP-19-0000726; *Wells Fargo v. Saito,* CAAP-19-0000674; *Wilmington v. Soto*, CAAP-19-0000663; *Wells Fargo v. Gilbert*, CAAP-19-0000596; *BONY Mellon v. Duncan*, CAAP-19-0000593; *US Bank v. Morton*, CAAP-19-0000581; *Aurora v. Currier*, CAAP-19-0000523; *U.S. Bank v. Omizo*, CAAP-19-0000524; *US Bank v. Ward*, CAAP-19-0000103; *US Bank v. Greenberg*, CAAP-19-0000065; *Romspen v. L & E Ranch*, CAAP-19-0000048; *JP Morgan v. Laudon*, CAAP-18-0000964; *Bank of Hawaii v. Mostoufi*, CAAP-18-0000961; *Blue*

*Mountain v. Page,* CAAP-18-0000927; *Deutsche Bank v. Yata,* CAAP-18-0000922; *Andrews v. Rosehill*, CAAP-18-0000742; *Bank of New York v. Aiwohi*, CAAP-18-0000736; *Wilmington v. Domingo*, CAAP-18-0000712; *U.S. Bank v. Compton*, CAAP-18-0000699; *Bank of America v. Paul Collins*, CAAP-18-0000458; *GemCap v. Bateman,* CAAP-18-0000463; *Maui Harbor Shops v. Octagon Corp.*, CAAP-18-0000443; *JPMorgan v. Raciti,* CAAP-18-0000386; *Maui Harbor Shops v. Octagon Corp.*, CAAP-18-0000365; *Aurora Loan Services v. Kalahiki,* CAAP-18-0000326; *AOAO Waiau Garden v. Latorre-Holt*, CAAP-18-0000124; *Maui Harbor v. Octagon Corp.*, CAAP-18-0000118; *HSBC Bank v. Gillespie,* CAAP-18-0000098; *Wilmington v. Domingo*, CAAP-18-0000099; *Saplan v. U.S. Bank*, CAAP-17-0000847; *U.S. Bank v. Verhagen,* CAAP-17-0000746; *GemCap Lending v. Bateman,* CAAP-17-0000652; *Mount v. Apao*, CAAP-17-0000401.

274. Hawaii Supreme Court -- *Wilmington v. Ryan*, SCWC-18-0000071 (successfully reversed after Dubin's disbarment); *Cambridge Management Inc. v. Jadan*, SCWC-17-0000176 (successfully reversed after Dubin's disbarment).

275. Disbarment in the State of Hawaii is the only forfeiture proceeding in the entire Western World where there is not only no right within the State legal system to a nondiscretionary appeal, in this case for Dubin, but where hundreds, in this case Dubin's clients, have also been locked out of the State proceedings despite their livelihood also being at stake.

# I. CLAIMS FOR RELIEF

## COUNT ONE
**Individual/Class Action for Declaratory Judgment
by Attorney Dubin Against all State Defendants for
Their Unconstitutional Exercise of Legislative Authority**

276. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count One of this Verified Complaint.

277. The basis for Count One is that the Hawaii Supreme Court lacks jurisdiction as does its entire attorney disciplinary system, *supra*, from regulating Members of the Hawaii legal profession for conduct allegedly occurring outside Hawaii courtrooms, because the Hawaii State Constitution gives that authority exclusively to the Hawaii State Legislature who has never delegated that authority, even if it constitutionally could, to the Hawaii Supreme Court.

278. Attorney Dubin brings this Action initially as an Individual Action seeking Class Certification against all State Defendants pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a Class defined as including every present Member of the Hawaii State Bar, active or inactive, potentially or actually so threatened  as aforesaid, and every past Member of the Hawaii State Bar who has been actually disbarred for conduct occurring outside Hawaii courtrooms who has contested such disbarment, each group as necessary to be designated as separate Sub-Classes.

279. The above described Class is so numerous and/or some of its Members unknown at this time, and collectively numbering in the thousands that joinder of all Members is impracticable.

280. The State Defendants' utilization of the complained of unconstitutional procedures presents to this District Court an active case and controversy.

281. There are numerous questions of fact and law common to the Class that do not involve any varying details pertaining to their individual situation, nor are damages being sought, but instead uniform declaratory relief against the unenforceability of all such disciplinary actions is being sought as contrary to the Hawaii State Constitution, requiring Quo Warranto, Ultra Vires, Ex Post Facto, and/or Bill of Attainder relief as subsidiary constitutional violations thereby occurring until the unconstitutional procedures challenged herein are remedied.

282. Attorney Dubin's claims are typical of the claims of the Class in that Attorney Dubin has been a Member of the Hawaii State Bar since 1982, and still is but for the unconstitutional actions of the Hawaii Supreme Court and its attorney disciplinary procedures complained of herein, while he and his state law license are each still vulnerable, liable and subject to the Hawaii Supreme Court's post-disbarment orders and requirements in numerous ways.

283. Declaratory, immediate emergency relief is hereby sought and is appropriate with respect to the Class as a whole where the State Defendants are

applying and continue to apply the complained of disciplinary procedures, on grounds uniformly applicable to the Plaintiff Class.

284. The Plaintiff Class Representative and the Plaintiff Class are represented by legal counsel who will adequately represent the class and who have the financial wherewithal to do so.

285. A Class Action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual Class Members would unduly burden this District Court and create the possibility of conflicting adjudications and whereas many Members of the Class are reluctant to individually raise the within issues initially fearful of retaliation.

286. Sovereign immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

287. Judicial immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief against nor damages from the State Defendants.

288. Res Judicata does not bar this action, whose underlying issues have not been adjudicated elsewhere nor by the Class and which challenge is also based on fraud.

289. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court nor by the Class, and

which Count does not challenge Dubin's disbarment but the jurisdiction of the Court that issued it.

290. Abstention is not available to this District Court on these underlying issues which involve substantive federal due process questions challenging the usurpation of exclusive state legislative powers, amounting also to a violation of Article IV, Section 4 of the Constitution of the United States of America.

**COUNT TWO**
**Individual/Class Action for Declaratory Judgment**
**by Client Plaintiffs Against all State Defendants for**
**Their Unconstitutional Exercise of Legislative Authority**

291. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Two of this Verified Complaint.

292. The basis for Count Two is that the Hawaii Supreme Court lacks jurisdiction as does its entire attorney disciplinary system, *supra*, from regulating Members of the Hawaii legal profession for conduct allegedly occurring outside Hawaii courtrooms, because the Hawaii State Constitution gives that authority exclusively to the Hawaii State Legislature who has never delegated that authority, even if it constitutionally could, to the Hawaii Supreme Court.

293. Attorney Dubin's Client Plaintiffs bring this Class Action initially as an Individual Action seeking Class Certification against all State Defendants pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a Class defined as including every person who was a client of Attorney Dubin or who was deterred

from being a client of Attorney Dubin or who lost attorney Dubin as their attorney as a result of the several years of disciplinary activities against Attorney Dubin aforesaid resulting in his disbarment, each group as necessary to be designated as separate Sub-Classes.

294. The above described Class is so numerous and/or some of its Members unknown at this time, and collectively numbering nearly one thousand that joinder of all Members is impracticable.

295. The State Defendants' utilization of the complained of unconstitutional procedures presents to this District Court an active case and controversy.

296. There are numerous questions of fact and law common to the Class that do not involve any varying details pertaining to their individual situation, nor are damages being sought, but instead uniform declaratory relief against the unenforceability of all such disciplinary actions is being sought as contrary to the Hawaii State Constitution, requiring Quo Warranto, Ultra Vires, Ex Post Facto, and/or Bill of Attainder relief as subsidiary constitutional violations thereby occurring until the unconstitutional procedures challenged herein are remedied.

297. Attorney Dubin's Client Plaintiffs' claims are typical of the claims of the Class in that Attorney Dubin's legal services were denied to them, both directly and indirectly, due to both the smear publicity and the disbarment due to the unconstitutional actions of the Hawaii Supreme Court and its attorney disciplinary

procedures complained of herein, while he and his state law license are still vulnerable, liable and subject to the Hawaii Supreme Court's post-disbarment procedures in numerous ways.

298. Declaratory, immediate emergency relief is hereby sought and is appropriate with respect to the Class as a whole where the State Defendants are applying and continue to apply the complained of disciplinary procedures, on grounds uniformly applicable to the Plaintiff Class.

299. The Plaintiff Class Representatives and the Plaintiff Class are represented by legal counsel who will adequately represent the class and who have the financial wherewithal to do so.

300. A Class Action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual Class Members would unduly burden this District Court and create the possibility of conflicting adjudications and whereas many Members of the Class are reluctant to individual raise the within issues fearful of retaliation.

301. Sovereign immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

302. Judicial immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

303. Res Judicata does not bar this action, whose underlying issues have not been adjudicated elsewhere nor by the Class and which challenge is also based on fraud.

304. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court, and which Count does not challenge Dubin's disbarment but the jurisdiction of the Court that issued it.

305. Abstention is not available to this District Court on these underlying issues which involve substantive federal due process questions challenging the usurpation of exclusive state legislative powers, amounting also to a violation of Article IV, Section 4 of the Constitution of the United States of America.

**COUNT THREE**
**Individual/Class Action for Declaratory Judgment**
**by Attorney Dubin Against all State Defendants for**
**Their Unconstitutional Violation of Equal Protection**

306. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Three of this Verified Complaint.

307. The basis for Count Three is that the Hawaii Supreme Court lacks jurisdiction as does its entire attorney disciplinary system, *supra*, from regulating Members of the Hawaii legal profession for conduct allegedly occurring outside Hawaii courtrooms, because the Hawaii State Constitution gives that authority exclusively to the Hawaii State Legislature which regulates every other profession such as physicians and every other occupation in the State of Hawaii substantially

differently, affording evidentiary and appellate rights, for instance, differently than those allowed attorneys by the Hawaii Supreme Court in its disciplinary procedures, even assuming that the Hawaii Supreme Court had such inherent autocratic power or that the Hawaii State Legislature were found to have delegated that authority to the Hawaii Supreme Court, all in violation of the Equal Protection constitutional guaranties embodied in the Fourteenth Amendment to the Constitution of the United States of America.

308.  Attorney Dubin brings this Action initially as an Individual Action seeking Class Certification against all State Defendants pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a Class defined as including every present Member of the Hawaii State Bar, active or inactive, potentially or actually so threatened as aforesaid, and every past Member of the Hawaii State Bar who has been actually disbarred for conduct occurring outside Hawaii courtrooms who has contested such disbarment, each group as necessary to be designated as separate Sub-Classes.

309.  The above described Class is so numerous and/or some of its Members unknown at this time, and collectively numbering in the thousands that joinder of all Members is impracticable.

310.  The State Defendants' utilization of the complained of unconstitutional procedures presents to this District Court an active case and controversy.

311. There are numerous questions of fact and law common to the Class that do not involve any varying details pertaining to their individual situation, nor are damages being sought, but instead uniform declaratory relief against the unenforceability of all such disciplinary actions is being sought as contrary to the Hawaii State Constitution, requiring Quo Warranto, Ultra Vires, Ex Post Facto, and/or Bill of Attainder relief as subsidiary constitutional violations thereby occurring until the unconstitutional procedures challenged herein are remedied.

312. Attorney Dubin's claims are typical of the claims of the Class in that Attorney Dubin has been a Member of the Hawaii State Bar since 1982, and still is but for the unconstitutional actions of the Hawaii Supreme Court and its attorney disciplinary procedures complained of herein, while he and his state law license are each still vulnerable, liable and subject to the Hawaii Supreme Court's post-disbarment orders and requirements in numerous ways.

313. Declaratory, immediate emergency relief is hereby sought and is appropriate with respect to the Class as a whole where the State Defendants are applying and continue to apply the complained of disciplinary procedures, on grounds uniformly applicable to the Plaintiff Class.

314. The Plaintiff Class Representative and the Plaintiff Class are represented by legal counsel who will adequately represent the class and who have the financial wherewithal to do so.

315. A Class Action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual Class Members would unduly burden this District Court and create the possibility of conflicting adjudications and whereas many Members of the Class are reluctant to individually raise the within issues initially fearful of retaliation.

316. Sovereign immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

317. Judicial immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief against nor damages from the State Defendants.

318. Res Judicata does not bar this action, whose underlying issues have not been adjudicated elsewhere nor by the Class and which challenge is also based on fraud.

319. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court nor by the Class, and which Count does not challenge Dubin's disbarment but the jurisdiction of the Court that issued it.

320. Abstention is not available to this District Court on these underlying issues which involve substantive federal Equal Protection Guaranties.

**COUNT FOUR**
**Individual/Class Action for Declaratory Judgment**
**by Client Plaintiffs Against all State Defendants for**
**Their Unconstitutional Violation of Equal Protection**

321. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Four of this Verified Complaint.

322. The basis for Count Four is that the Hawaii Supreme Court lacks jurisdiction as does its entire attorney disciplinary system, *supra*, from regulating Members of the Hawaii legal profession for conduct allegedly occurring outside Hawaii courtrooms, because the Hawaii State Constitution gives that authority exclusively to the Hawaii State Legislature which regulates every other profession such as physicians and every other occupation in the State of Hawaii substantially differently, affording evidentiary and appellate rights, for instance, differently than those allowed attorneys by the Hawaii Supreme Court in its disciplinary procedures, even assuming that the Hawaii Supreme Court had such inherent autocratic power or that the Hawaii State Legislature were found to have delegated that authority to the Hawaii Supreme Court, all in violation of the Equal Protection constitutional guaranties embodied in the Fourteenth Amendment to the Constitution of the United States of America.

323. Attorney Dubin's Client Plaintiffs' bring this Action initially as an Individual Action seeking Class Certification against all State Defendants pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a Class defined

as including every person who was a client of Attorney Dubin or who was deterred from being a client of Attorney Dubin or who lost attorney Dubin as their attorney as a result of the several years of disciplinary activities against Attorney Dubin aforesaid resulting in his disbarment, each group as necessary to be designated as separate Sub-Classes.

324. The above described Class is so numerous and/or some of its Members unknown at this time, and collectively numbering nearly one thousand that joinder of all Members is impracticable.

325. The State Defendants' utilization of the complained of unconstitutional procedures presents to this District Court an active case and controversy.

326. There are numerous questions of fact and law common to the Class that do not involve any varying details pertaining to their individual situation, nor are damages being sought, but instead uniform declaratory relief against the unenforceability of all such disciplinary actions is being sought as contrary to the Hawaii State Constitution, requiring Quo Warranto, Ultra Vires, Ex Post Facto, and/or Bill of Attainder relief as subsidiary constitutional violations thereby occurring until the unconstitutional procedures challenged herein are remedied.

327. Attorney Dubin's Client Plaintiffs' claims are typical of the claims of the Class in that Attorney Dubin's legal services were denied to them, both directly and indirectly, due to both the smear publicity and the disbarment due to the

unconstitutional actions of the Hawaii Supreme Court and its attorney disciplinary procedures complained of herein, while he and his state law license are each still vulnerable, liable and subject to the Hawaii Supreme Court's post-disbarment orders and requirements in numerous ways.

328. Declaratory, immediate emergency relief is hereby sought and is appropriate with respect to the Class as a whole where the State Defendants are applying and continue to apply the complained of disciplinary procedures, on grounds uniformly applicable to the Plaintiff Class.

329. The Plaintiff Class Representative and the Plaintiff Class are represented by legal counsel who will adequately represent the class and who have the financial wherewithal to do so.

330. A Class Action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual Class Members would unduly burden this District Court and create the possibility of conflicting adjudications and whereas many Members of the Class are reluctant to individually raise the within issues fearful of retaliation.

331. Sovereign immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

332. Judicial immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief against nor damages from the State Defendants.

333. Res Judicata does not bar this action, whose underlying issues have not been adjudicated elsewhere nor by the Class and which challenge is also based on fraud.

334. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court nor by the Class, and which Count does not challenge Dubin's disbarment but the jurisdiction of the Court that issued it.

335. Abstention is not available to this District Court on these underlying issues which involve substantive federal Equal Protection Guaranties.

### COUNT FIVE
**Individual/Class Action for Declaratory Judgment
by Attorney Dubin Against all State Defendants for
Their Unconstitutional Violation of Due Process**

336. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Five of this Verified Complaint.

337. The basis for Count Five is that the Hawaii Supreme Court and its attorney discipline procedures as promulgated and/or as applied deny targeted attorneys constitutionally protected evidentiary and appellate rights as shown in the chart on Page 28, *supra*, all in violation of the Due Process constitutional guaranties

to a fair hearing embodied in the Fourteenth Amendment to the Constitution of the United States of America.

338. Attorney Dubin brings this Action initially as an Individual Action seeking Class Certification against all State Defendants pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a Class defined as including every present Member of the Hawaii State Bar, active or inactive, potentially or actually so threatened as aforesaid, and every past Member of the Hawaii State Bar who has been actually disbarred for conduct occurring outside Hawaii courtrooms who has contested such disbarment, each group as necessary to be designated as separate Sub-Classes.

339. The above described Class is so numerous and/or some of its Members unknown at this time, and collectively numbering in the thousands that joinder of all Members is impracticable.

340. The State Defendants' utilization of the complained of unconstitutional procedures presents to this District Court an active case and controversy.

341. There are numerous questions of fact and law common to the Class that do not involve any varying details pertaining to their individual situation, nor are damages being sought, but instead uniform declaratory relief against the unenforceability of all such disciplinary actions is being sought as contrary to the Hawaii State Constitution, requiring Quo Warranto, Ultra Vires, Ex Post Facto,

and/or Bill of Attainder relief as subsidiary constitutional violations thereby occurring until the unconstitutional procedures challenged herein are remedied.

342. Attorney Dubin's claims are typical of the claims of the Class in that Attorney Dubin has been a Member of the Hawaii State Bar since 1982, and still is but for the unconstitutional actions of the Hawaii Supreme Court and its attorney disciplinary procedures complained of herein, while he and his state law license are each still vulnerable, liable and subject to the Hawaii Supreme Court's post-disbarment orders and requirements in numerous ways.

343. Declaratory, immediate emergency relief is hereby sought and is appropriate with respect to the Class as a whole where the State Defendants are applying and continue to apply the complained of disciplinary procedures, on grounds uniformly applicable to the Plaintiff Class.

344. The Plaintiff Class Representative and the Plaintiff Class are represented by legal counsel who will adequately represent the class and who have the financial wherewithal to do so.

345. A Class Action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual Class Members would unduly burden this District Court and create the possibility of conflicting adjudications and whereas many Members of the Class are reluctant to individually raise the within issues initially fearful of retaliation.

165

346. Sovereign immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

347. Judicial immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief against nor damages from the State Defendants.

348. Res Judicata does not bar this action, whose underlying issues have not been fully adjudicated elsewhere nor by the Class and which challenge is also based on fraud.

349. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court nor by the Class.

350. Abstention is not available to this District Court on these underlying issues which involve substantive federal Due Process Guaranties.

**COUNT SIX**
**Individual/Class Action for Declaratory Judgment**
**by Client Plaintiffs Against all State Defendants for**
**Their Unconstitutional Violation of Due Process**

351. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Six of this Verified Complaint.

352. The basis for Count Six is that the Hawaii Supreme Court and its attorney discipline procedures as promulgated and/or as applied deny targeted attorneys constitutionally protected evidentiary and appellate rights as shown in the chart on Page 28, *supra*, all in violation of the Due Process constitutional guaranties to a fair

hearing embodied in the Fourteenth Amendment to the Constitution of the United States of America.

353. Attorney Dubin's Client Plaintiffs' bring this Action initially as an Individual Action seeking Class Certification against all State Defendants pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a Class defined as including every person who was a client of Attorney Dubin or who was deterred from being a client of Attorney Dubin or who lost attorney Dubin as their attorney as a result of the several years of disciplinary activities against Attorney Dubin aforesaid resulting in his disbarment, each group as necessary to be designated as separate Sub-Classes.

354. The above described Class is so numerous and/or some of its Members unknown at this time, and collectively numbering nearly one thousand that joinder of all Members is impracticable.

355. The State Defendants' utilization of the complained of unconstitutional procedures presents to this District Court an active case and controversy.

356. There are numerous questions of fact and law common to the Class that do not involve any varying details pertaining to their individual situation, nor are damages being sought, but instead uniform declaratory relief against the unenforceability of all such disciplinary actions is being sought as contrary to the Hawaii State Constitution, requiring Quo Warranto, Ultra Vires, Ex Post Facto,

and/or Bill of Attainder relief as subsidiary constitutional violations thereby occurring until the unconstitutional procedures challenged herein are remedied.

357. Attorney Dubin's Client Plaintiffs' claims are typical of the claims of the Class in that Attorney Dubin's legal services were denied to them, both directly and indirectly, due to both the smear publicity and the disbarment due to the unconstitutional actions of the Hawaii Supreme Court and its attorney disciplinary procedures complained of herein, while he and his state law license are each still vulnerable, liable and subject to the Hawaii Supreme Court's post-disbarment orders and requirements in numerous ways.

358. Declaratory, immediate emergency relief is hereby sought and is appropriate with respect to the Class as a whole where the State Defendants are applying and continue to apply the complained of disciplinary procedures, on grounds uniformly applicable to the Plaintiff Class.

359. The Plaintiff Class Representatives and the Plaintiff Class are represented by legal counsel who will adequately represent the class and who have the financial wherewithal to do so.

360. A Class Action is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual Class Members would unduly burden this District Court and create the

possibility of conflicting adjudications and whereas many Members of the Class are reluctant to individually raise the within issues fearful of retaliation.

361. Sovereign immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief nor damages from the State Defendants.

362. Judicial immunity does not bar this action, which seeks a declaratory judgment and neither injunctive relief against nor damages from the State Defendants.

363. Res Judicata does not bar this action, whose underlying issues have not been adjudicated elsewhere nor by the Class and which challenge is also based on fraud.

364. Rooker-Feldman does not bar this action, whose underlying issues have not been fully adjudicated elsewhere in any Hawaii State Court nor by the Class.

365. Abstention is not available to this District Court on these underlying issues which involve substantive federal Due Process Guaranties.

**COUNT SEVEN**
**Individual Action for Actual and Punitive**
**Damages by Attorney Dubin Against all Civil Rights**
**Defendants for Their Unconstitutional Violation of Due Process**

366. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Seven of this Verified Complaint.

367. The basis for Count Seven is that the Civil Rights Defendants, each operating as state actors without good faith under color of state law, individually or

two or more conspired to target Attorney Dubin, hiding disqualifying conflicts of interest and exculpating evidence, and providing false information to the Hawaii Supreme Court through hidden false *ex parte* communications, designed to get him disbarred, denying Attorney Dubin his constitutionally protected right to a fair hearing as shown in the chart on Pages 30-31, *supra*, all in violation of the Due Process constitutional guaranties to a fair hearing embodied in the Fourteenth Amendment to the Constitution of the United States of America.

368. Attorney Dubin brings this Action as an Individual Action against all Civil Rights Defendants pursuant to 28 U.S.C. § 1983.

369. Attorney Dubin seeks actual damages against each and all Civil Rights Defendants for the millions of dollars in economic damage and destruction done to his law practice, and for the incalculable damage done to his health due to the enormous stress caused that triggered his early 2020 heart attack, subject to proof at trial.

370. Attorney Dubin also seeks punitive damages against each and all Civil Rights Defendants in that the above referenced damage intentionally and wantonly caused, each and all conspiring together, was the result of their criminal indifference to his financial and physical health and safety and that of his Clients, and to his reputation and livelihood, justifying an exemplary award against Civil Rights

Defendants, jointly and severely, of at least ten times his actual damages, subject to proof at trial.

371. Sovereign immunity does not bar this action, as this Count is not against the State of Hawaii whose state treasury is not liable for a damage award against the Civil Rights Defendants, and the Civil Rights Defendants are not paid by State funds.

372. Judicial immunity does not bar this action, since none of the Civil Rights Defendants acted in good faith, none were performing legitimate judicial functions, none operated within the protection of any enforcement quasi-judicial structure that had constitutional or legislative standing in Hawaii law, none had any immunity conferred upon them by the Hawaii State Legislature, and all of them separately defrauded Attorney Dubin and the Hawaii Supreme Court.

373. Res Judicata does not bar this action, whose underlying issues have not been fully adjudicated elsewhere and which challenge herein is also based on fraud waged against Attorney Dubin and the Hawaii Supreme Court by the Civil Rights Defendants.

374. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court and which do not directly challenge the Hawaii Supreme Court's disbarment order aforesaid.

**COUNT EIGHT**
**Individual Action for Actual and Punitive**
**Damages by Client Plaintiffs Against all Civil Rights**
**Defendants for Their Unconstitutional Violation of Due Process**

375.  Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Eight of this Verified Complaint.

376. The basis for Count Eight is that the Civil Rights Defendants, each operating as state actors without good faith under color of state law, individually or two or more conspired to target Attorney Dubin, hiding disqualifying conflicts of interest and exculpating evidence, and providing false information to the Hawaii Supreme Court through hidden false *ex parte* communications, designed to get him disbarred, denying Attorney Dubin his constitutionally protected right to a fair hearing as shown in the chart on Pages 30-31, *supra*, all in violation of the Due Process constitutional guaranties to a fair hearing embodied in the Fourteenth Amendment to the Constitution of the United States of America, and all directly negatively impacting Client Plaintiff's cases and finances.

377. Attorney Dubin's Client Plaintiffs bring this Action as an Individual Action against all Civil Rights Defendants pursuant to 28 U.S.C. § 1983.

378. Client Plaintiffs seek actual damages against each and all Civil Rights Defendants for the financial harm done to their cases and to the emotional stress they caused them, subject to proof at trial.

379. Client Plaintiffs also seek punitive damages against each and all Civil Rights Defendants in that the above referenced damage they intentionally and wantonly caused, each and all conspiring together, was the result of their criminal

indifference to Client Plaintiffs' finances and livelihood, justifying an exemplary award to them against Civil Rights Defendants, jointly and severely, of at least ten times their actual damages, subject to proof at trial or through the appointment of a Master to allocate the individual amount of such an award.

380. Sovereign immunity does not bar this action, as this Count is not against the State of Hawaii whose state treasury is not liable for a damage award against the Civil Rights Defendants, and the Civil Rights Defendants are not paid by State funds.

381. Judicial immunity does not bar this action, since none of the Civil Rights Defendants acted in good faith, none were performing legitimate judicial functions, none operated within the protection of any enforcement quasi-judicial structure that had constitutional or legislative standing in Hawaii law, none had any immunity conferred upon them by the Hawaii State Legislature, and all of them separately defrauded Attorney Dubin and the Hawaii Supreme Court.

382. Res Judicata does not bar this action, whose underlying issues have not been fully adjudicated elsewhere and which challenge herein is also based on fraud waged against Attorney Dubin and the Hawaii Supreme Court by the Civil Rights Defendants.

383. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court and which do not directly challenge the Hawaii Supreme Court's disbarment order aforesaid.

## COUNT NINE
### Individual Action for Actual and Punitive Damages by Attorney Dubin Against all Civil Rights Defendants for Their Unconstitutional Violation of Freedom of Speech

384. Every allegation in every Paragraph hereinabove is hereby incorporated hereinbelow in full support of Count Nine of this Verified Complaint.

385. The basis for Count Nine is that the Civil Rights Defendants, each operating as state actors without good faith under color of state law, individually or two or more conspired to target Attorney Dubin largely to remove him as a local, national talk show host whose principal motivation was revealed when the ODC, for example, complained to the Hawaii Supreme Court, *supra*, that Dubin's radio show was "a menace to the general public."

386. With that admission, the Civil Rights Defendants showed that they wanted to cancel Dubin's radio show, and did so by hiding disqualifying conflicts of interest and exculpating evidence, and providing false information to the Hawaii Supreme Court through hidden false *ex parte* communications, designed to get him disbarred, denying Attorney Dubin his constitutionally protected right to a fair hearing as shown in the chart on Page 28, *supra*, all in violation of the Due Process constitutional guaranties to a fair hearing embodied in the Fourteenth Amendment to the Constitution of the United States of America.

387. Attorney Dubin brings this Action as an Individual Action against all Civil Rights Defendants, as the evidence at trial may show so conspired with each

other, brought pursuant to 28 U.S.C. § 1983 and the First Amendment to the Constitution of the United States of America.

388. Attorney Dubin seeks actual damages against each and all Civil Rights Defendants responsible for seeking to remove him from the air, as was the result of his disbarment, for the millions of dollars in economic damage and destruction done to his law practice, and for the incalculable damage done to his health due to the enormous stress they caused that triggered his early 2020 heart attack, subject to proof at trial.

389. Attorney Dubin also seeks punitive damages against each and all Civil Rights Defendants whose actions were so motivated, in that the above referenced damage they intentionally and wantonly caused, each and all conspiring together, was the result of criminal indifference to his financial and physical health and safety and that of his Clients, and to his reputation and livelihood, justifying an exemplary award against such Civil Rights Defendants, jointly and severely, of at least ten times his actual damages, subject to proof at trial.

390. Sovereign immunity does not bar this action, as this Count is not against the State of Hawaii whose state treasury is not liable for a damage award against the Civil Rights Defendants, and the Civil Rights Defendants are not paid by State funds.

391. Judicial immunity does not bar this action, since none of the Civil Rights Defendants acted in good faith, none were performing legitimate judicial functions,

none operated within the protection of any enforcement quasi-judicial structure that had constitutional or legislative standing in Hawaii law, none had any immunity conferred upon them by the Hawaii State Legislature, and all of them defrauded Attorney Dubin and the Hawaii Supreme Court.

392. Res Judicata does not bar this action, whose underlying issues have not been fully adjudicated elsewhere and which challenge herein is also based on fraud waged against Attorney Dubin and the Hawaii Supreme Court by the Civil Rights Defendants.

393. Rooker-Feldman does not bar this action, whose underlying issues have not been adjudicated elsewhere in any Hawaii State Court and which do not directly challenge the Hawaii Supreme Court's disbarment order aforesaid.

## I. PRAYER FOR RELIEF

394. Attorney Dubin and his Client Plaintiffs seek a Judgment of this United States District Court, with class certification or otherwise, pursuant to the Equal Protection and Due Process Guaranties of the Fourteenth Amendment to the Constitution of the United States of America, declaring the Hawaii Supreme Court's attorney disciplinary structure described hereinabove to be unconstitutional as promulgated and/or as applied, and unconstitutional pursuant to the Constitution of the State of Hawaii as neither the Hawaii Supreme Court's inherent authority nor its delegated authority from the Hawaii State Legislature.

395. Attorney Dubin and his Client Plaintiffs seek a Judgment of this United States District Court, with class certification or otherwise, pursuant to the Equal Protection and Due Process Guaranties of the Fourteenth Amendment to the Constitution of the United States of America, awarding them and/or their harmed Class Members respectively their actual and punitive damages according to proof at trial.

396. Attorney Dubin seeks a separate and independent Judgment of this United Sates District Court pursuant to the Freedom of Speech Guaranty of the First Amendment to the Constitution of the United States of America, awarding him his actual and punitive damages according to proof at trial.

397. All Plaintiffs seek attorneys' fees and court costs.

## SUMMARY OF NINE CLAIMS FOR RELIEF

| NUMBER OF EACH COUNT | NATURE OF EACH CLAIM | BASIS OF EACH CLAIM | CLAIM MADE BY WHOM | CLAIM AGAINST WHOM | THE RELIEF SOUGHT |
|---|---|---|---|---|---|
| *Count One* | Class Action | Ultra Vires | Attorney Dubin | State Defendants | Declaratory Judgment |
| *Count Two* | Class Action | Ultra Vires | Client Plaintiffs | State Defendants | Declaratory Judgment |
| *Count Three* | Class Action | Equal Protection | Attorney Dubin | State Defendants | Declaratory Judgment |
| *Count Four* | Class Action | Equal Protection | Client Plaintiffs | State Defendants | Declaratory Judgment |
| *Count Five* | Class Action | Due Process | Attorney Dubin | State Defendants | Declaratory Judgment |
| *Count Six* | Class Action | Due Process | Client Plaintiffs | State Defendants | Declaratory Judgment |

| | | | | | |
|---|---|---|---|---|---|
| ***Count Seven*** | Class Action | Due Process | Attorney Dubin | Civ. Rights Defendants | Actual/Pun. Damages |
| ***Count Eight*** | Individual Action | Due Process | Client Plaintiffs | Civ. Rights Defendants | Actual/Pun. Damages |
| ***Count Nine*** | Individual Action | Freedom of Speech | Attorney Dubin | Civ. Rights Defendants | Actual/Pun. Damages |

Dated: Honolulu, Hawaii; April 9, 2021.

Respectfully submitted,

*/s/ Keith K. Kiuchi*

_____

KEITH K. KIUCHI
Attorney for Gary Victor Dubin

*/s/ Gary Victor Dubin*

_____

GARY VICTOR DUBIN
Attorney for Client Plaintiffs

## <u>VERIFICATION BY GARY VICTOR DUBIN</u>

I, GARY VICTOR DUBIN, HEREBY DECLARE:

1. I am a Plaintiff and an Attorney for my named clients in this action, and I make the within statements of my own personal firsthand knowledge.

2. The facts set forth in this Complaint are true and correct, and I am prepared to so testify.

3. The charges against me supposedly justifying my disbarment were false. I was targeted. By targeted, I mean the practice of a Prosecutor, or a Hearing Officer, or even a Judge or Justice assigned to one's case deciding in advance to find one guilty of something and then reengineering the facts to support the result desired, if necessary in the process intentionally overlooking material exculpating facts.

I Declare Under Penalty Of Perjury Under The Laws Of The United States Of America That The Foregoing Is True And Correct. Executed At Honolulu, Hawaii On April 9, 2021.

*/s/ Gary Victor Dubin*
_____
GARY VICTOR DUBIN

## VERIFICATION BY JOHN D. WAIHEE III

I, JOHN D. WAIHEE, HEREBY DECLARE:

1. I am a Member of the Bar of this Court, and I make the within statements based upon my own personal firsthand knowledge.

2. In the many positions I have held both in the State Legislature and as Governor, I have met and interacted with countless Members of the Hawaii Bar, including Mr. Dubin who I have worked closely with for a number of years and who in my experience without reservation is among the most honest and contributing Members of our entire legal community and who does not deserve to be disbarred.

3. I say this not only as a knowledgeable friend in support of his character and his worth as a practicing attorney to this State, and certainly not because of that friendship alone, but instead because I sat through the many prehearing conferences and the seven days of his disciplinary hearings, witnessing firsthand the abuse he experienced and can verify the truth of his factual representations to this Court in these papers, including personally eye-witnessing the extraordinary manner in which he was constantly denied due process of law as he summarizes for the Court.

4. Mr. Dubin has been the champion of the rights of ordinary people in our community who are neither wealthy nor influential, as their advocate and without

regard to his own personal financial sacrifices, and most of his cases have been of a *pro bono* nature, including the many important decisions he has secured in our Court.

5.  Some talk about Access to Justice. Mr. Dubin in his area of practice has done more than talk about it; through his advocacy and the response of our appellate courts in his cases he has created Access to Justice for thousands of Hawaii homeowners without seeking any personal recognition or monetary or system rewards.

6.  A people's practice such as his, however, spawns many irritated and powerful adversaries and unseen vendettas, not an uncommon experience to many of us as well, even though he serves as advocate and not decision maker in so many of his more than 100 successful appeals.

7.  This is a practice and a people's advocate who this Court should be protected and applauded, not disbarred on such a flawed record.

8.  The entire attorney regulatory system in Hawaii needs to be reexamined that has fostered such undeserved personal abuse waged against such an undeniably contributing Member of the Hawaii Bar as Mr. Dubin.

I Declare Under Penalty Of Perjury Under The Laws Of The United States Of America That The Foregoing Is True And Correct. Executed At Honolulu, Hawaii On April 9, 2021.

*/s/ John D. Waihee III*
_____
JOHN D. WAIHEE III